**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, TEXAS GENERAL LAND OFFICE, TEXAS DEPARTMENT OF AGRICULTURE, AND RAILROAD COMMISSION OF TEXAS | § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § § | Civil Action No. <u>7:23-cv-47</u> |
| U.S. DEPARTMENT OF THE INTERIOR; U.S. FISH AND WILDLIFE SERVICE; DEBRA HAALAND, in her official capacity as SECRETARY OF THE INTERIOR; MARTHA WILLIAMS, in her official capacity as DIRECTOR OF THE U.S. FISH AND WILDLIFE SERVICE | § § § § § § § § § § | |
| *Defendants*. | § § | |

## COMPLAINT AND PETITION FOR REVIEW

Plaintiffs, the State of Texas, the Texas General Land Office, the Texas Department of Agriculture, and the Railroad Commission of Texas, (collectively, "Plaintiffs"), file this Complaint against United States Department of the Interior, Debra Haaland in her official capacity as Secretary of the Interior, United States Fish and Wildlife Service, and Martha Williams in her official capacity as Director of the United States Fish and Wildlife Service, for violations of the Administrative Procedure Act ("APA"), the Endangered Species Act ("ESA"), and the National Environmental Policy Act ("NEPA") in listing the Lesser Prairie-Chicken ("LPC" or "LEPC") as threatened and endangered. Plaintiffs allege as follows:

## INTRODUCTION

1.      This is an action challenging the legality of the final administrative rule entitled "Endangered and Threatened Species: Lesser Prairie-Chicken; Threatened Status with Section 4(d)

Rule for the Northern Distinct Population Segment and Endangered Status for the Southern Distinct Population Segment" (the "Final Rule" or the "Rule"), promulgated by the defendant U.S. Fish and Wildlife Service (the "Service"). The Final Rule was published in the Federal Register at 87 Fed. Reg. 72,674 on November 25, 2022. A true and correct copy of the Rule is attached hereto as Exhibit 1. Prior to adopting the Final Rule, the Service published a Proposed Rule. *See* 86 Fed. Reg. 29,432 (June 1, 2021). A true and correct copy of the Proposed Rule is attached hereto as Exhibit 2.

2.      Procedural and legal defects plague the Service's decision-making process. The Service failed to rely on the best available science and misapplied its distinct population segments ("DPS") policy when it designated two population segments of the lesser prairie-chicken. In analyzing the LPC's current usable habitat, the Service made inaccurate and arbitrary assumptions about current impacts, relying on those assumptions to make equally arbitrary predictions about future impacts. The Service relies on unreliable data to determine that the LPC's population is trending downward, but dismisses more reliable data that points to the stabilization of the LPC population.

3.      The Service omits crucial elements in its analysis of the comprehensive conservation efforts in place to protect the LPC. It refuses to apply its Policy for Evaluation of Conservation Efforts ("PECE") even to nascent programs, and it does not analyze other conservation efforts with the same rigor, or in some cases, at all. Throughout its analysis, the Service focuses unreasonably on habitat quantity rather than quality in drawing its conclusions. The compounding effect of these errors precipitates the Service's conclusion that the LPC meets the definition for threatened species in its northern population and endangered species in its southern population.

4.      Also troubling, the full extent of the practical impacts of the Rule are unclear because the Rule is vague in its discussion of what activities can and cannot occur within the LPC's range. Texas agencies and citizens are left to seek answers in the general descriptions of activities that *may* result in a take.

5.     For the northern population, the Service published an ESA 4(d) Rule as part of its Final Rule, which also suffers from vagueness, but contains a more serious defect. Specifically, the 4(d) Rule contains a new exception to the take prohibition that outsources the Service's authority to as-yet-identified third parties. The 4(d) Rule purports to give these parties power to write and implement grazing management plans without federal or state oversight. This exception exceeds the Service's statutory authority and does not comply with notice and comment requirements. Finally, the Service failed to conduct an environmental assessment in promulgating the 4(d) Rule.

6.     The State of Texas has worked in close partnership with other states, private property owners, and industry partners to implement voluntary conservation measures to manage, conserve, and recover the lesser prairie-chicken. These efforts are succeeding, allowing the LPC population to stabilize. The ability to manage wildlife resources at the state level is especially important in a state like Texas, where most land is privately owned. Texas's collaboration with private landowners to achieve conservation while enabling economic development is crucial to the success of lesser-prairie chicken conservation. The Rule threatens to derail these efforts. Because it violates the Administrative Procedure Act, the Endangered Species Act, and the National Environmental Policy Act, the Rule must be vacated.

## THE PARTIES

### A.  Plaintiffs

7.     Plaintiff the State of Texas, by and through its Attorney General, brings this suit to assert the rights of the State and on behalf of its citizens. *See* Tex. Const. art. IV, § 22; Tex. Gov't Code, Ch. 402; *see also* Tex. H.B. 1, Art. IX, § 16.01, 82nd Tex. Leg., R.S. (2011).

8.     Plaintiff the Texas General Land Office is a Constitutionally-created agency empowered to supervise and manage state-owned lands dedicated to the Permanent School Fund. Tex. Const. art. VII, § 1; Tex. Nat. Res. Code § 31.051. The Texas General Land Office manages

millions of acres of state-owned lands and mineral interests to generate revenue for the Permanent School Fund—a constitutionally-created fund that collects and distributes hundreds of millions of dollars annually for the support of public schools. Tex. Const. art. VII, § 2.

9. The Texas General Land Office's interest in managing the Permanent School Fund is harmed by the decision to list the lesser prairie-chicken under the ESA. The LPC range significantly overlaps with the land and mineral resources owned and managed by the General Land Office. The Final Rule will limit or outright prohibit the leasing of its land for energy production, which in turn reduces revenue for the support of public schools as earned by the Permanent School Fund. This injury is actual and concrete, caused by the Service's decision to list the LPC, and will continue unless the Court grants relief. The relief sought would redress the Texas General Land Office's injury.

10. Plaintiff the Texas Department of Agriculture is an agency of the State of Texas charged with the proper development and promotion of agriculture, horticulture, and other industries that grow, process, or produce products in Texas. Tex. Agric. Code § 12.002. The Texas Department of Agriculture also regulates the distribution, application, and use of pesticides and herbicides, which includes registering pesticides for sale in the state, the education and licensing of pesticide applicators, and handling complaints filed against pesticide applicators. In addition, the Texas Department of Agriculture is responsible for protecting the state's agriculture industry from invasive species and harmful pests.

11. The Texas Department of Agriculture's interest in developing and promoting agriculture and regulating pesticides is harmed by the decision to list the lesser prairie-chicken under the ESA. The LPC range significantly overlaps with farms and ranches in Texas. Restrictions within the LPC range will lead to a reduction of current cropland or conversion of cropland to idle acreage or rangeland, and inhibit or dampen farmers' plans to expand acreage used to cultivate crops or make infrastructure improvements to farming operations. Restrictions will also affect ranchers' ability to

grow or purchase crops to feed animals or use pasture land to feed animals within the LPC range. The restriction of pesticide use in LPC habitat may drive applicators to use pesticides registered by the Texas Department of Agriculture in an off-label manner or to use pesticide brands not regulated by the Texas Department of Agriculture, which puts a strain on the agency's regulatory responsibility to minimize the impacts of pesticide application, including on endangered species. In fulfilling its regulated duties related to pesticide usage within the State, the Texas Department of Agriculture will be required to enhance monitoring to ensure compliance. This injury is actual and concrete, caused by the Service's decision to list the LPC, and will continue unless the Court grants relief. The relief sought would redress the Texas Department of Agriculture's injury.

12.     Plaintiff the Railroad Commission of Texas is an agency of the State of Texas responsible for the control and disposition of waste and the abatement and prevention of pollution of surface and subsurface water resulting from activities associated with the exploration, development, and production of oil or gas or geothermal resources, and charged with administering the drilling and operation of oil and gas wells in Texas for the prevention of waste and protection of correlative rights. Tex. Nat. Res. Code §§ 81.051, 85.045–85.046, 86.011–86.012. The Railroad Commission of Texas protects the environment from discharges associated with oil, gas, geothermal, and surface mining activities. Tex. Water Code § 26.131. The Railroad Commission of Texas is also responsible for plugging abandoned oil and gas wells and cleaning up and remediating abandoned oil and gas sites for which the responsible party fails or refuses to take action or is unknown, deceased, or bankrupt, or where a leaking well is likely to cause a serious threat of pollution or injury to public health. *See* Tex. Nat. Res. Code §§ 81.068, 89.043.

13.     The Railroad Commission of Texas's interest in well-plugging and remediation activities is harmed by the decision to list the lesser prairie-chicken. The range of the lesser prairie-chicken overlaps with the oil and gas producing areas of Texas, and birds may be present in areas

where wells have been abandoned and little infrastructure exists on the surrounding landscapes that would cause avoidance. The Railroad Commission of Texas cannot proceed with well plugging activities without significant delay, increased expense, or outright prohibition as a result of the Final Rule. This injury is actual and concrete, caused by the Service's decision to list the LPC, and will continue unless the Court grants relief. The relief sought would redress the Railroad Commission of Texas's injury.

**B. Defendants**

14.    Defendant Department of the Interior is a federal agency within the meaning of the APA. *See* 5 U.S.C. § 551(1). The Department of the Interior is charged with administering the ESA, 16 U.S.C. §§ 1531 *et seq.*

15.    Defendant Debra Haaland is the Secretary of the Interior and is sued in her official capacity. Secretary Haaland, in her capacity as Secretary of the Interior, is ultimately responsible for the Service's actions under the ESA.

16.    The U.S. Fish and Wildlife Service is a federal agency within the meaning of the APA. *See* 5 U.S.C. § 551(1). The Service is an agency within the Department of the Interior. The Secretary of the Interior has delegated the implementation of the ESA, including listing decisions, to the Service.

17.    Defendant Martha Williams is the Director of the Service and is sued in her official capacity. Director Williams is responsible in her official capacity for actions of the Service under the ESA.

**JURISDICTION AND VENUE**

18.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701–706 (Administrative Procedure Act), and 16 U.S.C. § 1540(g) (Endangered Species Act). There is a present and actual controversy between the parties, and Plaintiffs are

challenging a final agency action pursuant to 5 U.S.C. §§ 551(13), and 704. This Court can grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

19.     Venue is proper in this Court under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1) because: (1) Plaintiff State of Texas and its agencies are residents of this judicial district; and (2) the lesser prairie-chicken and its current and historical range are occupied range are located in this district.

20.     On January 19, 2023, Plaintiffs notified the Service in writing by e-mail and certified mail of their intent to file this suit if the Service did not correct the deficiencies in the Final Rule. The Service did not address the issues identified in Plaintiffs' letter within 60 days.

## LEGAL FRAMEWORK

### The Administrative Procedure Act

21.     The APA governs the federal rulemaking process and sets the standards applicable when federal agencies propose and adopt final rules and regulations. 5 U.S.C. §§ 553, 551(4).

22.     The APA provides for judicial review of final agency actions by persons adversely affected by such actions. 5 U.S.C. § 702. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). A final agency action may be held unlawful and set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). A reviewing court shall also "hold unlawful and set aside agency action, findings and conclusions found to be … without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

23.     A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

24.     If an agency changes its position, it "must provide a reasoned explanation" for the change. *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). "Such an action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.*

## The Endangered Species Act

25.     The purpose of the ESA is "to provide means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species[.]" 16 U.S.C. § 1531(b).

### *Listing a Species or Distinct Population Segment*

26.     Before a species receives protection under the ESA, it must be listed as "threatened" or "endangered." A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

27.     The term "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

28.     The Service's authority to designate and list distinct population segments ("DPS") is governed by its DPS Policy. Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4,722 (Feb. 7, 1996). Congress has instructed the Service to exercise its authority with regard to DPS's "sparingly and only when the biological evidence indicates that such action is warranted." *Id.*

29.     Under the DPS Policy, the Service evaluates: (1) the discreteness of the population in relation to the remainder of the species to which it belongs, and the (2) significance of the population to the overall taxon. DPS Policy, 61 Fed. Reg. at 4,725. A population is discrete when it is markedly separated from other populations. *Id.* A population is significant when it is important to the overall taxon in such a way that loss of the population would be significant to the species as a whole. *Id.* The Service considers significance under four factors: (1) the persistence of the DPS in an unusual or unique ecological setting for the taxon, (2) the loss of the DPS would result in a significant gap in the range of the taxon, (3) the DPS represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or (4) the DPS differs markedly from other populations of the species in its genetic characteristics. *Id.* Once the Service determines that a population is discrete from and significant to the species as a whole, the Service evaluates the conservation status of the DPS under the standards for listing to determine whether the segment is threatened or endangered. *Id.*

30.     A species or DPS may be listed as endangered or threatened if any one, or a combination of the following factors are present:

> (1) The present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (2) Overutilization for commercial, recreational, scientific, or educational purposes;
>
> (3) Disease or predation;
>
> (4) The inadequacy of existing regulatory mechanisms; or
>
> (5) Other natural or manmade factors affecting its continuing existence.

16 U.S.C. § 1533(a)(1).

31.     A determination to list a species must be based on the "best scientific and commercial data available" and shall take into account any efforts being made by any state to protect the species. *Id.* § 1533(b)(1)(A).

32.     For each listing determination, the Service must publish in the Federal Register a summary of the data on which the listing determination is based and show the relationship of the data to the determination. *Id.* § 1533(b)(8).

**Evaluation of Conservation Efforts in Listing Decisions**

33.     The ESA requires the Secretary to consider any conservation efforts, such as protection of habitat and food supply, being made by States or political subdivisions to protect the species. *Id.* §1533(b)(1)(A). To ensure consistent and adequate consideration of such efforts, the Service has issued a formal Policy for Evaluation of Conservation Efforts When Making Listing Decisions ("PECE"). 68 Fed. Reg. 15,100-01 (Mar. 28, 2003). The PECE "identifies criteria [the Service] will use in determining whether formalized conservation efforts that have yet to be implemented or to show effectiveness contribute to making listing a species as threatened or endangered unnecessary." *Id.* at 15,100.

34.     The PECE identifies two key factors for evaluating whether certain conservation efforts improve the status of the species under the ESA: "(1) for those efforts yet to be implemented, the certainty that the conservation effort will be implemented; and (2) for those efforts that have not yet demonstrated effectiveness, the certainty that the conservation effort will be effective." *Id.* at 15,114.

35.     The PECE directs the Service to determine the "certainty that the conservation effort will be implemented" based on nine criteria. *Id.* at 15,114–15. Important here, the Service considers whether the conversation effort identifies the parties to the agreement or plan that will implement the effort, as well as the staffing, funding level, funding source, and other resources for implementation, with a high level of certainty that the parties will obtain the necessary funding. 68 Fed. Reg. at 15,114–15.

36.     The PECE indicates that a "high level of certainty of funding does not mean that funding must be in place now for implementation of the entire plan, but rather, it means that we must have convincing information that funding will be provided each year to implement relevant conservation efforts." *Id.* at 15,108. Specifically, "at least 1 year of funding should be assured, and we should have documentation that demonstrates a commitment to obtain future funding." *Id.*

37.     The PECE directs the Service to determine the "certainty that the conservation effort will be effective" using six criteria. *Id.* at 15,115. Important here, the Service must consider the nature and extent of the threats addressed by the conservation effort, and how the conservation effort reduces those threats. *Id.*

### Consequences of Listing a Species and 4(d) Rules

38.     "Endangered" species are protected by Section 9 of the ESA, which, among other things, makes it unlawful for any person to "take" such a species. *See* 16 U.S.C. § 1538(a)(1)(b).

39.     The term "take" means to "harass, harm, hunt, pursue, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm" is defined to include significant habitat modification or degradation if it results in the death or injury to a listed species by significantly impairing essential behavior patterns including breeding, feeding, or sheltering. 50 C.F.R. § 17.3.

40.     Depending on the needs of an individual species, the "take" prohibition can mean an outright prohibition or significant limitation on certain activities on land that contain habitat for the species. For example, farming, oil and natural gas drilling, renewable energy development, grazing livestock, or other activities may be prohibited if they modify existing habitat or "harass" the species in some way. "Harass" is defined as an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal

behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

41.     While wildlife listed as endangered are automatically afforded protections under Section 9 of the ESA, wildlife listed as threatened are not automatically afforded these same protections. *See* 50 C.F.R. § 17.31. Instead, if the Service decides to provide protections for a threatened species, it can do so by promulgating a "4(d) rule." Section 4(d) of the ESA allows the Service to promulgate regulations that are "necessary and advisable to provide for the conservation of threatened species." 16 U.S.C. § 1533(d).   These species-specific 4(d) rules allow for tailored protections that are "necessary and advisable" to protect a threatened species. A 4(d) rule is typically finalized with the listing of the species. *See* Endangered and Threatened Wildlife and Plants; Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44,753, 44,755 (Aug. 27, 2019) (to be codified at 50 C.F.R. pt. 17).

<u>**The National Environmental Policy Act**</u>

42.     The purpose of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, is to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). The purpose and function of NEPA are satisfied "if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process." *Id.* NEPA regulations are binding on all federal agencies. 40 C.F.R. § 1500.3(a).

43.     NEPA requires federal agencies to prepare and circulate for public comment a detailed environmental impact statement prior to undertaking any major federal action that may significantly affect the environment. 42 U.S.C. § 4332; 40 C.F.R. § 1500.1. Major federal actions include "new or revised agency rules, regulations, plans, policies, or procedures" and the "[a]doption of official policy,

such as rules, regulations, and interpretations adopted under the Administrative Procedure Act[.]" 40 C.F.R. § 1508.1(q)(2), (3)(i).

44.    When a federal agency is unsure whether an environmental impact statement is required,[1] the agency is directed to prepare an environmental assessment that "provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement." 40 C.F.R. § 1501.5(c)(1). If the agency concludes in the environmental assessment that the project may have significant environmental impacts on the environment, then the agency must prepare an environmental impact statement. 40 C.F.R. § 1501.5(c)(1). If the agency determines during the environmental assessment that the "proposed action will not have significant effects" the agency must prepare a "finding of no significant impact." 40 C.F.R. § 1501.6(a).

## BACKGROUND

### A.    The Lesser Prairie-Chicken

45.    The lesser prairie-chicken (*Tympanuchus pallidicinctus*) is a North American species of prairie grouse found in portions of Colorado, Kansas, New Mexico, Oklahoma, and Texas. Approximately fifteen percent of the total range-wide LPC habitat occurs in Texas. The LPC's preferred habitat is mixed-grass prairies and shrublands, with the dominant shrub species being sand sagebrush and shinnery oak. Final Rule, 87 Fed. Reg. at 72,677. The LPC tends to avoid using any areas with trees, vertical structures, and other sizeable disturbances. *Id.*

46.    Over the years, estimates have been made of the lesser prairie-chicken's historic and occupied range. The Service has estimated the historic range prior to European settlement to have encompassed approximately 115,000 acres.

---

[1] 40 C.F.R. § 1501.5(a) ("An agency shall prepare an environmental assessment … when the significance of the effects is unknown[.]")

47. The lesser prairie-chicken habitat and occupied range can be described as four ecoregions: the Short-Grass Prairie/Conservation Reserve Program ("CRP") Ecoregion, the Sand Sagebrush Prairie Ecoregion, the Mixed-Grass Prairie Ecoregion, and the Shinnery Oak Prairie Ecoregion.

48. The Short-Grass Prairie/CRP Ecoregion is located in central and western Kansas and is comprised of predominately short-grass prairie with some mixed-grass prairie and sand sagebrush along drainages. Final Rule, 87 Fed. Reg. at 72,679. Approximately 23,083 birds occupy the Short-Grass/CRP Ecoregion, which is roughly 72 percent of the total lesser-prairie chicken population. *Id.*

49. The Sand Sagebrush Prairie Ecoregion is located in southeast Colorado, southwest Kansas, and western Oklahoma, and is comprised of shrubs like the sand sagebrush and grass species that are found in sandier soils along rivers and streams. Final Rule, 87 Fed. Reg. at 72,679. Approximately 1,297 birds occupy the Sand Sagebrush Ecoregion, which is roughly less than 5% of the total lesser prairie-chicken population. *Id.*

50. The Mixed-Grass Prairie Ecoregion is located in northeastern panhandle of Texas, the panhandle of northwestern Oklahoma, and south-central Texas, and is comprised of a mix of perennial grasses and shrubs. Final Rule, 87 Fed. Reg. at 72,679. Approximately 5,024 birds occupy the Mixed-Grass Ecoregion, which is roughly 15% of the total lesser prairie-chicken population. *Id.*

51. The Shinnery Oak Prairie Ecoregion is located in eastern New Mexico and the southern plains of Texas, and is comprised of shrubs like the sand shinnery oak, tall grasses, and forbs or wildflowers. Final Rule, 87 Fed. Reg. at 72,678. Approximately 2,806 birds occupy the Shinnery Oak Ecoregion, which is roughly 9% of the total lesser prairie-chicken population. *Id.* Much of the

lesser prairie-chicken habitat in this ecoregion is found on private land in both Texas and New Mexico. *Id.*

52.     Adult lesser prairie-chickens typically live for two to three years and reproduce in the spring and summer months. Final Rule, 87 Fed. Reg. at 72,675. Males congregate in areas known as leks during the spring to attract and mate with females. *Id.* Males tend to demonstrate strong breeding site fidelity, even when facing declining habitat conditions and low female attendance. *Id.* Females tend to establish their nests relatively close to the leks and then remain in the area to raise their young throughout the summer months. *Id.* Eggs and young tend be susceptible to natural mortality from environmental stress and predation. *Id.* Thus, the appropriate vegetative environment is important to the survival of the species, as it provides the necessary cover for nests and young, as well as food resources for young lesser prairie-chickens as they mature into adults. *Id.*

**B.     The Ongoing Efforts to Conserve the Lesser-prairie Chicken**

53.     The State of Texas, through the Texas Parks and Wildlife Department ("TPWD"), has a long history of conservation efforts to preserve the LPC population within the state. See Declaration of John Silovsky Declaration, Exhibit 3. TPWD biologists first began tracking the LPC population in the 1950's. Over the decades, the TPWD has facilitated four strategies to enhance conservation of the LPC: (1) habitat restoration and management; (2) surveys; (3) coordination; and (4) research.

54.     Habitat conservation and management is a critical part of modern wildlife conservation programs. Because Texas is a private lands-dominated state, voluntary programs are key to effectively establishing and maintaining long-term conservation efforts within the state. One of the main voluntary conservation efforts to benefit the LPC in Texas is the Texas LEPC Agricultural Candidate Conservation Agreement with Assurances ("Texas CCAA"). The Texas CCAA, finalized

in 2006, is an umbrella agreement developed by TPWD, in conjunction with the Service and Texas landowners.

55. The conservation goals of the Texas CCAA are to encourage conservation and improvement of LPC habitat on non-federal lands by offering private landowners incentives to implement voluntary conservation measures through available funding mechanisms and by providing technical assistance and regulatory assurances concerning land use restrictions that might otherwise apply should the LPC become listed under the ESA. The conservation measures generally consist of prescribed grazing; prescribed burning; brush management; cropland and residue management; range seeding; and enrollment in various Farm Bill programs (such as the Conservation Reserve Program), and wildlife habitat treatments (through the Environmental Quality Incentives Program).

56. The Texas CCAA covers 50 counties, largely within the Texas Panhandle region, and encompasses all lands currently occupied by LPC in Texas. The Texas CCAA also covers lands that are unoccupied by the lesser prairie-chicken but have potential usable habitat if the population increases in Texas, as well as lands that could contain potential habitat if habitat is restored. As of January 2021, 91 properties totaling approximately 649,780 acres in 15 counties participate in Texas CCAA.

57. Texas Parks and Wildlife Department is also part of a multi-state effort to conserve the LPC across its range—the LEPC Interstate Working Group ("IWG"). In 2012 and 2013, the IWG and the Western Association of Fish and Wildlife Agencies ("WAFWA") finalized the Lesser-Prairie Chicken Range-wide Conservation Plan ("RWP"). The RWP identifies a two-pronged strategy for LEPC conservation: (1) the coordinated implementation of incentive-based landowner programs, and (2) the implementation of a mitigation framework that reduces threats and provides resources for conservation of the LEPC. The Service endorsed the RWP in October 2013 as a comprehensive voluntary conservation program that, when fully implemented, should provide a net conservation

benefit to the lesser prairie-chicken. *See* U.S. Fish and Wildlife Service, Species Status Assessment Report for the Lesser Prairie-Chicken (*Tympanuchus pallidicinctus*), May 31, 2021, Docket ID No. FWS-R2-ES-2021-0015-0003 ("SSA") at 49.

58.     In addition to the RWP, WAFWA also created the Range-Wide Oil and Gas Candidate Conservation Agreement with Assurances (Oil and Gas CCAA) to support the RWP. The Oil and Gas CCAA is a voluntary conservation strategy in partnership with New Mexico, Colorado, Kansas, Oklahoma, Texas, the oil and gas industry, private landowners and permitted by USFWS. The Oil and Gas CCAA provides a mitigation program for industry to voluntarily offset its impacts to the LEPC by providing funds to incentivize voluntary conservation of LEPC habitat on private lands. As WAFWA-member states, TPWD and the other four LEPC state wildlife agencies provide oversight of WAFWA's Oil and Gas CCAA. The Oil and Gas CCAA has a duration of 30 years from the date the Service signs it, which is 2014. The Oil and Gas CCAA has undergone recent adjustments to mitigation fees and updates to its business plan in 2021 and 2022, in consultation with the Service. Declaration of John Silovsky Declaration, Exhibit 3.

## C.    The Service's 2014 Attempt to List the Lesser-Prairie Chicken

59.     In 2014, the Service listed the lesser prairie-chicken as a threatened species. Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Lesser Prairie-Chicken, 79 Fed. Reg. 19,974 (Apr. 10, 2014) ("2014 Listing"). The Service declined to designate any DPS's of the lesser prairie-chicken, reasoning that "[t]he best scientific and commercial information available does not indicate that lesser prairie-chicken populations in Kansas are discrete from the populations in the neighboring States of Colorado or Oklahoma because there is no marked separation from other populations." 2014 Listing, 79 Fed. Reg. at 19,977.

60.     The Permian Basin Petroleum Association ("PBPA") filed suit on June 9, 2014, challenging the 2014 Listing. *Permian Basin Petroleum Ass'n v. Dep't of the Interior,* 127 F. Supp. 3d 700

(W.D. Tex. 2015). PBPA and the Service filed cross-motions for summary judgment. In its motion, PBPA argued that the Service failed to thoroughly apply its PECE Policy to the Range-wide Plan, which was newly developed at the time. *Id.* at 707. This Court reviewed the Service's analysis under each of the 15 criteria in the PECE Policy and found that its conclusions under most of the criteria were arbitrary and capricious. *See id.* at 713–22. In particular, the Court held it was arbitrary for the Service to assume that without listing the lesser prairie-chicken, industry would no longer be incentivized to enroll in the range-wide plan. *Id.* at 712–13. This unsupported assumption tainted the rest of the Service's analysis of the first prong of PECE Policy—whether a conservation effort will be implemented. *Id.* at 713. As to the effectiveness of the range-wide plan, the Court held it was arbitrary for the Service to assume that the plan would not address the threat of drought and climate change. *Id.* at 720. The Court held the Service failed to account for "the main function of the [Range Wide Plan]: creating additional habitat and access to that habitat (through connectivity zones) to ameliorate the effects of drought and habitat fragmentation." *Id.* Again, this unsupported conclusion tainted the Service's analysis under the second prong of the PECE Policy—the effectiveness of a conservation effort. The Court held that "these errors tainted critical findings and determinations, resulting in an unwarranted final rule listing the LPC as a threatened species" and vacated the final rule and listing determination. *Id.* at 722. The Court granted PBPA summary judgment and vacated the final rule. *Id.* at 723.

D. **The Service's Proposal to List the Species**

61. On September 8, 2016, the Service received a petition to list the lesser prairie-chicken as endangered throughout its range, or in three distinct population segments. Endangered and Threatened Wildlife and Plants; Lesser Prairie-Chicken; Threatened Status with Section 4(d) Rule for the Northern Distinct Population Segment and Endangered Status for the Southern Distinct Population Segment, 86 Fed. Reg. 29,432, 29,434 (June 1, 2021) ("Proposed Rule"). The Service

determined that the petition presented "substantial scientific or commercial information indicating that listing the lesser prairie-chicken may be warranted." Endangered and Threatened Wildlife and Plants; 90-Day Findings on Three Petitions, 81 Fed. Reg. 86,315, 86,317 (Nov. 30, 2016).

62. The petitioning organizations sued the Service on June 12, 2019, for failing to complete the 12-month finding for the lesser prairie-chicken. Proposed Rule, 86 Fed. Reg. at 29,434. The Service entered into a settlement agreement with the petitioning organizations, agreeing to submit a 12-month petition finding for the lesser prairie-chicken by May 26, 2021. *Id.*

63. On June 1, 2021, the Service issued a 12-month finding on the lesser prairie-chicken pursuant to the settlement agreement. *Id.* The 12-month finding accompanied a proposed rule to list the northern segment of the LPC as threatened and the southern segment of the LPC as endangered. Proposed Rule, 86 Fed. Reg. at 29,432.

64. The Service received 413 unique comments on the Proposed Rule,[2] including comments from General Land Office, Railroad Commission, and Texas Parks and Wildlife Department.[3] The State agency comment letters are included in Exhibit 4.

## FINAL RULE AND SECTION 4(D) REGULATION

65. The Rule divides the LPC population into two distinct population segments and lists each one under the ESA, pointing to the ongoing loss of large, connected blocks of grassland and shrubland habitat as the primary threat against both populations. Final Rule, 87 Fed. Reg. at 72,674.

---

[2] Final Rule, 87 Fed. Reg. 72,710.
[3] Letter from Texas General Land Office, to U.S. Fish and Wildlife Service, Sept. 1, 2021, Docket ID No. FWS-R2-ES-2021-0015-0400 [hereinafter "General Land Office Comment Letter"]; Letter from Railroad Commission of Texas, to U.S. Fish and Wildlife Service, Sept. 1, 2021, Docket ID No. FWS-R2-ES-2021-0015-0305 [hereinafter "Railroad Commission Comment Letter"]; Letter from Texas Parks and Wildlife Department, to U.S. Fish and Wildlife Service, Aug. 30, 2021, Docket ID No. FWS-R2-ES-2021-0015-0285 [hereinafter "Texas Parks and Wildlife Department Comment Letter"].

The Service's listing determination is impaired by unreasonable assumptions that form the basis for its flawed conclusions.

## A. The Unfounded Determination of Distinct Population Segments

66.     The Final Rule represents the first time in the Service's history that it has determined the lesser prairie-chicken has two distinct population segments. The Final Rule designates a Northern DPS, comprised of the Sand Sagebrush Ecoregion, the Mixed-Grass Ecoregion, and the Short-Grass-CRP Ecoregion. Final Rule, 87 Fed Reg. at 72,680. The Final Rule designates the Shinnery Oak Ecoregion as the Southern DPS. *Id.*

67.     The Final Rule fails to acknowledge that listing the LPC as two distinct population segments is a departure from past agency practice.[4] In the 2014 Listing, the Service declined to find any distinct population segments for the species, stating that such a determination was unsupported by the evidence. 2014 Listing, 79 Fed. Reg. at 19,974; 19,976-77; 19,986. The Service does not acknowledge its change in position, nor does it point to new evidence that justifies the change.

68.     The Final Rule also does not demonstrate that the LPC populations meet the two elements to establish a DPS under Service Policy: discreteness and significance. DPS Policy, 61 Fed. Reg. at 4,725. The Rule's analysis suffers from an error that pervades its discussion of both DPS elements: the Service analyzed the discreteness and significance of the two DPS in comparison to each other, not to the species as a whole. The plain language of DPS Policy requires the Service to evaluate: (1) the "[d]iscreteness of the population segment in relation to the remainder of the *species* to which it belongs," and the (2) significance of the population "to the *taxon* to which it belongs." DPS Policy, 61 Fed. Reg. at 4,725 (emphasis added). By separating the species into two halves and conducting its

---

[4] *See* Letter from American Petroleum Institute, American Exploration and Production Council, and Texas Oil & Gas Association, pp. 10-14, Sept. 1, 2021, Docket ID. No. FWS-R2-ES-2021-0015-0369 [hereinafter "API Comment Letter"].

analysis of each in reference to the other half, the Service guaranteed a DPS finding without properly analyzing the populations by ecoregions independently.

### 1. Discreteness

69.     The Final Rule concludes that *both* population segments "individually meet the condition for discreteness" because they are "markedly separate" by virtue of being physically separated by 95 miles. Final Rule, 87 Fed. Reg. at 72,680.   Physical separation is the crux of the Service's reasoning, underpinning the rest of its discreteness analysis. The Rule points to a lack of recorded movement between the two populations "over the past several decades," and reasons that "[b]ecause there is no connection between the two population segments, there is subsequently no gene flow between them." *Id.* But the Service pointedly ignores the scientific data indicating that the lack of gene flow does not demonstrate a lack of genetic diversity between the ecoregions.[5] But because the Service determined the Southern population is discrete, the Service concludes through circular reasoning that the Northern population is also discrete. Final Rule, 87 Fed. Reg. at 72,680. This Service's logic is unsound and unsupported by the evidence.

70.     The Final Rule also does not explain how the physical distance between the ecoregions alone makes the populations "markedly separated … as a consequence of physical, physiological, ecological, or behavioral factors." DPS Policy, 61 Fed. Reg. at 4,725. The conclusory statements in the Final Rule are just that—they do not provide support for the Service's discreteness finding.

### 2. Significance

71.     The Service's "significance" analysis is based on the same reasoning as its "discreteness" analysis and suffers from the same shortcomings. The Service determines that there is

---

[5] *See also* Letter from Ben Shepperd, President, Permian Basin Petroleum Association, to U.S. Fish and Wildlife Service, pp. 14-15, Sept. 1, 2021, Docket ID No. FWS-R2-ED-2021-0015-0390 [hereinafter "PBPA Comment Letter"]; Letter from Leland Gould, Chairman, New Mexico Oil and Gas Association, to U.S. Fish and Wildlife Service, pp. 13-14, Sept. 1, 2021, Docket ID. No. FWS-R2-ES-2021-0015-0368; API Comment Letter, at pp. 17-20.

(1) evidence that the discrete population segment differs markedly from other populations in its genetic differences, and (2) evidence that the loss of the population segment would result in a significant gap in the range of the taxon. Final Rule, 87 Fed. Reg. at 72,680–81. First, the Final Rule points to differences in four neutral genetic markers between the Southern population and the rest of the species. Final Rule, 87 Fed. Reg. at 72,680. But under the significance prong of the DPS analysis, the Service must demonstrate more than actual genetic differences. The Service does not demonstrate how these four neutral markers suggest *marked* differences in the genetic characteristics between the lesser prairie-chicken populations.[6] The evidence does not support the Service's conclusions about genetic differences.

72.     Second, by bifurcating the species and comparing the two segments to each other instead of the entire taxon, the Final Rule avoids having to demonstrate how the loss of either DPS would create a significant gap.[7] DPS Policy, 61 Fed. Reg. at 4,725. Again, the Service's reasoning on this point is circular and conclusory. The Service decides that because the Northern DPS and Southern DPS are separated by 95 miles, the loss of the Southern DPS "would result in the loss of the entire southern part of the species' range and decrease species redundancy and ecological and genetic representation[.]" Final Rule, 87 Fed. Reg. at 72,681. In turn, the "loss of the other three ecoregions would result in the loss of 75 percent of the species' range," which would "create a large gap in the northern portion of the species range[.]" *Id.* Therefore, the Service concludes the "loss of either part of the range would result in a significant gap in the range of the lesser prairie-chicken." Final Rule, 87 Fed. Reg. at 72,681.

73.     The Service never independently analyzes how the loss of the Southern population would create a substantial reduction in the species range or population. The Final Rule provides no

---

[6] *See also* PBPA Comment Letter, at p. 16.
[7] API Comment Letter, at pp. 20-23.

quantifiable measure of the percentage of range or population that would be lost if the Southern DPS was extirpated. Similarly, the Rule selectively highlights that the loss of the Northern DPS would result in the loss of 75% of the range to justify its conclusion. With the Service's logic, any species with two populations automatically meets the significance prong because the loss of either would create a "significant gap." The DPS Policy does not contemplate this liberal application. DPS Policy, 61 Fed. Reg. at 4,722.

## B.    The Service's Arbitrary Justification for Listing

74.    The Service made unreasonable assumptions about the LPC's current and future conditions in reaching its conclusion that the species should be listed. After determining both the southern and northern populations met the definition of a DPS, the Service applied the listing factors to each population segment separately to determine whether either DPS qualifies as threatened or endangered. Final Rule, 87 Fed. Reg. at 72,681.

75.    The Service's biological review of the current status of the LPC is contained in its Species Status Assessment Report. Final Rule, 87 Fed. Reg. at 72,683. The Service assessed the viability of the LPC using the conservation biology principles of *resiliency*, *redundancy*, and *representation*. *Id.*

76.    Under the Rule, the Service evaluates *representation* by considering the need for multiple LPC populations within each of four ecoregions to conserve genetic and ecological diversity. Final Rule, 87 Fed. Reg. at 72,684.

77.    The Service determines the primary indicators of *resiliency* to be habitat availability and population abundance, growth rates, and quasi-extinction risk. Final Rule, 87 Fed. Reg. at 72,684. The Rule explains that the LPC is a "boom-bust" species whose population fluctuates from year to year based on weather conditions. *Id.* Because of this, the Rule points to a relationship between the size and quality of the grassland patches needed to support the life cycle of the LPC. *Id.* ("Exactly how

large habitat patches should be to support healthy populations depends on the quality and intactness of the patches.").

78. *Redundancy* is described as the ability to withstand catastrophic events that are expected to lead to population collapse regardless of population health and for which adaptation is unlikely, such as extreme drought or disease outbreak. Final Rule, 87 Fed. Reg. at 72,684. It is measured "through the duplication and distribution of resilient populations that are connected across the range of the species." *Id.* at 72,684–85.

79. Applying these conservation biology principles, the Service assessed the current condition of the LPC through an analysis of its existing habitat, reviewing factors that have impacted the species in the past, and creating a geospatial analysis to estimate areas of land cover impacts on the current landscape condition. The Service also relied on past and current population estimates. Final Rule, 87 Fed. Reg. at 72,685 (citing Species Status Assessment Report, Docket ID No. FWS-R2-ES-2021-0015-0002). Finally, the Service "evaluated and summarized the benefits of the extensive conservation efforts that are ongoing throughout the lesser prairie-chicken range to conserve the species and its habitat." *Id.* at 72,685.

### 1. The Service's Unsupported Assumptions about Current Landscape Conditions

80. The Service's geospatial analysis involves estimating the extent of usable land coverage changes and fragmentation of the LPC's potential landscape. Final Rule, 87 Fed. Reg. at 72,685. The Service acknowledges that the geospatial analysis is based only on an approximation of available land cover (i.e., habitat *quantity*); it does not attempt to measure habitat *quality*. *Id; see also* SSA at vi. The Service acknowledges that a high-quality patch of grassland can support a higher-density population of lesser prairie-chickens. Final Rule, 87 Fed. Reg. at 72,685.

81. The Rule discusses and quantifies (in terms of acres) the threats that contribute to habitat degradation, loss, and fragmentation, including: (1) conversion of grassland to cropland;

(2) petroleum and natural gas production; (3) wind energy development and power lines; (4) woody vegetation encroachment; (5) roads and electrical distribution lines, and (6) other factors such as livestock grazing, shrub control and eradication, influence of anthropogenic noise, the absence of fire, and extreme weather events. Final Rule, 87 Fed. Reg. at 72,686–93.

82.     To quantify these threats, the Service uses data from various external sources[8] to estimate the amount of usable land cover impacted. Final Rule, 87 Fed. Reg. at 72,687. For example, the Service estimates that 23% of the LPC's range (4,963,000 acres) has been converted from grassland to cropland, which has "significantly impacted the amount of habitat available and how fragmented the remaining habitat is for the lesser prairie-chicken, leading to overall decreases in resiliency and redundancy throughout the range of the lesser prairie-chicken." *Id.* at 72,687. In making this impact estimate, the Rule briefly acknowledges the positive impacts of compatible agricultural practices but does not meaningfully incorporate them into its impact analysis. *Id.* at 72,686–87.

83.     In assessing impacts from oil and gas production, the Service describes both direct habitat loss (through removal of vegetation used by the LPC), and indirect habitat loss that occurs from avoidance of vertical structures, noise, and human presence. Final Rule, 87 Fed. Reg. at 72,687. To determine how many acres of usable habitat are impacted by oil and gas activity, the Service first utilized data from aggregating source IHS to approximate the number of wells within the LPC's range "that were likely still in operation and/or had infrastructure still on site." SSA, at B-25. The Service then applied an impact radius of 300 meters for indirect effects of these active wells, assuming that the LPC would avoid active well infrastructure, and therefore would not use habitat within this radius. *Id.*; SSA at B-7.

84.     The Service does not explain its rationale for the 300-meter impact radius for oil and gas activities, or justify the change in its position from the 200-meter impact radius it used in the 2014

---

[8] SSA at B-3.

Listing.[9] It also appears to assume, without explanation, that the LPC avoids all "active wells," even though older active wells may not have tall vertical structures or an otherwise obvious human presence on the landscape.[10]

85.     The Service makes similar assumptions about the impact radius of other threats. Final Rule, 87 Fed. Reg. at 72,687–88, 72,690; SSA at B-23. Each assumption the Service makes that informs its conclusions about these impact radii has an outsized effect on the listing decision because they drive the conclusion that "[t]he remaining four ecoregions contain a small fraction of the likely overall historical LEPC habitat on the order of the 10 to 20% of historical range." SSA at 105. The Service ties the decline of available habitat to the decline of redundancy of the LPC. SSA at 109.

### 2. The Service's Incorrect Assumptions About Future Landscape Conditions

86.     The Service relies on its characterization of the current condition of the landscape to estimate the future condition on the landscape, making unreasonable assumptions about how current threats will develop. SSA at 80, 98.

87.     The Service's assumptions about the future of oil and gas development are particularly haphazard.[11] The Service forecasts the likelihood of oil and gas development in the LPC's range based solely on IHS data about the existence of active wells. *Id.* at B-26. It reasons:

> Past oil and gas development is indicative of ongoing activities and future development likelihood. The use of occurrence of wells and a defined extent around them is reasonable method for estimating the location where much of the future oil and gas development activities will occur in the modeled area.

SSA at B-26.

88.     The Service draws this conclusion without reviewing any data about the production rates of the wells, technical aspects of determining oil and gas reserve potential in any specific geologic

---

[9] *See* PBPA Comment Letter, at p. 7.
[10] *See also* New Mexico Oil and Gas Association Comment Letter, at p. 16.
[11] *See* PBPA Comment Letter, at pp. 43-44.

setting, or impact of market economics on other issues that determine whether development in a particular county is likely. The Service's analysis does not take into account whether the active wells in any given location were drilled within the last year or are 30 years old. In the latter scenario, a 30-year-old vertical well may no longer be producing significantly, suggesting further development in the foreseeable future in the same location is unlikely. The Service's reliance on the presence of active wells to forecast oil and gas activity is arbitrary and unreasonable.

89.     The Service's assumptions about the current and future impacts of threats to the LPC lead it to conclude that future impacts outpace future habitat restoration in "all but the most optimistic future scenario." SSA at 105–06. Said another way, the Service's errors inform its conclusions about the LPC's decreased resiliency. Final Rule, 87 Fed. Reg. at 72,712.

### 3. The Service's Internally Inconsistent Analysis of Population Size

90.     The Service's estimates of historical LPC population size shape its analysis of the species' trajectory over time and bake uncertainty into its conclusions. Final Rule, 87 Fed. Reg. at 72,676. LPC abundance prior to the 1960s is indeterminable and based solely on anecdotal information. *Id.* The Service's estimates after 1960 rely on two main methodologies: (1) historical lek surveys; and (2) aerial surveys. *Id.* The Service acknowledges it has concerns with the accuracy of historical lek surveys to inform an understanding of LPC abundance from 1965 through 2016. *Id.* Despite the lack of confidence in these surveys, the Service estimates a mean population of greater than 100,000 males until 1989, after which the population steadily declined to a low of 25,000 males in 1997. *Id.* The Service estimates the population peaked again at 92,000 males in 2006 and then declined to 34,440 males in 2012. *Id.*

91.     Aerial survey methods began to provide more reliable estimates of LPC population sizes starting in 2012. Final Rule, 87 Fed. Reg. at 72,676. Aerial surveys are conducted by flying aerial line-transect surveys throughout the range of the LPC and then extrapolating the densities from the

surveyed area to the rest of the range. *Id.*; *see also* SSA at 64. But the results of aerial surveys are imprecise; the Rule acknowledges "conclusions regarding current population sizes or changes should not be drawn based upon annual fluctuations." *Id.* The lack of confidence in the survey results is compounded by the LPC's "boom-bust" nature (i.e., its "high degree of annual variation in rates of successful reproduction and recruitment."). *Id.* To adjust for this, the Service reports population estimates for current conditions as an average of the survey results from the years 2017 through 2022, excluding 2019 during which no surveys were conducted. *Id.* Using these methods, the Service estimates a current population size of 32,210 (with a large, i.e., uncertain, 90% confidence interval of 11,489 to 64,303 birds). *Id.*

92. The Service acknowledges in its SSA that several modeling tools estimate that the LPC population is growing based on current conditions. SSA at 101. But the Service suggests that these analyses are using growth rates based on "short-term data sets," which "can be problematic." *Id.* at 101 n.40. The Service calls out the years where aerial surveys were taken as an example of a short-term data set. *Id.* at 101 n.41 ("[I]f you use 2012 as the starting point for a trend analysis it may appear that populations are relatively stable to slightly increasing, but during the years of 2010-2013, the range of the LEPC experienced a severe drought and thus LEPC populations were at historic lows.") But the Service disregards that 2010-2013 also marks the beginning of the implementation of the RWP. It arbitrarily credits the rise in LPC population to drought recovery instead of a massive multi-state species conservation effort.

93. Thus, despite their unreliability, historical ground surveys form the basis for the Service's position on the LPC's future viability.[12] SSA at 102; Final Rule, 87 Fed. Reg. at 72,677–79. This leads the Service to conclude that "range-wide abundance of the LEPC has declined from estimates in the hundreds of thousands of birds (or even millions) to most recent 5-year average

---

[12] *See* PBPA Comment Letter, at pp. 33-39.

estimate of about 30,000 birds (90% confidence intervals around estimates over the last 5 years range from 9,000 to 60,000 birds)."[13] SSA at 105.

### 4. The Service's Superficial Assessment of Existing Conservation Measures

94.    With one exception,[14] the Rule points to its SSA for its detailed analysis of ongoing LPC conservation measures, Final Rule, 87 Fed. Reg. at 72,725, but fails to apply its PECE Policy or conduct a similarly comprehensive review of these measures. SSA at 49–62.

95.    For example, the SSA mentions a very recent conservation effort called the Southern Plains Grassland Program, which aims to improve grassland health and resilience, and seeks to make more than $10 million in grants over the next five years. SSA at 54. The Service acknowledges the program "will likely result in some future benefits to the lesser prairie-chicken" yet it did not make changes to future projections based on the program because "no data is available on what actions will be implemented and where those actions will occur[,]" so the Service was "not able to quantify the future benefits to the [LPC]."[15] Final Rule, 87 Fed. Reg. at 72,730.

96.    Despite the Court's holding in the 2014 Listing challenge, *Permian Basin Petroleum Ass'n*, 127 F. Supp. 3d 723, the Rule does not apply the PECE Policy to any of the ongoing conservation efforts, including the Southern Plains Grassland Program.[16] In response to comments on the Service's failure to apply the PECE Policy, the Service replied:

> PECE is inapplicable to this situation because the purpose of PECE... is to ensure consistent and adequate evaluation of recently formalized conservation efforts when making listing decisions. . .The conservation efforts cited are ongoing (not new) and have a track record of implementation and effectiveness. Because these have already been in place and have a track record regarding effectiveness, we did not conduct a

---

[13] *See* General Land Office Comment Letter, at p. 3; Texas Parks and Wildlife Department Comment Letter, at p. 2.
[14] The SSA does not discuss the conservation benefits of programs designed to protect other species within the lesser prairie-chicken's range—the Rule dismisses these with a cursory explanation. Final Rule, 87 Fed. Reg. at 72,730.
[15] *See* PBPA Comment Letter, at pp. 47–49, 61.
[16] *See* PBPA Comment Letter, at pp. 8-11, 47–49; API Comment Letter, at pp. 46–48.

PECE analysis. Rather, the current and projected future effects of these conservation measures are fully included in our SSA.

Final Rule, 87 Fed. Reg. at 72,725.

97.     Instead of applying its policy for determining the future benefits of conservation efforts, the Service completes a more cursory analysis to estimate the future success of existing efforts. It characterizes two types of conservation efforts: restoration efforts to convert otherwise non-usable area for the LPC to usable space, and enhancement efforts to maintain or enhance the *quality* of existing habitat. SSA at 94. But the Service does not attempt to quantify habitat enhancement efforts because "data are unavailable at the appropriate scale and resolution" to evaluate them. SSA at 94. Thus, much of the Service's analysis is focused on the *quantity* of acres that conservation efforts may add to the LPC's range. SSA at 94–97.

98.     These estimates of future restoration efforts are combined with the Service's estimates of future impacts from threats to create a model for potential future scenarios. The median results show a modest increase in acreage of usable habitat for the most optimistic scenario and decreases in usable acreage for less optimistic scenarios. SSA at 98–99. But because the model is based on flawed assumptions, it is not reliable.

99.     The Service's assessment of the future benefits of the mitigation program associated with the RWP and CCAA is colored by its consideration of a business practices audit.[17] The Service noted that a July 2019 audit of the RWP mitigation program "found a variety of deficiencies with the program," which the Rule describes vaguely as relating to "the financial management, accounting, compliance, and conservation delivery." Final Rule, 87 Fed. Reg. at 72,715. But the Service does not analyze the impacts of the audit on the RWP. In its response to comments, the Service simply

---

[17] *See* PBPA Comment Letter, at p. 56.

concludes that "due to the identified deficiencies, we are concerned that the implementation of the mitigation framework is not offsetting impacts to the species." Final Rule, 87 Fed. Reg. at 72,715.

100. Had the Service applied its PECE Policy to the RWP and CCAA, it would have considered the practical impacts of the audit as part of its analysis under the nine-criteria framework designed to determine whether conservation efforts will be implemented. PECE Policy, 68 Fed. Reg. at 15,115. Of particular note, under the PECE, the Service would have considered whether there is a "high level of certainty" that the RWP will obtain the necessary funding. PECE Policy, 68 Fed. Reg. at 15,114–15. If the Service had "convincing information that funding will be provided each year to implement the relevant conservation efforts," and that "at least 1 year of funding" was assured, it would have sufficient documentation to demonstrate a commitment to obtain future funding. *Id.* The Rule does not indicate that the Service conducted a similarly comprehensive analysis; its conclusion is unsupported.

101. The Service's errors determine its ultimate conclusions about the need to list each DPS. The Service concludes that the Southern DPS should be listed as endangered because current landscape conditions indicate only 27 percent of the region is usable habitat, and conservation restoration efforts focused on increasing habitat quantity "have not been enough to offset the impacts" to the LPC. Final Rule, 87 Fed. Reg. at 72,744. Thus, the Southern DPS is "likely to continue to experience declines in resiliency, redundancy, and genetic representation." *Id.* Based on these concerns, the Service determined that the Southern DPS met the definition of endangered species under three of the five factors for consideration: (1) present or threatened destruction, modification, or curtailment of its habitat or range, (2) disease or predation, and (3) other natural or manmade factors affecting its continued existence. *Id.* at 72,744–45.

102. The Service determined the Northern DPS was threatened by the same impacts to its habitat, and that future restoration efforts would be inadequate to offset those impacts. Final Rule,

87 Fed. Reg. at 72,745–46. But the Service determined that the Northern DPS maintained redundancy and genetic and environmental representation. *Id.* at 72,745.

103.    Thus, the Service concluded that the Northern DPS is not currently in danger of extinction but is likely to become in danger of extinction within the foreseeable future. The Rule therefore lists it as threatened. *Id.* at 72,746.

## C.    The Rule's Unclear Discussion of Activities that Could Result in a Take

104.    By listing the LPC as endangered, the Final Rule made it illegal to take a lesser prairie-chicken in the Southern DPS. Final Rule, 87 Fed. Reg. at 72,747. A "take" includes harassing, harming, pursing, hunting, shooting, wounding, killing, trapping, capturing, or collecting an endangered species, or attempting any of these activities. 16 U.S.C. § 1532(19).

105.    The Final Rule falls short of the Service's policy to "identify to the maximum extent practicable at the time the species is listed those activities that would or would not constitute a violation of section 9 of the Act." Final Rule, 87 Fed. Reg. at 72,748 (citing Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative Policy for Endangered Species Act Section 9 Prohibitions, 59 Fed. Reg. 34,272 (July 1, 1994)).  The Policy requires the Service to identify activities that would result in a take "in as specific a manner as possible." Section 9 Policy, 59 Fed. Reg. at 34,272.

106.    The Final Rule states that "[r]estoration actions will not constitute a violation of section 9 as those actions are implemented on lands that are not currently lesser prairie-chicken habitat." Final Rule, 87 Fed. Reg. at 72,748. Restoration activities include: converting cropland to grasses; removing nonnative or invasive trees and shrubs; and "remov[ing] … existing infrastructure, including oil and gas infrastructure … and other anthropogenic features impacting the landscape." *Id.* But the Final Rule does not designate critical habitat for the lesser prairie chicken, leaving it to the regulated community to assess whether any particular activity would or would not result in a take

based on whether the activity has an impact "on lands that are not currently lesser prairie-chicken habitat." *Id.*

107.    The Final Rule provides a list of ill-defined activities that "may potentially" result in destruction of lesser prairie-chicken habitat or cause habitat avoidance, but specifically notes that the prohibited activities are not limited to the identified examples. *Id.* Thus, the Final Rule is overly vague, making compliance impossible.[18] Section 9 Policy, 59 Fed. Reg. at 34,272.

### D.  The Vague Section 4(d) Rule for the Northern DPS

108.    In the Final Rule, the Service also issued a Section 4(d) Rule for the Northern DPS of the lesser prairie-chicken. Final Rule, 87 Fed. Reg. at 72,748. This rule generally prohibits the same activities that are prohibited for an endangered species. *Id.* However, it includes exceptions from the take prohibition for activities that the Service has determined incentivizes conservation actions that may have a minimal level of take of the lesser prairie chicken in the northern DPS, but on the whole are not expected to have a negative impact on the species conservation. *Id.* at 72,750. Because of its scope and wording, the 4(d) Rule is also unlawful.

109.    The Section 4(d) regulations for the Northern DPS impose sweeping restrictions to "slow the rate of habitat loss, fragmentation, and degradation and decrease synergistic, negative effects from other threats." Final Rule, 87 Fed. Reg. at 72,749. The Section 4(d) regulations extend the take prohibitions of Section 9 to the lesser prairie-chicken in the Northern DPS. This means the Section 4(d) Rule prohibits by reference a wide range of activities, including:

- Incompatible livestock grazing;
- The application of herbicides and insecticides;
- Seeding of nonnative plant species that would compete with native vegetation for water, nutrients, and space;
- Actions that would result in LPC avoidance of an area during one or more seasonal

---

[18] Se*e* PBPA Comment Letter, at pp. 69–72, Texas Parks and Wildlife Department Comment Letter, at p. 3.

periods;

- Construction of vertical structures such as power lines; communication towers; buildings;

- Installing of infrastructure to support energy development, roads, and other anthropogenic features;

- Motorized and nonmotorized recreational use;

- Activities such as well drilling, operation, and maintenance, which would entail significant human presence, noise, and infrastructure; and

- Actions, intentional or otherwise, that would result in the destruction of eggs or active nests or cause mortality or injury to chicks, juveniles, or adult lesser prairie chickens.

Final Rule, 87 Fed. Reg. at 72,749.

110. The Section 4(d) Rule creates exceptions to the take prohibition for three categories of activities: (1) continuation of routine agricultural practices on existing cultivated lands; (2) implementation of prescribed fire for the purposes of grassland management; and (3) implementation of prescribed grazing following a site-specific grazing management plan developed by a Service-approved party (hereinafter the "Grazing Exception"). Final Rule, 87 Fed. Reg. at 72,750–51.

111. Like the Final Rule's description of activities that result in a take in the Southern DPS, the Section 4(d) Rule suffers from the same vagueness.[19] The Final Rule notes that "[a] range of activities have the potential to affect the Northern DPS of the lesser prairie-chicken, including actions that would result in the unauthorized destruction or alteration of the species' habitat." Final Rule, 87 Fed. Reg. at 72,749. But the Service fails to identify with any degree of specificity the bounds of those activities, as required by the APA and the Service's own policy. Section 9 Policy, 59 Fed. Reg. at 34,272.

112. As an example, in the Section 4(d) Rule, the Service makes a take exception for prescribed fire in the Northern DPS but does not explain what qualifies as a prescribed fire under the Final Rule. The Final Rule also creates a take exception for grazing activities pursuant to a grazing

---

[19] *See* PBPA Comment Letter, at pp. 69–72; Texas Parks and Wildlife Department Comment Letter, at p. 3.

management plan developed by a Service-approved party but does not describe the approval or implementation process for the plans. The 4(d) Rule's vagueness makes it nearly impossible for the public to understand what activities may or may not result in a take.

## E. The Unlawful Section 4(d) Grazing Exception

113.    The Grazing Exception contemplates that Service-approved third parties will be authorized to create grazing management plans for individual landowners. Final Rule, 87 Fed. Reg. at 72,751. The plans are to be reviewed and adjusted by the third party every five years to account for current ecological conditions. *Id.* The grazing management plans must prescribe actions based on site-specific characteristics, including soils, precipitation, and past management of the land. *Id.* The grazing management plans must also include drought management measures. *Id.*

114.    If occurring under an approved grazing management plan, the following impacts would not constitute a take: (1) the physical impact of cattle to vegetative composition and structure; (2) trampling of lesser prairie-chicken nests; (3) the construction and maintenance of required infrastructure for grazing management, including but not to limited fences and water sources; and (4) other routine activities required to implement managed grazing, including but not limited to feeding, monitoring, and moving of livestock. Final Rule, 87 Fed. Reg. at 72,751.

115.    The practical effect of the Grazing Exception is to outsource the Service's permitting and enforcement authority to third parties over which neither the Service nor the States have any control. Aside from approving the third parties who will develop the grazing management plans, the Grazing Exception does not contemplate any Service involvement or oversight in developing or approving the plans themselves, reviewing them, adjusting them, or ensuring their implementation. Final Rule, 87 Fed. Reg. at 72,751. Neither are States provided any opportunity to oversee the development or implementation of the plans.

116.     The Service failed to give proper notice of the Section 4(d) Grazing Rule, as required by the APA. 5 U.S.C. § 553(b), (c). In the Proposed Rule, the Service included only two exceptions to the take provisions for routine agricultural practices and prescribed fires for grassland management. Proposed Rule, 86 Fed. Reg. at 29,476. The Service specifically represented that "determining how to manage grazing in a manner compatible with the Northern DPS of the lesser prairie chicken is highly site specific based on conditions at the local level; thus, broad determinations within this proposed 4(d) rule would not be beneficial to the species or local land managers." Proposed Rule, 86 Fed. Reg. at 29,475.

117.     Thus, the public was not able to comment on the parameters of the Grazing Exception or its third-party approval process. States especially should be heard on any provision that can potentially affect how the ESA is being implemented within their borders.

## F.  The Missing NEPA Requirements

118.     NEPA analysis is required for major federal actions that have a significant impact on the human environment, which include the promulgation of rules and regulations like Section 4(d) regulations. The Endangered Species Act grants the Service broad authority under Section 4(d) to develop any regulations "necessary and advisable for the conservation" of threatened species, which includes the authority to extend the take prohibition of section 9 to threatened species. 16 U.S.C. § 1533(d). Such protective regulations are likely to have significant environmental consequences that must be analyzed under NEPA.

119.     The Service declined to conduct a NEPA analysis, reasoning that "NEPA does not apply to listing decisions under section 4(a) of the Act, nor to 4(d) rules issued concurrent with the listing." Final Rule, 87 Fed. Reg. at 72,717.  By disregarding its obligation under NEPA to disclose the

environmental impacts of the Section 4(d) regulations, the Service deprived the public the opportunity to participate in the decision-making process.[20]

## CLAIMS FOR RELIEF

### Claim I: The Final Rule Violates the ESA

120.    Plaintiffs reallege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in fully herein.

121.    The Final Rule's decision to list the LPC as two distinct population segments is not supported by the best available scientific information, as required by the Endangered Species Act. 16 U.S.C. §1533(b)(1)(A). The Service ignored scientific data indicating that the Shinnery Oak Ecoregion is genetically similar to the other ecoregions. The Service also failed to demonstrate how four neutral genetic markers support its conclusion that the genetic characteristics of the population segments differ markedly from the species as a whole, and thereby make the populations significant.

122.    By failing to apply its PECE Policy (or a similarly robust analysis) to the existing conservation measures in place that protect the lesser prairie-chicken, the Service failed to comply with the ESA requirement to consider any conservation efforts being made by states or political subdivisions to protect the species. 16 U.S.C. § 1533(b)(1)(A).

### Claim II: The Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA

123.    Plaintiffs reallege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in fully herein.

***The Service's justification for listing the lesser prairie-chicken is arbitrary and unreasonable.***

124.    First, in the Final Rule, the Service arbitrarily departed from past agency practice by listing the lesser prairie-chicken as two distinct population segments. The Service failed to

---

[20] *See* Letter from James Carlson, Executive Director, Kansas Natural Resource Coalition, to U.S. Fish and Wildlife Service, pp. 4-6, Sept. 1, 2021, Docket ID No. FWS-R2-ES-2021-0015-0347.

acknowledge that listing the lesser prairie-chicken in two distinct population segments was a departure from past practice and failed to provide a reasoned explanation for such departure, in violation of the APA. 5 U.S.C. § 706(2)(A).

125. Second, contrary to the DPS Policy directives, the Service conducted its DPS analysis by comparing the Southern population to the Northern population, instead of analyzing each population independently and comparing it to the entire taxon. The Service failed to make a reasoned decision when it determined the southern and northern populations of the LPC were discrete and significant. 5 U.S.C. § 706(2)(a)(1). Thus, the Service ignores its own directives to use the DPS designation "sparingly" and only when justified. The Service has therefore offered an "explanation that runs counter to the evidence before it." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

126. Third, the Service makes arbitrary assumptions about current and future landscape conditions that inform its determination that the lesser-prairie chicken is threatened and endangered. For example, its explanation of current and future oil and gas impacts based on the presence of current active wells is so implausible that it cannot be ascribed to a difference in view or a product of agency expertise. *Motor Vehicle Mfrs. Ass'n*, 463 US. at 43. The Service also fails to provide a reasoned explanation for its use of 300 meters for the buffer around oil and gas activity. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

127. Fourth, the Service's selective use of population data that demonstrates a downward trend, while ignoring more accurate population data that indicates a stabilized or upward population trend, is internally inconsistent and counter to the evidence. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

128. Finally, the Service fails to apply its PECE Policy or conduct a similarly robust review of the existing conservation measures protecting the lesser prairie-chicken. This leads the Service to ignore the potential benefits of new programs and discount the benefits of programs geared towards

other species within the lesser prairie-chicken's range. It also results in an undisciplined consideration of a business audit that the PECE Policy would not have allowed. The Service's failure to observe its own policy in drawing its conclusions is arbitrary. 5 U.S.C. § 706(2)(D).

### The Grazing Exception Violates the APA.

129.    The Grazing Exception exceeds the authority granted under ESA by delegating to third parties the power to develop and implement grazing management plans that will except landowners from the take prohibitions of the ESA. Thus, the Grazing Exception outsources ESA enforcement authority in contravention of the clear language of the statute. 16 U.S.C. § 1540(e).

130.    The ESA provides the Service with broad authority to take action that it deems "necessary and advisable to provide for the conservation" of a species, 16 U.S.C. § 1533(d), but outsourcing the Service's authority to third parties does not ensure conservation. Under the plain language of the ESA, Congress vests the power to enforce the statute and any regulations or permits issued thereunder to the Secretary of the Department of Interior, the Secretary of the Treasury, and/or the Secretary of the Department in which the Coast Guard is operating. 16 U.S.C. § 1540(e). These Secretaries may use the personnel, services, and facilities of any other *federal or state agency* for the purposes of enforcing this chapter. *Id.* (emphasis added). The Act does not contemplate delegating this authority to private parties and the Service exceeds its authority by doing so.

131.    The Grazing Exception also was not noticed to the public—it was implemented without giving interested parties an opportunity to participate in the rulemaking process. Thus, it was promulgated without following required procedure and must be set aside. 5 U.S.C. § 706(2)(D).

### The Take Prohibitions of the Rule are vague, in violation of the APA.

132.    The Final Rule is arbitrary, an abuse of discretion, and not in accordance with the law because it is overly vague and does not adequately describe the activities that violate the Rule. The

Service does not specify the activities that may or may not result in a take, as required by the Service's own policy, resulting in an overly vague, arbitrary rule that violates the APA. 5 U.S.C. § 706(2)(A).

### Claim III: The Final Rule Violates the National Environmental Policy Act

133.    Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth fully herein.

134.    In the Final Rule promulgating Section 4(d) regulations for the Northern DPS of the lesser prairie-chicken, the Service declined to follow NEPA, preparing neither an Environmental Assessment nor an Environmental Impact Statement. Neither the ESA nor any other statute exempts section 4(d) regulations from complying with NEPA, and the Service's is thus in violation of NEPA.

135.    The Service's failure to comply with NEPA constitutes agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation 5 U.S.C § 706(2)(B).

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that the Court:

(1)    adjudge and declare that the rulemaking titled "Endangered and Threatened Species: Lesser Prairie-Chicken; Threatened Status with Section 4(d) Rule for the Northern Distinct Population Segment and Endangered Status for the Southern Distinct Population Segment" is unlawful because it violates the Endangered Species Act, the Administrative Procedure Act, and the National Environmental Policy Act;

(2)    adjudge and declare that the Final Rule is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and otherwise contrary to constitutional rights and powers;

(3)    vacate the Final Rule;

(4)    award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including

attorney's fees, associated with this litigation; and

(5)     grant Plaintiffs such additional and further relief as the Court may deem just, proper, and necessary.

Dated:   March 21, 2023                    Respectfully submitted,

                                           KEN PAXTON
                                           Attorney General of Texas

                                           BRENT WEBSTER
                                           First Assistant Attorney General

                                           GRANT DORFMAN
                                           Deputy First Assistant Attorney General

                                           SHAWN COWLES
                                           Deputy Attorney General for Civil Litigation

                                           PRISCILLA M. HUBENAK
                                           Chief, Environmental Protection Division

                                           */s/ Katie B. Hobson*
                                           KATIE B. HOBSON
                                           Assistant Attorney General
                                           State Bar No. 24082680
                                           Katie.Hobson@oag.texas.gov

                                           BRITTANY WRIGHT
                                           Assistant Attorney General
                                           State Bar No. 24130011
                                           Brittany.Wright@oag.texas.gov

                                           OFFICE OF THE ATTORNEY GENERAL
                                           Environmental Protection Division
                                           P. O. Box 12548, MC-066
                                           Austin, Texas 78711-2548
                                           Tel:    (512) 463-2012
                                           Fax:    (512) 320-0911

                                           ***COUNSEL FOR STATE OF TEXAS PLAINTIFFS***