# Exhibit 3
# Plaintiffs' Notice of Intent to Sue Letters



**KATIE B. HOBSON**  
Assistant Attorney General  
Environmental Protection Division

PHONE: (512) 475-4165  
FAX: (512) 457-4616  
EMAIL: Katie.Hobson@oag.texas.gov

January 19, 2023

The Honorable Deb Haaland  
Secretary  
U.S. DEPARTMENT OF THE INTERIOR  
1849 C Street, N.W.  
Washington, D.C. 20240  
*Via Email: exsec@ios.doi.gov; Deb_Haaland@ios.doi.gov*  
*and CMRRR: #7018 0680 0001 4136 6605*

The Honorable Martha Williams  
Director  
U.S. FISH AND WILDLIFE SERVICE  
1849 C Street, N.W.  
Washington, D.C. 20240  
*Via Email: fws_director@fws.gov; Martha_Williams@fws.gov*  
*and CMRRR #7018 0680 0001 4136 6612*

Re: State of Texas's 60-day Notice of Intent to File Suit

Dear Secretary Haaland and Director Williams:

On November 25, 2022, the U.S. Fish and Wildlife Service and the U.S. Department of the Interior (collectively, the "**Service**") listed the lesser prairie chicken ("**LPC**") as threatened in the northern part of its range and endangered in the southern part of its range. Endangered and Threatened Wildlife and Plants; Lesser Prairie-Chicken; Threatened Status With Section 4(d) Rule for the Northern District Population Segment and Endangered Status for the Southern Distinct Population Segment, 87 Fed. Reg. 72,674 (Nov. 25, 2022) (to be codified at 50 C.F.R. pt. 17) ("**LPC Rule**" or the "**Rule**"). The LPC Rule violates the Endangered Species Act ("**ESA**"), 16 U.S.C. §§ 1531, *et seq*.; the Administrative Procedure Act ("**APA**"), 5 U.S.C. §§ 551, *et seq*.; and the National Environmental Policy Act ("**NEPA**"), 42 U.S.C. §§ 4321, *et seq*. I write on behalf of the State of Texas and its agencies: the Texas General Land Office, the Texas Department of Agriculture, and the Texas Railroad Commission. Pursuant to the citizen suit provisions of the ESA, this letter serves to notify you that the State of Texas intends to file suit against the Service. 16 U.S.C. § 1540(g)(1)(C).

Texas has worked closely with other states, industry groups, private landowners, and conservation organizations to protect the LPC and conserve its habitat across its range. These partnerships have resulted in significant achievements, allowing the LPC's population numbers to stabilize. The ability to manage wildlife resources at the state level is especially important in a

state like Texas, where most land is privately owned. Texas's collaboration with private landowners to achieve conservation while safeguarding private property rights and enabling economic development is crucial to the success of LPC conservation. The LPC Rule threatens to derail these efforts. It also suffers from procedural and legal defects.

### I. BACKGROUND

#### A. Endangered Species Act

Under the ESA, the Service can list a species as "endangered" or "threatened" when it is "in danger of extinction" or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20). The Service must make its listing determinations "solely on the basis of the best scientific and commercial data available" and must take into account conservation efforts made by states. *Id.* at § 1533(b)(1)(A); *see also* implementing regulations at 50 C.F.R. § 424.11(g) (requiring the Service to take into account efforts being made by states to protect species "whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction"). The Service's evaluation of conservation efforts that have not yet been implemented or have not yet demonstrated effectiveness is guided by its *Policy for Evaluation of Conservation Efforts When Making Listing Decisions*, 68 Fed. Reg. 15,100 (Mar. 28, 2003) ("**PECE**").

Under certain circumstances, the Service may list a distinct population segment ("**DPS**") rather than a species as a whole. *Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act*, 61 Fed. Reg. 4,722 (Feb. 7, 1996) ("**DPS Policy**"). Congress has instructed the Service to "exercise this authority with regard to [listing] DPS's . . . sparingly and only when the biological evidence indicates that such action is warranted." *Id.* In order to list a population of a species as a DPS, the Service evaluates (1) the discreteness of the population segment in relation to the remainder of the species to which it belongs, and (2) the significance of the population segment to the taxon to which it belongs. 61 Fed. Reg. at 4,725. If the Service determines the population segment is a DPS, the Service evaluates the listing status for the DPS as if it were a species and determines whether the DPS is endangered or threatened. *Id.*

#### B. Administrative Procedure Act

The APA governs the federal rulemaking process and provides standards applicable when federal agencies propose and adopt final rules and regulations. 5 U.S.C. §§ 551(4), 553. Before adopting a final rule, an agency must publish notice of the proposed rulemaking in the Federal Register and provide the public with an opportunity to participate in the rulemaking process through the submission of written comments. 5 U.S.C. § 553(b)-(c). The published notice must contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(3).

The APA provides for judicial review of final agency actions by persons adversely affected by such actions. 5 U.S.C. § 702. A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action may also be set aside

if it is found to be "in excess of statutory jurisdiction, authority, or limitations" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(C)-(D).

**C.     National Environmental Policy Act**

NEPA requires federal agencies to prepare an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Major federal actions include an "[a]doption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act." 40 C.F.R. § 1508.1(q)(3)(i). The environmental impact statement must analyze, among other things, the environmental impacts of the proposed action; unavoidable environmental effects of the proposed action; alternatives to the proposed action; and any irreversible and irretrievable commitments of resources if the proposed action is implemented. 42 U.S.C. § 4332(C).

Critically, the agency must compare the environmental effects of its proposed action and the reasonable alternatives against a "no action" decision. 40 C.F.R. § 1502.14(c). If it is unclear whether an environmental impact statement is required, the agency is directed to prepare an environmental assessment that "provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement." 40 C.F.R. § 1501.5(c)(1). If after conducting the environmental assessment, the agency determines that the proposed action will not have a significant effect on the environment, the agency must issue a Finding of No Significant Impact. 40 C.F.R § 1501.6(a). A determination that there will be a significant effect requires the preparation of an environmental impact statement.

**II.     BASIS FOR THE STATE'S CHALLENGE**

**A.     The Service failed to adequately consider existing voluntary conservation measures.**

The Rule ignores the stabilizing effects of ongoing conservation efforts on the LPC population. The Service did not apply its PECE to the Southern Plains Grassland Program, a new conservation program that the Service acknowledges "will likely result in some future benefits to the lesser prairie-chicken." 87 Fed. Reg. at 72,730. Neither did the Service apply the PECE or conduct a comparably comprehensive analysis of the Range-Wide Plan and other conservation programs still underway, such as Texas's state-wide umbrella Candidate Conservation Agreement with Assurances. 87 Fed. Reg. at 72,725-26. The Rule also ignores the positive effects of compatible agricultural and livestock grazing practices in the Southern DPS. The Service declined to consider conservation efforts for other species with similar habitat needs. *Id.* The Service's analysis also does not adequately account for future improvements to habitat quality that voluntary conservation measures will help to create. 87 Fed. Reg. at 72,711. Finally, the Service draws unreasonable conclusions about the effectiveness of the Range-Wide Plan to mitigate impacts to the LPC. 87 Fed. Reg. at 72,715.

B.  **The Service's Distinct Population Segment analysis does not comply with the ESA, APA, or the DPS Policy.**

The Service violated the ESA and APA by listing the southern population of the lesser prairie-chicken as a distinct population segment. Its DPS decision represents an arbitrary reversal of its prior decision-making unsupported by the best available science and contrary to the Service's guidance.

The Service's authority to designate and list a DPS is meant to be used sparingly. As such, it is limited to instances where populations of a species are markedly separated from each other (*i.e.*, discrete) and important to the overall taxon in such a way that loss of the population would be significant to the species as a whole (*i.e.*, significant). DPS Policy, 61 Fed. Reg. at 4725. As recently as 2014, the Service in a since-vacated LPC rule declined to find any distinct population segments for the species, saying that such a determination was unsupported by the evidence. *See* Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Lesser Prairie-Chicken, 79 Fed. Reg. 19,974; 19,976-77; 19,986 (Apr. 10, 2014) (to be codified at 50 C.F.R. pt. 17). In the current LPC Rule, the Service changes course but does not justify its reversal. This change is arbitrary and unsupported by the best available scientific and commercial data.

The LPC Rule does not demonstrate that the populations are discrete. The Service explains that its "discreteness" determination is based on the physical separation between the Shinnery Oak Ecoregion and the other three ecoregions. *See* 87 Fed. Reg. at 72,680. Because of the physical distance, the Service concludes, there is no gene flow between the ecoregions. *Id.* By reaching this conclusion, the LPC Rule ignores the best available scientific data that establishes a similar level of genetic diversity across the ecoregions. *See* Sara J. Oyler-McCance, *Rangewide genetic analysis of Lesser Prairie-Chicken reveals population structure, range expansion, and possible introgression,* 17 Conservation Genetics 643-660, pg. 14 (2016). Similarly, the Service fails to explain how and why, based on the best available scientific data, the physical distance between ecoregions supports that they are "markedly" separate.

The Service also fails to thoroughly analyze the significance factor in its DPS determination and instead concludes that because the populations are discrete, they are significant. 87 Fed. Reg. at 72,681. This analysis is conclusory and circular at best and fails to meet the standards set in the DPS Policy. For example, in its significance analysis, the Service concludes that both the northern and southern DPS are significant because the loss of either would result in a significant gap in the range of the lesser prairie chicken. 87 Fed. Reg. at 72,680-81. This is a misapplication of the DPS Policy and an incorrect construction of the phrase, "significant gap," which is only one of four factors the Service evaluates in determining significance. 61 Fed. Reg. at 4,725. The significant gap analysis exists to ensure gene flow across the range of a species. But the Service concludes in its discreteness analysis that there is no connectivity or gene flow between the two populations of the LPC. The Service cannot claim the populations are discrete because there is no connectivity and gene flow, and then also claim the populations are significant because

the loss of either would "decrease . . . ecological and genetic representation." 87 Fed. Reg. at 72,681. The Service's analysis also does not explain how the slight genetic differences in genetic markers result in meaningful and observable differences in LPC population characteristics. Finally, the Service ignores evidence that was in its possession at the time of its decision, including genomic data.

C.  **The 4(d) portion of the LPC Rule exceeds congressional authority granted under the ESA.**

The 4(d) portion of the Rule pertaining to grazing management (the "**4(d) Grazing Rule**") exceeds the Service's statutory authority and must be set aside. 5 U.S.C. § 706(2)(C). Enforcement authority over the ESA rests with the Secretary of the Department of the Interior, the Secretary of the Treasury, and/or the Secretary of the Department in which the Coast Guard is operating, along with the personnel, services, and facilities of any other federal or state agency. 16 U.S.C. § 1540(e)(1). The 4(d) Grazing Rule effectively outsources this authority to as-yet-unidentified third parties. 87 Fed. Reg. at 72,751. Specifically, the 4(d) rule provides that a take of the LPC in the Northern DPS will not be prohibited provided the take is incidental to grazing management that is conducted by a land manager who is implementing a grazing management plan developed by a "qualified party that has been approved by the Service for the specific purposes of this 4(d) rule." *Id.* The rule does not contemplate or require any oversight of the plans' development or implementation by either states or the Service. In other words, the determination of compliance with the Northern DPS take prohibition is controlled entirely by a third party who, once approved, stands in the shoes of the Service. *Id.* The ESA does not give the Service the power to divest its responsibility in this way.

D.  **The 4(d) Grazing Rule violates APA notice requirements.**

The Service failed to give proper notice under the APA of the 4(d) Grazing Rule. The APA requires an agency to publish notice of a proposed rulemaking in the Federal Register and provide the public with an opportunity to submit written comments. 5 U.S.C. § 553(b)-(c). The published notice must contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(3).

While the Service published notice of a proposed 4(d) rule in the Federal Register, the notice failed to include the 4(d) Grazing Rule. *See* Endangered and Threatened Wildlife and Plants; Lesser Prairie-Chicken; Threatened Status With Section 4(d) Rule for the Northern Distinct Population Segment and Endangered Status for the Southern Distinct Population Segment, 86 Fed. Reg. 29,432, 29,476 (proposed June 1, 2021) (to be codified at 50 C.F.R. pt. 17). Instead, the notice specifically represented that the Service was not proposing any provisions of the 4(d) rule pertaining to grazing management. As explained in the notice, the Service found that "determining how to manage grazing in a manner compatible with the Northern DPS of the lesser prairie chicken is highly site specific based on conditions at the local level; thus, broad determinations within this proposed 4(d) rule would not be beneficial to the species or local land managers." 86 Fed. Reg. at 29,475.

Given the Service's clear representation that it did not find grazing management to be an appropriate subject for the 4(d) rule, the provision of the final rule providing for third-party approved grazing management plans was not a logical outgrowth of the proposed rule.[1] But even if the notice's grazing management discussion could be construed as logically leading to the inclusion of a grazing management provision, there was no indication in the proposed rule that any such provision would include a third-party approval process. Interested parties, especially those that may become Service-approved parties under the final rule, were not afforded adequate notice and opportunity to comment on this provision.

**E.     The LPC Rule suffers from vagueness.**

The LPC Rule is arbitrary, an abuse of discretion, and not in accordance with the law because it is overly vague and fails to provide the public with adequate guidance regarding the activities that may result in a violation of the Rule. For example, under the 4(d) portion of the Rule, it is unlawful, subject to a few limited exceptions, to engage in any activity that results in the "take" of the Northern DPS of the lesser prairie-chicken. 87 Fed. Reg. at 72,754. The Service notes that "[a] range of activities have the potential to affect the Northern DPS of the lesser prairie-chicken, including actions that would result in the unauthorized destruction or alteration of the species' habitat" but fails to identify with any degree of specificity the bounds of those activities. *Id.* at 72749. Instead, the Service provides only a short, non-exhaustive list of broadly described examples of activities that *may* be prohibited under the LPC Rule. *Id*.

The exceptions to the take prohibition are equally vague. For example, the 4(d) Grazing Rule provides an exception for prescribed grazing following a site-specific grazing management plan developed by a Service-approved party. 87 Fed. Reg. at 72751. However, the Rule provides little to no information regarding the approval and implementation process for plans developed under this provision, nor does it specify how the Service will oversee and enforce the third-party approved plans. *See* 87 Fed. Reg. at 72,750-52. Also, the Rule includes prescribed fire as an exception for the Northern DPS without explaining specifically what qualifies as a prescribed fire. 87 Fed. Reg. 72,751. Without adequate guidance, the public cannot reasonably ascertain which activities may result in a violation.

The LPC Rule also fails to describe the prohibited actions with the level of specificity required by the Service's own policy regarding identification of activities covered by the Section 9 take prohibition. *See* Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative Policy for Endangered Species Act Section 9 Prohibitions, 59 Fed. Reg. 34,272 (July 1, 1994). Under this policy, the Service must, at the time of listing, identify activities that will be

---

[1] Notice is sufficient if it is a "logical outgrowth" of the proposed rule, meaning the notice must "adequately frame the subjects for discussion" such that "the affected party 'should have anticipated' the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (quoting *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d. 1102, 1115 (D.C. Cir. 2019)).

considered likely to result in a violation of the take prohibition "in as specific a manner as possible." *Id.* The Service has not met this standard. The Rule includes a conclusory description of the prohibited activities as those that "would result in the unauthorized destruction or alteration of the [LPC's] habitat." 87 Fed. Reg. at 72,748-49. The Rule provides a limited list of vaguely defined activities that could fall within this scope, but specifically notes that the prohibited activities are not limited to the identified examples. 87 Fed. Reg. at 72,748-49. This overly vague and underinclusive description of the prohibited activities does not comport with the Service's policy to identify activities subject to the take prohibition "in as specific a manner as possible."

**F.       The 4(d) portion of the Rule violates NEPA.**

The Service failed to comply with the National Environmental Policy Act when promulgating the Section 4(d) provisions by failing to undertake an analysis of the environmental impacts of those provisions. NEPA requires all federal agencies to evaluate the environmental effects of major federal actions and provide the public with an opportunity to comment on the proposed action and its environmental effects.

The Service states it is exempt from preparing "environmental analyses . . . in connection with regulations adopted pursuant to section 4(a) of the Act," 87 Fed. Reg. at 72,752, and attempts to extend that exemption to regulations issued under Section 4(d) of the Act. 87 Fed. Reg. at 72,716-17. But the rules promulgated under Section 4(d) are wholly different from the decision to list the species under Section 4(a) and come with significant differences in implementation effects. Because Section 4(d) regulations are major federal actions that may impact the human environment, the Service should have conducted a NEPA analysis.

**G.       The LPC Rule arbitrarily forecasts future impacts to LPC habitat.**

The Service arbitrarily forecasts the effects of future impacts to LPC habitat, making assumptions about the future development of industries without sufficient data. Its evaluation of the future status of the LPC also relies on an arbitrary use of population data to forecast trends.

### III.     CONCLUSION

The State of Texas intends to file suit against the Service for the violations described above if the Service does not abate these violations within 60 days. Thank you for your attention to this matter.

Respectfully,

*/s/ Katie B. Hobson*
Katie B. Hobson
Assistant Attorney General
Katie.Hobson@oag.texas.gov

*/s/ Brittany Wright*
Brittany Wright
Assistant Attorney General
Brittany.Wright@oag.texas.gov

*/s/ Erin Snody*
Erin Snody
Assistant Attorney General
Erin.Snody@oag.texas.gov


OFFICE OF THE ATTORNEY GENERAL
Environmental Protection Division
P.O. Box 12548, MC–066
Austin, Texas 78711-2548
(512) 475-4165 | Fax (512) 320-0911



KRIS W. KOBACH  
ATTORNEY GENERAL

MEMORIAL HALL  
120 SW 10TH AVE., 2ND FLOOR  
TOPEKA, KS 66612-1597  
(785) 296-2215 • FAX (785) 296-6296  
WWW.AG.KS.GOV

January 30, 2023

The Honorable Deb Haaland  
Secretary  
U.S. Department of the Interior  
1849 C Street, NW  
Washington, D.C. 20240  
*By Email: exsec@ios.doi.gov, Deb_Haaland@ios.doi.gov*  
*and Certified U.S. Mail (return receipt requested)*

The Honorable Martha Williams  
Director  
U.S. Fish & Wildlife Service  
1849 C Street NW, Room 3331  
Washington, D.C. 20240  
*By email: fws_director@fws.gov, Martha_Williams@fws.gov*  
*Certified U.S. Mail (return receipt requested)*

> **RE: Notice of Intent to File Suit under the Endangered Species Act in Connection with the Status of the Lesser Prairie-Chicken**

Dear Secretary Haaland and Director Williams:

This letter serves as written notice of my intent to sue you on behalf of the State of Kansas for failing to follow Section 4 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1533, with regard to the Final Rule the U.S. Fish and Wildlife Service ("Service") issued on November 25, 2022.[1] Among other things, the Final Rule divides the Lesser Prairie-Chicken ("LPC") into a "Northern Distinct Population Segment" ("NDPS") and a "Southern Distinct Population Segment" ("SDPS"),[2] determines threatened status for the NDPS[3] and endangered status for the SDPS,[4] adds

---

[1] *See* Endangered and Threatened Wildlife and Plants; Lesser Prairie-Chicken; Threatened Status With Section 4(d) Rule for the Northern Distinct Population Segment and Endangered Status for the Southern Distinct Population Segment, 87 Fed. Reg. 72,674 to 72,755 (Nov. 25, 2022), *available at* https://www.govinfo.gov/content/pkg/FR-2022-11-25/pdf/2022-25214.pdf [hereinafter "Final Rule"].

[2] *See id.* at 72674, 72,679-82, 72,738.

[3] *See id.* at 72,674.

[4] *See id.*

both so-called "segments" "to the List of Endangered and Threatened Wildlife,"[5] and provides under the authority of Section 4 for "measures that are necessary and advisable to provide for the conservation of the [NDPS]."[6] The Final Rule is effective March 27, 2023.[7]

Through the Kansas Department of Wildlife and Parks ("KDWP"), the State has worked with federal agencies (including the Service), regional organizations, the wildlife agencies of other states, nonprofit organizations, educational institutions, industry, and private landowners to conserve the LPC and its habitat.[8] These joint efforts have resulted in or can be associated with the stabilization of the LPC's population and the expansion of its range in Kansas.[9]

Also, as "[t]he vast majority of land within the known LPC range in Kansas is privately owned,"[10] managing the LPC's population and range at the state level through the KDWP personnel who have relationships with private landowners is essential. The Final Rule imperils the relationships the KDWP has established with private landowners as well as the voluntary actions those landowners have taken in connection with the effective and first-of-its-kind LPC Range-Wide Conservation Plan ("RWP")—which the KDWP played a major role in developing and implementing.[11]

Although they care about the LPC,[12] Kansans also care about private-property rights[13] and rely on industries like farming, ranching, wind, and mineral extraction for jobs, food, energy, and economic prosperity.[14] In addition to imperiling each of the foregoing, the Final Rule violates

---

[5] *See id.*

[6] *See id.*

[7] *See* Press Release, U.S. Fish & Wildlife Service, Service Extends Effective Date for Lesser Prairie-Chicken Listing ¶ 1 (Jan. 23, 2023), *available at* https://www.fws.gov/press-release/2023-01/service-extends-effective-date-lesser-prairie-chicken-listing. The Final Rule was originally to be effective January 24, 2023. *See* Final Rule, *supra* note 1, at 72,674.

[8] *See* KAN. DEP'T OF WILDLIFE & PARKS, RE: FEDERAL DOCKET #: FWS-R2-ES-2021-0015 FEDERAL REGISTER NOTICE FOR ENDANGERED AND THREATENED WILDLIFE AND PLANTS; LESSER PRAIRIE-CHICKEN; THREATENED STATUS WITH SECTION 4(D) RULE FOR THE NORTHERN DISTINCT POPULATION SEGMENT AND ENDANGERED STATUS FOR THE SOUTHERN DISTINCT POPULATION SEGMENT 2, 5, 8-9 (Sept. 1, 2021), *available at* https://www.regulations.gov/comment/FWS-R2-ES-2021-0015-0397 [hereinafter "KDWP Comment"].

[9] *See id.* at 1, 3.

[10] *See* OFFICE OF THE KAN. ATT'Y GEN., RE: FWS-R2-ES-2021-0015-0285 – PROPOSED LISTING OF THE NORTHERN DISTINCT POPULATION SEGMENT OF THE LESSER PRAIRIE-CHICKEN AS A THREATENED SPECIES UNDER SECTION 4(D) OF THE ENDANGERED SPECIES ACT OF 1973, AS AMENDED 2 (Sept. 1, 2021), *available at* https://www.regulations.gov/comment/FWS-R2-ES-2021-0015-0373.

[11] *See* KDWP Comment, *supra* note 8, at 2, 8-9.

[12] *See, e.g.*, U.S. DEP'T OF AGRIC., NATURAL RES. CONSERVATION SERV., LESSER PRAIRIE-CHICKEN: 2021 PROGRESS REPORT 2 (2021), *available at* https://www.nrcs.usda.gov/sites/default/files/2022-10/Lesser%20Prairie%20Chicken_Scorecard_2022.pdf (featuring photograph of Kansas landowner participating in Lesser Prairie-Chicken Initiative).

[13] *See, e.g.*, K.S.A. § 77-702 (declaring it to be Kansas public policy "that state agencies . . . anticipate, be sensitive to and account for the obligations imposed by . . . [the U.S. and Kansas] constitution[s]" and declaring further that "the express purpose of th[e Private Property Protection Act is] to reduce the risk of undue or inadvertent burdens on private property rights resulting from certain lawful governmental actions").

[14] *See* AGRICULTURE, https://www.kansascommerce.gov/industry/agriculture/ (last visited Jan. 17, 2023); ENERGY & NATURAL RESOURCES, https://www.kansascommerce.gov/industry/energy-natural-resources/ (last visited Jan. 17, 2023).

Section 4 of the ESA as well as the ESA's implementing regulations.[15]

## ARGUMENT

In a letter to you dated January 19, 2023, the State of Texas outlined several ways in which the Final Rule violates the ESA as well as Texas's grounds for suit. In a letter to you dated the same date (drafted by Kelly Hart & Hallman LLP), the Permian Basin Petroleum Association and five other organizations outlined other ways in which the Final Rule violates the ESA as well as those organizations' grounds for suit. Kansas hereby joins each of those letters. Kansas also asserts the following additional problems with the Final Rule:

**Failure to Adequately Consider Pre-Existing and Ongoing Voluntary Measures**

The Service did not adequately take into account Kansas's pre-existing and ongoing conservation and mitigation measures. Among other things, the KDWP commented in response to the proposed version of the Final Rule that it has monitored and conserved the LPC since the 1960s[16] and that, in connection with the RWP, Kansas's LPC population has stabilized and its range has expanded.[17] However, the Final Rule either mischaracterized the RWP's effectiveness or in several instances did not dispute the proposition that the RWP caused or can be linked to the stabilization of Kansas's LPC population.[18]

Furthermore, the Final Rule's conclusions about the future effectiveness of the RWP are doubtful speculation at best and contrary to actual, demonstrated experience from the RWP's implementation. Thus, those conclusions are not based on "the best scientific and commercial data available."[19] Listing the LPC therefore violates the ESA, which requires the Service to "determine whether any species is an endangered species or a threatened species" only "*after*," among other things, "taking into account those efforts . . . being made by any [s]tate . . . to protect such species."[20] It also violates the ESA's implementing regulations, which require the Service to "take into account, in [determining that a species is endangered or threatened], those efforts . . . being made by any [s]tate . . . to protect such species[.]"[21]

Relatedly, the Service discounted the connection between the RWP and the LPC's recent bounce-back and stabilization because of the Service's focus on supposed "long-term" data over more recent aerial surveys.[22] However, the Service admits in the Final Rule that historical data is (or can be) conjectural and poorly documented[23] and that aerial surveys provide the most statistically

---

[15] Kansas does not intend to waive any claim(s) it may have under the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*, or other law, which may be asserted without the prior notice required by Section 11 of the ESA. *See, e.g.*, *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601-04 (9th Cir. 2014).

[16] See KDWP Comment, *supra* note 8, at 1, 3.
[17] *See id.*
[18] *See* Final Rule, *supra* note 1, at 72,695-697, 72,715, 72,729-730.
[19] *See* 16 U.S.C. § 1533(b)(1)(A) and (b)(2).
[20] *See id.* at § 1533(a)(1) and (b)(1)(A) (emphasis added).
[21] *See* 50 C.F.R. § 424.11(c) and (g).
[22] *See* Final Rule, *supra* note 1, at 72,713-14.
[23] *See id.* at 72,676, 72,686-87, 72,689, 72,711, 72,713.

3

reliable evidence available.[24] Thus, the Service's decision to rely on supposed "long-term" data is not based on the best scientific data available and, indeed, is a rejection of the same.

**Restricting Human Activity Despite Causation by Natural Factors**

The protective measures the Final Rule imposes, e.g., the new exception from the Section 9 take prohibition for take incidental to grazing management when land managers follow a site-specific grazing plan developed by a Service-approved third party,[25] cannot reasonably be understood as necessary and advisable to provide for the conservation of the LPC. As the Service admits in the Final Rule, LPC populations are substantially driven by precipitation patterns.[26] Indeed, the dramatic rise in LPC populations following the end of the 2009-2012 drought and the return of sufficient rainfall[27] suggests strongly that the same will occur when the current drought ends. Yet the protective measures the Final Rule imposes apply entirely to human activity that is unconnected to and does not directly affect precipitation patterns.

## CONCLUSION

Kansans care about the LPC and have successfully managed and conserved its so-called "NDPS". At the same time, Kansans care about private property rights as well as feeding their families, having jobs, having access to a range of energy sources, and advancing and maintaining the economic prosperity of Kansas. Farming, ranching, wind energy, and fossil fuels are inextricably linked to those things. In addition to imperiling the foregoing, the Final Rule is unlawful for the reasons explained above.

If the Service does not withdraw the Final Rule, Kansas intends to file suit in federal court seeking declaratory relief, injunctive relief, and litigation costs, as appropriate under the ESA. Kansas may also bring additional claims under the U.S. Constitution, the Administrative Procedure Act, or other law.

I look forward to receiving a response from and working with the Service so that it will not be necessary to take further legal action in connection with this matter.

Sincerely,

*Kris W. Kobach*

Kris Kobach
Kansas Attorney General

---

[24] *See id.* at 72,714.
[25] *See id.* at 72,675.
[26] *See id.* at 72,693-94, 72,706-07, 72,713-14, 72,722.
[27] *See id.* at 72,713.



## Gentner Drummond
### Attorney General

February 1, 2023

The Honorable Deb Haaland
Secretary
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240
*Via Email: exsec@ios.doi.gov; Deb_Holland@ios.doi.gov*
*and Certified U.S. Mail (return receipt requested)*

The Honorable Martha Williams
Director
U.S. Fish and Wildlife Service
1849 C Street NW, Room 3331
Washington, D.C. 20240
*Via Email: fws_director@fws.gov; Martha_Williams@fws.gov*
*and Certified U.S. Mail (return receipt requested)*

**RE:    Notice of Intent to File Suit under the Endangered Species Act**

Dear Secretary Haaland and Director Williams:

Pursuant to 16 U.S.C. § 1540(g) of the Endangered Species Act (ESA), this letter serves as notice that the State of Oklahoma intends to file suit against you concerning the listing of the lesser prairie-chicken under the ESA.

On November 25, 2022, the U.S. Department of the Interior and the U.S. Fish and Wildlife Service published a final rule listing two Distinct Population Segments (DPSs) under the ESA for the lesser prairie-chicken. 87 Fed. Reg. 72,674 (Nov. 25, 2022) (Final Rule). The two DPSs are designated as a Northern DPS and a Southern DPS. The Final Rule assigns a threatened status for the Northern DPS and an endangered status for the Southern DPS. Further, the Final Rule adds the DPSs to the List of Endangered and Threatened Wildlife under the ESA, and it finalizes a rule under section 4(d) of the ESA to provide measures for the conservation of the Northern DPS.

The State of Texas, in a letter dated January 19, 2023, and the State of Kansas, in a letter dated January 30, 2023, notified you of intent to file suit under the ESA for violations of the Final Rule as well as other grounds for filing suit. The State of Oklahoma hereby joins in each of those letters. Oklahoma also makes the following additional assertions:



Through the Oklahoma Department of Wildlife Conservation (ODWC), the State of Oklahoma has worked closely with federal agencies, states, industry groups, private landowners, conservation organizations, and other stakeholders to protect the lesser prairie-chicken and its habitat. As the State's wildlife agency, the OWDC has the expertise and relationships necessary to conserve the lesser prairie-chicken. Among other things, the Final Rule fails to adequately consider the existing conservation programs that the State of Oklahoma has implemented in cooperation with other stakeholders. Further, the Final Rule violates the ESA by making listing determinations that fail to take into account the best scientific and commercial data available as required under 16 U.S.C. § 1533(b)(1)(A) and (b)(2).

The unlawful actions of the U.S. Department of the Interior and the U.S. Fish and Wildlife Service have caused serious, immediate, and ongoing harms to the State of Oklahoma. Unless the violations described above are corrected, the State of Oklahoma will commence legal action.

Please direct communications regarding this notice to me at the contact information provided below.

Respectfully,

Gentner Drummond
Oklahoma Attorney General