# Exhibit 5
# Plaintiffs' Comment Letters on the Proposed Rule


# RAILROAD COMMISSION OF TEXAS
## OFFICE OF GENERAL COUNSEL

August 2, 2021

Public Comments Processing
Attn: FWS–R2–ES–2021–0015, U.S. Fish and
Wildlife Service, MS: PRB/3W, 5275
Leesburg Pike, Falls Church, VA 22041–3803.

To Whom It May Concern:

The Railroad Commission of Texas (RRC) submits its comments on the US Fish and Wildlife Service (FWS) Proposal to List the Lesser Prairie Chicken (LPC) Under the Endangered Species Act, Docket No. FWS-R2-ES-2021-0015; 86 Fed Reg 29432 (June 1, 2021).

The RRC opposes listing of the LPC and opposes the designation of distinct population segments (DPS). Alternatively, if listing proceeds, RRC urges FWS to list the LPC as threatened, with a 4(d) rule that allows Candidate Conservation Agreements with Assurances, and not delay critical habitat designation so that FWS is required to evaluate the economic impact of its actions.

Texas is the nation's largest producer of oil and natural gas. According to 2020 numbers from the U.S. Energy Information Administration, Texas accounted for 43% of crude oil production and 26% of marketed natural gas production in the United States. According to current numbers from the Dallas Federal Reserve Bank, approximately 30% of U. S. refinery capacity and 75% of U.S. petrochemical production is in Texas.

According to the Texas Oil and Gas Association January 2021 Energy and Economic Impact Report, direct and indirect oil and natural gas employment generated 1.37 million jobs in Texas. Over the years, the oil and gas and energy industry have contributed between 30 and 40 percent of the overall economy in Texas. Nationally, the U.S. Department of Energy estimated that: (1) at the start of 2020, the oil and gas industry was responsible for 12.3 million American jobs; (2) between 2012 and 2025, the industry is projected to provide $1.6 trillion in federal and state tax revenue, supporting the maintenance of schools, hospitals, and public infrastructure across the country; and (3) the U.S. trade deficit in 2019 was $305 billion lower than it would have been without domestic oil and natural gas production.

The RRC has effectively regulated the oil and natural gas industry in the State of Texas since 1919. The RRC's primary statutory responsibilities in the regulation of Texas oil, gas and geothermal resources, as well as lignite mining, are to conserve the State's natural resources; prevent the waste of natural resources; protect the correlative rights of mineral interest owners; protect the environment from pollution associated with oil, gas, geothermal, and surface mining activities; and ensure safety.

RRC notes the following particular areas of concern with respect to the current listing proposal:

- the manner by which the listing has come to be;

- the inherently speculative nature of the studies that inform listing decisions contrasted with the real-world needs served by activities affected by the listing;

- the pivot away from/lack of weight given to stakeholder agreements and efforts at LPC protection that the very act of listing represents, especially in the face of well-organized people who have demonstrated a commitment to devoting time, talent and treasure to protection; and, from RRC perspective,

- the failure to utilize the wide variety of stakeholders willing to help a situation uniquely suited to be helped by a broad-based group: habitat fragmentation where nearly all of the habitat is on private property.

RRC does not agree with how the current (and the previous listing of December 11, 2012) came to be, that is, through litigation and a settlement agreement. In these "cases" FWS is required to file a proposed listing within a deadline prescribed by the settlement agreement and enforceable by the court. To the RRC this seems like a skirting of the normal process established by the laws and rules of FWS and compromises the integrity of the Endangered Species Act (ESA) regulatory framework. This is particularly troubling because the ESA, more than many other programs, demands cooperation from stakeholders with an incredibly wide range of primary interests. The sue and settle approach alienates people and should be avoided.

RRC is disturbed because the nature of the studies and information relied upon seem to be inherently speculative. The proposal preamble notes many times how information in studies that contribute to an ultimate listing decision is "extrapolated," how survey methodology has differed over the decades, that predictions are relied upon, and upon review it seems predictions are made based on results from relatively small samples. Discussion of the predicted impact of climate change is illustrative, with repeated uses of what "may" happen, and what is "projected," and "predicted" for up to fifty years or more out. *See* 86 FR 29465. And as a further example of a moving target, it is noted that populations of the LPC have fluctuated greatly over an extended period of time. See 86 FR 29437. Opposite this variability and uncertainty stands the lawful, concrete and necessary activities of energy exploration, production, transportation and generation. Activities that directly serve people; activities that improve lives.

It is a challenge for the RRC to understand how current, beneficial human activity could be put at risk in favor of protecting against what might happen in the future. The potential impacts of the proposed listing are significant for the people of our state because the range of the LPC coincides with the dominant oil producing region in Texas, the Permian Basin. The importance of these matters is underscored by the significant effort stakeholders in several sectors of the Texas economy, but particularly the oil and gas industry, have put into conservation efforts associated with Western Association of Fish and Wildlife Agencies. The correct final action here is not to list the LPC.

If FWS decides to list, which RRC does not concede is legally justified or smart, RRC encourages FWS to list as threatened with a 4(d) rule that provides for Candidate Conservation Agreements with Assurances. FWS should place significant weight on the value of past and ongoing conservation efforts that benefit the LPC. These efforts involve a wide variety of stakeholders and property owners who have demonstrated a willingness to and, because of the breadth their interests, are in a uniquely strategic position to address the habitat fragmentation that, according to the listing proposal, poses the greatest threat to the LPC.

Finally, RRC agrees with commenters from the energy generation sector who noted the impending publication of new studies which would qualify for consideration by FWS, and RRC agrees with commenters who, in the name of using the best available information, have urged FWS to allow an extension of time to include studies on the verge of peer review and/or publication.

RRC appreciates the opportunity to provide these comments and is happy to provide additional information on request. If you have any questions, please contact David Cooney at david.cooney@rrc.texas.gov.

David W. Cooney, Jr.
Senior Attorney
Railroad Commission of Texas



August 30, 2021

**Commissioners**

Arch "Beaver" Aplin, III
Chairman
Lake Jackson

James E. Abell
Kilgore

Oliver J. Bell
Cleveland

Paul L. Foster
El Paso

Anna B. Galo
Laredo

Jeffery D. Hildebrand
Houston

Robert L. "Bobby" Patton, Jr.
Fort Worth

Travis B. "Blake" Rowling
Dallas

Dick Scott
Wimberley

Lee M. Bass
Chairman-Emeritus
Fort Worth

T. Dan Friedkin
Chairman-Emeritus
Houston

Carter P. Smith
Executive Director

Public Comments Processing
Attn. FWS–R2–ES–2021–0015
U.S. Fish and Wildlife Service
MS: PRB/3W
5275 Leesburg Pike
Falls Church, VA 22041-3803

To Whom It May Concern:

This letter is the official response of the Texas Parks and Wildlife Department (TPWD) to the U.S. Fish and Wildlife Service's (USFWS) May 31, 2021, request in the Federal Register (Docket No FWS-R2-ES-2021-0015) for comments regarding the Threatened status for the Lesser Prairie-Chicken (LEPC) with Section 4(d) Rule for the Northern Distinct Population Segment (DPS) and Endangered status for the Southern DPS under the Endangered Species Act (ESA). TPWD appreciates the opportunity to review and provide comments that TPWD believes will help inform decision making on the ruling and the 4(d) Rule for the conservation of LEPC.

TPWD has a long history of conducting and assisting with various LEPC research, monitoring, and conservation efforts in our state. Since nearly all our state's LEPC population occurs on private lands, much of our work involves providing technical guidance to Texas landowners where this species occurs. TPWD is currently the permit holder for the Candidate Conservation Agreement with Assurances for the Lesser Prairie-Chicken on Private Land in the Texas Panhandle (USFWS Permit Number TE-123658-1) and continues to work with enrolled landowners to implement voluntary conservation measures to manage, conserve and recover the species. TPWD is committed to continuing such efforts with private landowners within the range of the LEPC. Additionally, TPWD staff has been heavily involved in the LEPC Interstate Working Group, Range-Wide Conservation Plan (RWP), and Species Status Assessment (SSA), and look forward to continued opportunities to collaborate with all stakeholders for the betterment of this state trust species.

In 2014, TPWD and the other LEPC states opposed the listing of the LEPC arguing that voluntary conservation efforts including enhancement of LEPC habitat quality with affected industry, landowner, and other public and private partners could recover this species. We contend that not only did this approach work, but that it remains the best path forward if we are going to have any kind of a meaningful chance at the full recovery of this species.

USFWS endorsed the population goal of 67,000 birds established in the RWP and included the RWP as part of the 4(d) rule associated with a Threatened listing status.

To manage and conserve the natural and cultural resources of Texas and to provide hunting, fishing and outdoor recreation opportunities for the use and enjoyment of present and future generations.

The listing decision was short-lived, but the ongoing voluntary conservation efforts led by the states and supported by oil and gas, and other industry partners continued successfully and as predicted. The range wide LEPC population has recovered significantly from approximately 19,000 birds in 2014 when it was initially listed, to approximately 30,000-35,000 birds where it has remained for several years. As such, TPWD requests that USFWS acknowledge wildlife agencies and allow these efforts to continue for the benefit of this species. Candidly, we can point to few, if any examples, where an imperiled species has shown that kind of recovery in such short order.

In summary, TPWD opposes the listing decisions being considered across the range for LEPC.

In the unfortunate event that USFWS decides to move forward with the proposed listing decision, TPWD provides the following comments for consideration concerning specifics of the proposed rule:

**Factors that may affect the continued existence of the species**
1. The range wide LEPC population has recovered significantly since 2014 when it was initially listed, to approximately half of the range-wide population goal of 67,000 birds, as outlined in the RWP. The draft Impact Analysis section of the 5-Year Review of the RWP suggests that reaching the range-wide population goal would be enhanced if there were incentives for continued industry participation and enrollment in the RWP, as well as incentives or assurances for private landowners to implement voluntary conservation measures on private lands to protect and enhance habitat for the LEPC.
2. TPWD is concerned that any listing for the LEPC may affect the continued existence of the species by jeopardizing decades of voluntary conservation efforts that have resulted in an increased-to-stable population trend since 2012. For example, the proposed 4(d) exemptions for normal agricultural operations and habitat management activities (such as prescribed grazing and prescribed fire) that benefit LEPC would be considered take under an Endangered status. TPWD is concerned that this would disincentivize LEPC habitat management among private landowners in Texas and would subsequently detract from past and continued accomplishments and compromise existing and future relationships with private landowners who would otherwise voluntarily implement LEPC conservation efforts with appropriate technical guidance.
3. TPWD recommends that USFWS acknowledge and incentivize participation in voluntary conservation efforts that have resulted in a rebound of the LEPC population and include 4(d) rule "coverage" for industry and landowner participants who are enrolled in and operating in compliance with the mitigation framework included in the RWP.

**Clarity of the Proposed Rule**
1. TPWD requests clarification on the restrictions regarding grazing within the estimated occupied range (EOR) and the use of consistent language across both DPSs. It is not clear what practices are authorized in each of the DPSs (e.g., the rule says "compatible grazing" may be allowed in the Northern DPS, but in the Southern DPS, it says "incompatible grazing" is prohibited). As such, TPWD requests the USFWS provide a common definition for "compatible grazing" and "incompatible grazing" to provide livestock producers with a clear understanding of what is authorized.
2. TPWD requests clarification on whether seeding of non-native plant species on rangeland within the EOR would be considered take. There are several parts of the proposed rule where this seems to be implied but not clearly stated. TPWD highly recommends planting native plant species only.
3. TPWD requests clarification on whether shinnery oak and sand sagebrush control or suppression are allowable under the proposed rule, as opposed to eradication. Based upon the best available science, TPWD does not believe that shinnery and sagebrush suppression results in sustained alteration (eradication) of preferred vegetative characteristics of LEPC habitat. In the absence of fire, these shrub species can dominate the vegetative community. Managing these species is an important tool for LEPC habitat management.
4. TPWD requests clarification regarding the restrictions on farming, particularly in the Southern DPS. As the rule is currently proposed, TPWD interprets it to prohibit farming activities within the Southern DPS EOR. As mentioned in the proposed rule, cropland does not provide the year-round habitat requirements for LEPCs so those acres are generally unoccupied most, if not all, of the year. Therefore, take should not occur.

**Biological, commercial trade, or other relevant data concerning any threats to this species and existing conservation measures and regulations that may be addressing those threats.**
1. As discussed within the proposed rule, the Conservation Reserve Program (CRP) is a valuable tool for LEPC conservation; however, tens of thousands of acres are expiring from the program each year across the species range, which is a significant threat to its continued existence. In the unfortunate event that USFWS chooses to list the LEPC, through the Section 7 consultation process, TPWD recommends the development of a Biological Opinion with the Farm Service Agency for the CRP that provides competitive annual rental rate and incentive payments to ensure sufficient acres remain in the program each year, removes the "County Cap" restrictions on the acres enrolled, enforces the implementation of Mid-Contract Management Practices when they are required, and requires that only native grass mixes, as recommended by TPWD and other partners, be used within the LEPC EOR. TPWD remains committed to continued

engagement with the Farm Service Agency and Natural Resources Conservation Service on the implementation of this and other vitally important conservation programs.

2. Grazing practices may either constitute a threat or a valuable tool to LEPC habitat management, depending on implementation. As such, TPWD recommends an exception from the prohibitions associated with Section 9 be included in the 4(d) rule for grazing on high-quality native rangelands. This would serve as a reward and incentive to private landowners who have maintained high-quality rangelands through beneficial grazing practices.

3. TPWD requests clarification that specimens legally harvested under state-controlled hunting seasons within the last century may be possessed. The rule states, *"Unauthorized collecting, handling, possessing, selling, delivering, carrying, or transporting of the species, including import or export across State lines and international boundaries, except for properly documented antique specimens of these taxa at least 100 years old, as defined by section 10(h)(1) of the Act,"* may result in a violation of Section 9 of the Act in the southern DPS of the LEPC if they are not authorized in accordance with applicable law. It is unclear if this would make these specimens illegal to possess. Texas authorized an LEPC hunting season as recently as 2008 and other states as recently as 2014, which means many individuals legally harvested LEPC and have specimens in their possession that should remain legal.

TPWD reiterates our strong opposition in Texas and across both proposed DPS segments to listing the LEPC, either as Threatened and/or Endangered. Moreover, we are confident that segregating and listing a DPS for the southern ecoregion, particularly as endangered, will result in negative consequences for this state trust species. TPWD appreciates the opportunity to comment on this proposal and looks forward to commenting on any additional matters regarding the conservation of the LEPC. If you have any questions, please do not hesitate to contact Regional Diversity Biologist Mr. Russell Martin by email at russell.martin@tpwd.texas.gov or by phone at (806) 452-9616. Thank you.

Sincerely,

Carter Smith
Executive Director

CS:RM:bdk

cc:    Mr. Clayton Wolf
       Mr. John Silovsky
       Ms. Meredith Longoria

Comments from the Texas General Land Office


September 1, 2021


U.S. Fish and Wildlife Service
Attn: FWS-R2-2021-0015
MS: PRB/3W
5275 Leesburg Pike
Falls Church, VA 22041-3803

      Re:    FWS-R2-ES-2021-0015. Proposed Rule regarding the Lesser Prairie
                Chicken. Comments of the Texas General Land Office


Ladies and Gentlemen:

The Texas General Land Office appreciates the opportunity to comment on proposed rule
FWS-R2-ES-2021-0015 (the Proposed Rule).

<u>Specific Interest in this Proposed Rule</u>

The General Land Office (GLO) is a Constitutionally-created agency of the State of Texas,
and is the administrative agency of the State that, among other things, manages millions of
State-owned surface and/or mineral acres in the Texas Panhandle and in West Texas that
appear to be located either in the proposed Mixed-grass Prairie Ecoregion or the Sand
Shinnery Oak Prairie Ecoregion, respectively (collectively, the Affected Lands). The
Affected Lands appear, according to the very imprecise maps included in the Proposed
Rule, to be part of the proposed protected habitat for the Lesser Prairie Chicken (LPC).
The Affected Lands would be detrimentally impacted by this listing.

<u>PSF</u>. The Affected Lands, both surface and minerals, were dedicated by the Texas
Legislature to the Permanent School Fund (PSF)—a Constitutionally-created fund that
distributes hundreds of millions of dollars annually to Texas public schools, and
functions as security for tens of billions of dollars' worth of Texas public school district
bonds. The PSF is the lifeblood of public K-12 education in Texas, and has been built
and is sustained largely from royalties and other revenues derived from the energy
industry.

The GLO, as the custodian of the Affected Lands committed to the PSF, has a fiduciary
duty to maximize the PSF through revenue generated from its land and mineral assets.
This duty is typically met by leasing the land to private companies for development of oil,
gas, other minerals, wind energy, solar energy, geothermal energy, and other attributes in
exchange for substantial fees and royalties. With the listing of the LPC, and the severe
limitations and prohibitions that would be placed on the LPC's alleged and poorly-identified

habitat, the GLO's lessees may incur substantial additional costs and delays, or even outright use prohibitions, that will likely render many development projects uneconomic, to the detriment of the schoolchildren of Texas.

PUF.  The Commissioner of the General Land Office also serves, ex officio, as the chairman of the Board for Lease of University Lands, which oversees lands dedicated by the Texas Legislature to the Permanent University Fund (PUF).  The PUF owns approximately 2.1 million acres in West Texas, including lands in several Texas counties where the proposed Rule indicates the LPC has historically been found.  Similar to the PSF, the PUF is a Constitutionally-created fund that generates substantial revenue for the University of Texas and Texas A&M University Systems.

Due to the likelihood of diminished revenues from oil and gas exploration and production activities, hard mineral leasing, and leasing for wind, solar, and geothermal energy, that would otherwise flow to and benefit the PSF and the PUF, the listing of the LPC as endangered, in the Southern DPS, or threatened, in the Northern DPS, will have a negative impact on funding for all levels of education in Texas.  As a result of this listing, and its effect on school funds generated from royalty and lease revenues, the schoolchildren of Texas, as well as secondary education, will be severely and directly impacted.

Scope of Habitat

The Proposed Rule states, in part, that "The larger and more intact the remaining grassland patches are, with appropriate vegetation structure, the larger, healthier, and more resilient the lesser prairie-chicken populations will be.  Exactly how large habitat patches should be to support healthy populations depends on the quality and intactness of the patches." (pg. 29443, Federal Register, Vol. 86, No. 103). (emphasis added)

Further, at pg. 29444:

"There are several important limitations to our geospatial analysis.  First, it is a landscape-level analysis, so the results only represent broad trends at the ecoregional and rangewide scales.  Secondly, this analysis does not incorporate different levels of habitat quality, as the data do not exist at the spatial scale or resolution needed."  (emphasis added)

Surely, this is too inexact and arbitrary, and conclusory, a standard on which to base as critical a decision as identification of habitat for a proposed endangered or threatened species' habitat, with all of the restrictions and economic burdens that such identification would bring with it.

Additionally, regarding proposed habitat, at pg. 29471:

"We have determined that the Southern DPS of the lesser prairie-chicken is in danger of extinction throughout all of its range and accordingly did not undertake an analysis of any significant portion of its range."

Given the shortcomings of the geographic data available to USFWS, as pointed out above (and stated in the Proposed Rule itself), the statement that the LPC "is in danger of extinction throughout all of its range" is entirely conclusory and without support in adequate data.

<u>Determination that the Population is Endangered or Threatened</u>

In addition, it isn't clear from the Proposed Rule that the size of the LPC population even warrants protection. As noted in the Proposed Rule, an earlier listing of the LPC as threatened was vacated by the US District Court for the Western District of Texas. It appears to be only as a result of litigation filed by a private environmental group that the LPC and its habitat are, once again, being proposed for listing.

At pg. 29435, the Proposed Rule admits:

"<u>Estimates</u> of population abundance prior to the 1960s <u>are indeterminable and rely almost entirely on anecdotal information</u>. … While little is known about precise historical population sizes, <u>the lesser prairie-chicken was **reported** to be quite common</u> throughout its range in the early 20th century. … <u>However, survey methodology and effort have differed over the decades, **making it difficult to precisely estimate trends**</u>." (emphasis added)

Without accurate population information in the early 20th Century, there can be no reliable baseline population data against which to measure current populations, even assuming current populations themselves are accurately counted. Therefore, USFWS can not reasonably conclude that the species is declining in Texas to the point of extinction or, further, that ongoing activities would have adverse impacts on the LPC. As with the Proposed Rule's statements regarding habitat location, the Proposed Rule's statements regarding the population trends of the LPC are entirely conclusory.

.

<u>Conclusion</u>

USFWS has insufficient data to estimate the LPC population, its current distribution, and species viability in Texas. Additionally, other factors, such as, prolonged drought conditions, predation, disease and competition with other species must be researched over an adequate period of time before reaching any conclusion that would support the listing. The GLO believes that the listing of the LPC is neither appropriate nor warranted at this time due to the lack of population data, the lack of habitat location and suitability data, the incomplete research on factors affecting the species, the availability of common-sense alternatives to the listing, and constitutional considerations regarding the PSF and the PUF.

Due to the lack of supporting evidence to conclude that the LPC warrants listing, the only reasonable path forward is for USFWS to withdraw the Proposed Rule to list the LPC as endangered (Southern DPS) or threatened (Northern DPS) under the Endangered Species Act until substantial evidence is obtained to justify such a listing.

Please be advised that the General Land Office intends to seek relief in the appropriate court to stop USFWS from proceeding with implementation if USFWS does indeed designate the LPC as endangered. The General Land Office respectfully requests that the USFWS respond to these comments in writing. Thank you for your careful consideration of these comments.

Office of the Secretary
1020 S Kansas Ave., Suite 200
Topeka, KS 66612-1327

**Kansas Department of Wildlife and Parks**

Phone: (785) 296-2281
Fax: (785) 296-6953
www.ksoutdoors.com

Brad Loveless, Secretary

Laura Kelly, Governor

Public Comments Processing
Attn: FWS-R2-ES-2021-0015
U.S. Fish and Wildlife Service
MS: PRB/3W
5275 Leesburg Pike
Falls Church, VA 22041-3803

September 1, 2021

RE: Federal Docket #: FWS-R2-ES-2021-0015 Federal Register Notice for Endangered and
Threatened Wildlife and Plants; Lesser Prairie-Chicken; Threatened Status with Section 4(d) Rule for
the Northern Distinct Population Segment and Endangered Status for the Southern Distinct
Population Segment

Dear Sir or Madam:

The Kansas Department of Wildlife and Parks (KDWP) submits these comments on the U.S. Fish
and Wildlife Service's (Service) proposed rule to list the lesser prairie-chicken (LPC) as a threatened
species in the Northern Distinct Population Segment (DPS), endangered in the Southern DPS, and
the proposed 4(d) special rule for the Northern DPS. Herein, KDWP comments directly on the
proposal to list the Northern DPS—which encompasses LPC habitat in Kansas within the Sand
Sagebrush, Mixed Grass, and Shortgrass/CRP Mosaic Ecoregions.

KDWP believes the LPC does not warrant any federal protections under the Endangered Species
Act (ESA) because the available information does not indicate the species is "likely to become an
endangered species within the foreseeable future throughout all or a signification portion of its
range". We acknowledge long-term population declines have occurred throughout the species'
range—however, populations have stabilized, management efforts have been implemented to
specifically conserve and enhance LPC habitat, and there is little threat of extinction in the
"foreseeable future"—especially in the Northern DPS. Additionally, populations have expanded in
Kansas to the extent that an entire ecoregion was recently defined to describe the habitats being
utilized that were not historically inhabited by the species.

Whether a listing is determined to be warranted or not, the state wildlife management agencies
remain the best source of management authority and conservation actions for the LPC. KDWP has
surveyed and monitored LPC leks and occurrences in Kansas since 1964, creating one of the most
extensive and robust datasets available for examining LPC population trends, habitat use and
distribution. Additionally, KDWP has funded and implemented the most extensive series of LPC
research studies in the recent past, earning it the 2019 Wildlife Restoration Award from The Wildlife
Society. These studies served as a foundation for the most exhaustive book written about LPCs,
*Ecology and conservation of Lesser Prairie-Chickens* (Haukos and Boal 2016). More recently (August 2021),

theses have been completed for two state-funded projects that have greatly furthered our collective understanding of LPC ecology and responses to wildfire (becoming more common with climate change) and translocation (Parker 2021, Teige 2021). States have much more flexibility than the Service for funding and implementing research projects that are both timely and relevant to the management and conservation of the species.

If the species is listed, state wildlife management goals are more difficult to accomplish. In the proposed rule, the Service acknowledges the vital role private landowners will continue to play in providing habitat for LPC in the future. However, the Service does not have the staffing in Kansas (or elsewhere in the LPC range) to do the amount of work they deem necessary to counteract habitat loss. State wildlife management agencies have the technical expertise and long-standing relationships with landowners that is necessary to accomplish the task of increasing habitat quality and reversing habitat loss trends. By listing the LPC, the Service will make these tasks more difficult due to mistrust and a lack of developed relationships with the landowners that are critical to the success of the species.

A listing will also negatively impact state agencies through our application and review of funding grants to implement research and management activities. In most instances, state agencies are responsible for ensuring management on state-managed lands as well as private land programs are meeting requirements allowed within a potential 4(d) rule and/or other agreements that may provide additional exclusions. This will require additional work to develop programmatic agreements or biological opinions for habitat management programs, resulting in additional cost and delayed implementation of programs that may be impacted by additional restrictions.

KDWP has played a major role in the development and implementation of the Lesser Prairie-Chicken Range-wide Conservation Plan (RWP, Van Pelt et al. 2013)—a first-of-its kind conservation plan that not only outlined the needs of the species, threats to populations, and population and habitat goals, but also provided a funding mechanism for directly providing conservation for the species through a mitigation framework. The RWP serves as a standard for all conservation organizations—including the Service—when discussing and recommending areas to target conservation efforts, as well as areas to avoid when siting industry developments and infrastructure. The RWP identifies a process and committee structure for discussing, recommending, and changing aspects of the RWP, and these committees have been actively filled with a variety of stakeholders and interests.

One example of the states' role in furthering the goals of the RWP is the development and engagement of LPC State Implementation Teams. In Kansas, the LPC State Implementation Team has met quarterly since 2019 and includes members from the state and local offices of NRCS, FSA, USFWS (Ecological Services and Partners for Fish and Wildlife), NGOs (Playa Lakes Joint Venture, Pheasants Forever/Quail Forever, The Nature Conservancy), Kansas Cooperative Fish and Wildlife Research Unit, Kansas State University and KDWP. The Kansas team has discussed important research findings and how recommended management activities can be implemented, provided recommendations to the FSA Kansas State Technical Committee, reviewed priority area designations and provided a venue for the continued discussion of LPC issues and challenges throughout the state. This is one of many examples of states taking a proactive role in LPC management in a manner that the Service has not begun to develop.

While the Service provides opportunities for regulatory assurances via a variety of mechanisms associated with the ESA (e.g., 4(d) rule, Habitat Conservation Plans, Candidate Conservation Agreements with Assurances, Safe Harbor Agreements), these tools are costly and time-intensive to develop and implement. If a listing occurs, it will be imperative that the Service provide the funding and staffing necessary to develop and implement such programs to provide the necessary and warranted assurances to landowners for the positive impacts they are having for LPC, as well as conservation activities that are benefiting the species.

Finally, there must be more and improved coordination among federal agencies—regardless of whether the LPC is listed. As an example, the Service acknowledges the positive role FSA's Conservation Reserve Program (CRP) has in LPC management and conservation. However, when completing the Species Status Assessment (SSA), the Service was not able to obtain CRP enrollment data to better inform the geospatial analysis. While KDWP does not question the results of the geospatial analysis used in the SSA, the lack of coordination among federal agencies is disheartening. This becomes more concerning when looking to the future of Farm Bill conservation programs and the importance of these programs to all wildlife management—not just LPC.

## Distinct Population Segments

While KDWP maintains the species should not be listed—if it is listed—we agree that distinct population segments (DPS) should be designated. As such, we agree that the three ecoregions in Kansas are included in the Northern DPS and as such should be analyzed in policy decisions separately from the Southern DPS.

## Analytical Approach: Species Status Assessment

The USFWS LPC Species Status Assessment (SSA) relies heavily on data from the states within the species range. KDWP has shown a concerted effort to monitor and conserve LPC for more than fifty years. During this time, Kansas is the only state to document range expansion (as well as further population expansion into Colorado from the expanded Kansas range). Within this expanded range, populations have been relatively stable, given the boom-bust nature of the species. Kansas data also demonstrate stability in the Kansas portion of the Mixed Grass Ecoregion. Moreover, an increase in targeted conservation programs due to decreasing groundwater aquifer levels are likely to lead to restoration of cropland acres to native grasses within the Sand Sagebrush Ecoregion. While difficult to quantify, it is not unreasonable to expect expanded habitat availability for the species and associated population increases within this ecoregion in the future, given the conservation status and interest in LPC and water issues.

Because the Service does not consistently monitor LPC populations and/or habitat, they are required to seek information from state wildlife agencies, other federal agencies, and other organizations providing LPC conservation and management. While state wildlife agencies have collaborated extensively with the Service in the development of the SSA and many other LPC policy discussions and decisions, there is a lack of similar coordination from federal agencies. This is a shortcoming of the SSA process. For example, USDA's Farm Services Agency did not provide relevant Conservation Reserve Program (CRP) data for use in the habitat analysis portion of the SSA. Because CRP fields has been documented to be critical for LPC across the range, this lack of coordination and cooperation among federal agencies results in a SSA product that does not reflect the best available information. Similarly, USDA Natural Resources Conservation Service (NRCS)

did not provide relevant habitat restoration and enhancement efforts to the Service beyond the Lesser Prairie-Chicken Initiative (LPCI) for inclusion in the SSA—thereby not providing information relevant to other programs, including Environment Quality Incentives Program (EQIP) Grazing Lands Health and Wildlife programs. These issues are not unique to the LPC SSA but reflect a shortcoming of the SSA process and result in a lack of incorporation of the best available information when analyzing, summarizing and reviewing the status of a species.

**Request for Clarification**
If the species is listed, KDWP requests clarification from the Service concerning how the greater prairie-chicken season and hunt units will be addressed in northwestern Kansas and any potential incidental take associated with legal hunting of other game species in southwest Kansas. We request the Service provide clear documentation that is easily accessible for both KDWP and the public using FAQs, other relevant informational products, and language in the listing decision.


Additionally, we offer the following information as specifically requested in the proposed listing:

**The species' biology, range, and population trends, including:**

No additional information.

**Biological or ecological requirements of the species, including habitat requirements for feeding, breeding, and sheltering;**

New and ongoing research funded by KDWP has provided new insights into LPC responses to wildfires (Parker 2021) and translocation (Teige 2021).

**Genetics and taxonomy;**

KDWP and CPW have contracted with Sara Oyler-McCance (U.S. Geological Survey) to conduct a genetic analysis of feathers collected from LPC translocated from the Short-grass prairie/CRP Ecoregion to the Sand Sagebrush Ecoregion between 2016-2019. The analysis also included feather samples collected in 2020 on leks established through the translocation. In addition, CPW and KDWP submitted feathers collected prior to the translocation and on leks outside of the translocation area. As anticipated, preliminary analyses document that the genetics of the translocated birds are characteristic of Shortgrass/CRP Ecoregion. Similarly, genetic makeup of the feathers collected in 2020 on the translocation-established leks within the Sand Sagebrush Ecoregion are characteristic of the Short-grass/CRP Ecoregion. Feather samples in this current analysis were compared to samples previously analyzed as part of the range-wide LPC genetic structure (Oyler-McCance et al. 2016). KDWP and CPW are currently working with Dr. Oyler-McCance to finalize the genetics report from the translocation. We will provide the final report as soon as it is complete.

**Historical and current range, including distribution patterns;**

No additional information.

**Historical and current population levels, and current and projected trends; and**

KDWP has surveyed and monitored LPC leks in Kansas since 1964, creating one of the most extensive and robust datasets available for examining LPC population trends. Reports and data are available upon request or at https://ksoutdoors.com/Services/Research-Publications/Wildlife-Research-Surveys/Upland-Bird and the Kansas Natural Resources Planner.

KDWP, CPW, and Kansas State University (KSU) continue to monitor all leks associated with the Sand Sagebrush translocation effort. From 2016-2019, 411 LPC were translocated from the Short-grass/CRP ecoregion to the Comanche and Cimarron National Grasslands in the Sand Sagebrush Ecoregion. In 2020, one year after the final release, biologists documented 115 males on 20 leks in the release area. In 2021, biologists documented 65 males (28 in Colorado and 37 in Kansas) on 15 leks in the release area. Two theses have been completed (Berigan 2019, Teige 2021) and are available upon request.

The five LPC state wildlife agencies continue their commitment to conduct 10 years of range-wide aerial surveys. Surveys have now been completed from 2012-2021 (except 2019). WAFWA has provided 2021 population estimates and a final report to the Service.

**Past and ongoing conservation measures for the species, its habitat, or both.**

In 2014, the KDWP rebranded the Kansas State Wildlife Habitat Incentives Program (Kansas WHIP) to the Habitat First program, allowing for KDWP to leverage the previous State funds (used for Kansas WHIP) to additional funding available through the WSFR grant program. The Habitat First program includes the implementation of habitat management practices that include native grass/forb plantings, CRP disking, planting cover crops, tree and brush management, prescribed fire, and use exclusion (livestock exclusion). The Habitat First program has improved about 12,000 ac (4,856 ha) in the LPC range since 2014. Prior to 2014, the Kansas WHIP program had improved 30,284 ac (12,255 ha) in LPC range.

In addition, KDWP was provided an opportunity through contributions from the Comanche Pool Prairie Resource Foundation to leverage additional WSFR funds in 2016. These funds were matched with voluntary cost share contributions from landowners to implement management practices that include tree and brush removal (pre- and post-wildfire), prescribed fire, and native grass planting within the Red Hills Ecoregion. The Kansas Prescribed Fire Council and USFWS Kansas Partners for Fish and Wildlife (PFW) program collaborated with KDWP staff to engage landowners in ongoing conservation delivery efforts. Since implementation in 2016, contracts are currently obligated to complete the direct implementation of 19,655 ac (7,954 ha) with additional funding to be obligated to additional projects soon.

KDWP continues to provide input priority areas and practices to benefit LPC, both through the Kansas LPC State Implementation Team and through the FSA Kansas Technical Committee.

The KDWP State Wildlife Action Plan (Rohweder 2015) uses a hierarchial classification system that divides Kansas into three conservation regions: (1) Shortgrass Prairie, (2) Central Mixed-Grass Prairie, and (3) Eastern Tallgrass Prairie. Within each region, geographically explicit areas described to target conservation efforts. These Ecological Focus Areas represent landscapes where conservation actions can be applied to maximize benefits to Kansas wildlife, including LPC. For each EFA, priority habitats and conservation actions are described.

KDWP, Colorado Parks and Wildlife and Kansas State University (KSU) continue to monitor all leks associated with the Sand Sagebrush translocation effort. From 2016-2019, 411 LPC were translocated from the Short-grass/CRP ecoregion to the Comanche and Cimarron National Grasslands in the Sand Sagebrush Ecoregion. In 2020, one year after the final release, biologists documented 115 males on 20 leks in the release area. In 2021, biologists documented 65 males (28 in Colorado and 37 in Kansas) on 15 leks in the release area. Graduate students at KSU are finalizing their research results from the translocation. Two theses have been completed (Berigan 2019, Teige 2021) with a manuscript submitted for publication. These documents are available upon request.

**Factors that may affect the continued existence of the species, which may include habitat modification or destruction, overutilization, disease, predation, the adequacy of existing regulatory mechanisms, or other natural or manmade factors.**

Kansas has several regulatory mechanisms in place that are providing adequate protections for LPC in Kansas. The Kansas Nongame and Endangered Species Conservation Act (KNESCA) of 1975 (Kansas Statutes Annotated 32-957 through 32-963 and associated Kansas Administrative Regulations 115-15-1 through 115-15-4) provides KDWP with the authority to designate both "Threatened" and "Endangered" status, conserve, manage, and regulate listed species and associated state designated critical habitat in Kansas. The existing regulatory structure provides the opportunity for internal (KDWP) and external petitions to assess population status and potentially add new species to the lists of "Threatened" or "Endangered" wildlife within the state's borders. If the species were to be successfully petitioned for protection via the KNESCA, this existing regulatory structure would provide KDWP with the authority to maintain existing critical habitat, designate new critical habitat areas for the species (as needed), and require avoidance, minimization, and/or mitigation for impacts to those critical habitats. The KNESCA would also provide the necessary authorities to allow KDWP to develop and implement plans/programs for the recovery of the species within the state's boundaries.

The LPC hunting season in southwest Kansas has been closed since 2014—even though research and survey efforts have indicated legal pursuit and harvest does not negatively impact LPC populations (Haukos et al. 2016).

KDWP has assisted and collaborated with researchers conducting a parasitological and infectious disease survey of LPC across their range. While research and analysis are ongoing, the following description is a summary of ongoing research and survey efforts being conducted in the LPC range by researchers at Texas Tech University and Kansas State University (B. Grisham, personal communication).

Using samples collected from March-April 2012-2014 and 2018-2019, we conducted a parasitological and infectious disease survey of Lesser Prairie-Chickens across the southern portion of their range in Texas and New Mexico. To identify nematode parasites present in this population, 7 frozen archived birds collected from 2012-2018 were submitted for necropsy to Sam Houston State University, and fecal samples collected from leks were tested for parasites using PCR. Blood, fecal, and cloacal and choanal swabs from captured birds were tested for exposure or infection with select viruses and bacteria recognized to be of importance to prairie grouse. Samples from frozen archived birds and birds collected with a collection permit in spring 2020 and 2021 are currently being analyzed. Additional information is available upon request.

**Biological, commercial trade, or other relevant data concerning any threats (or lack thereof) to this species and existing conservation measures and regulations that may be addressing those threats.**

Collection, exhibition, and trade of LPC is prohibited by KDWP without issuance of a Scientific Collection Permit (K.S.A. 32-807, 32-952, and 32-1002).

The LPC is currently considered as a Species of Greatest Conservation Need (SGCN) as defined by the Kansas State Wildlife Action Plan (SWAP). Using the WAFWA CHAT and data for existing contiguous native grasslands, the Kansas SWAP has identified several Ecological Focus Areas (EFA) which overlap the LPC range in Kansas. The SWAP also notes conservation issues and activities which seek to highlight threats to LPC and other SGCN, ways to restore or improve habitat for those species, and work to focus conservation efforts within the EFA landscapes. This allows Kansas to seek additional grant funding for conservation of SGCN, focuses work and program enrollments from conservation partners (e.g., USDA Environmental Quality Incentives Program-Wildlife), and takes a proactive approach to future conservation activities and focus areas if additional funding mechanisms avail themselves in the future (e.g., passage of the Recovering America's Wildlife Act).

**Additional information concerning the historical and current status, range, distribution, and population size of this species, including the locations of any additional populations of this species.**

The five LPC state wildlife agencies continue their commitment to conduct 10 years of range-wide aerial surveys. Surveys have now been completed from 2012-2021 (except for 2019) and states are pursuing funding for 2022. WAFWA provided initial 2021 population estimates to the Service on June 30, 2021. A final report has been submitted to Service.

**Information on regulations that are necessary and advisable to provide for the conservation of the Northern DPS of the lesser prairie-chicken and that the Service can consider in developing a 4(d) rule for the DPS. In particular, information concerning the extent to which we should include any of the prohibitions associated with section 9 in the 4(d) rule or whether any other forms of take should be excepted from the prohibitions in the 4(d) rule.**

If the proposed listing is finalized, a blanket exemption for grazing should be provided in a 4(d) rule. While the Service has noted that granting a blanket 4(d) exemption for grazing is not the best tool to encourage and/or regulate grazing in the LPC range, they have not offered any alternative methods for addressing grazing and providing assurances to landowners. The Service has also noted that some existing rangeland is of low enough quality that it would not currently be considered habitat for the species. However, they cannot assess habitat quality at the landscape scale to inform landowners if their grazing lands would currently be considered as "habitat". Without any baseline data, it would be nearly impossible to determine if inappropriate grazing management has resulted in "take" pre- or post-listing (e.g., Was the parcel considered habitat when the species was listed or was it already too degraded?). The Service also does not have the staff to enforce take related to inappropriate grazing or develop plans/programs to provide coverage for suitable grazing management. Furthermore, the failure to exempt grazing activities is likely to exacerbate landowner hesitancy to work with the Service and their partners on conservation activities and may make it

more difficult to implement conservation plans to restore habitat. Alternative methods are costly and do not lend themselves to proactive, meaningful conservation with regulatory assurances.

As noted in the SSA, woody plant encroachment is a primary threat to LPC habitat and populations. KDWP requests mechanical removal of undesirable woody vegetation such as eastern red cedar (*Juniperus virginiana*), Russian olive (*Elaeagnus angustifolia*), black locust (*Robinia pseudoacacia*) and others (including native and non-native species) be included in the final 4(d) rule. Removing woody vegetation is a direct habitat restoration activity that benefits LPC and all efforts to curb woody vegetation encroachment should be promoted. Similarly, KDWP requests a provision for herbicide applications that target specific species of trees and non-native grasses be considered and included in a final 4(d) rule. The current proposed 4(d) rule only allows for chemical application that is directly related to agricultural practices. Targeted herbicide application in native prairie and grassland habitats can be crucial for removing undesirable trees (e.g., Eastern Redcedar, Black Locust, Siberian Elm, and Russian Olive) as well as invasive grasses including Yellow Bluestem (*Bothriochloa ischaemum*) and positively benefit LPC habitat.

KDWP supports the proposed 4(d) rule exceptions allowing continued agricultural practices on currently cultivated lands and the use of prescribed fire as a habitat management activity.

**Information on whether an exception from the prohibitions associated with section 9 should be included in the 4(d) rule for the Northern DPS for industry and/or landowner participants who are enrolled in and operating in compliance with the mitigation framework included in the Range-Wide Conservation Plan for the Lesser Prairie-Chicken being administered by the Western Association of Fish and Wildlife Agencies but who do not have incidental take coverage via the companion Candidate Conservation Agreement with Assurances covering oil and gas activities.**

KDWP strongly recommends the Service continue to work with WAFWA, industry participants, and landowner participants to encourage beneficial voluntary actions taken under the RWP, including providing incidental take coverage like that provided to oil and gas participants. State and Service leadership endorsed the RWP in 2013. This allowed industry and landowners to enroll in the RWP for potential take coverage through WAFWA Certificates of Participation in the WAFWA Conservation Agreement (WCA) built around the mitigation framework in the RWP. From 2014–2016 industry and landowners enrolled with the understanding of a 4(d) exemption covering RWP participants.

As a member on the WAFWA LPC Initiative Council, KDWP remains committed to the RWP as a tool for LPC conservation, voluntary landowner LPC habitat enhancement, and effective mitigation of industry impacts. KDWP is committed to working with LPC state wildlife agency partners, the Service, WAFWA personnel, and industry to reconcile the issues identified by the Service and the WAFWA Audit to insure continued administration of the RWP for both the Candidate Conservation Agreement with Assurances (CCAA) and the RWP WCA. WAFWA has developed a Net Conservation Benefits Analysis to transparently quantify the impacts and offsets of the RWP mitigation program. KDWP believes the RWP has provided a conservation benefit to LPC through conservation offsets, minimization efforts such as co-location, and mitigation of 2:1 offset habitat unit to impact habitat unit. Furthermore, because the Service endorsed the RWP in 2013, industry enrolled in the RWP with the understanding of legal assurances through WCA coverage in a 4(d) rule. Therefore, KDWP strongly recommends including language in the final 4(d) rule to provide

similar coverage for RWP WCA industry participants. Inclusion is both necessary and advisable because of prior commitments to industry participants as well as documented conservation benefit to LPC.

KDWP strongly recommends the Service include 4(d) language to explicitly provide coverage for landowners providing conservation offsets through the RWP. Participating landowners are required to manage their property to provide habitat for LPC. Some practices required by the WAFWA Conservation Agreements may result in short term take of LPC; however, the long-term beneficial impacts would outweigh the short-term impact. Inclusion of an exemption providing coverage for landowners participating in the RWP is both necessary and advisable. If coverage for RWP participants via a final 4(d) rule is not deemed possible, KDWP recommends the Service work with WAFWA to develop other options for coverage of potential take as well as assurances for regulatory predictability for industry AND landowner participants participating and in compliance with the RWP.

**Which areas would be appropriate as critical habitat for the species and why areas should or should not be proposed for designation as critical habitat in the future, including whether there are threats to the species from human activity that would be expected to increase due to the designation and whether that increase in threat would outweigh the benefit of designation such that the designation of critical habitat may not be prudent.**

Given the relative stability of LPC populations in Kansas, critical habitat should not be designated within the Northern DPS and/or Kansas. Efforts should instead be focused on proactive engagement of landowners to provide quality habitat within focal areas and connectivity zones identified in the RWP.

**The amount and distribution of habitat for the lesser prairie-chicken which should be considered for proposed critical habitat;**

The LPC Interstate Working Group continues to monitor and assess habitat as described in the RWP (Van Pelt et al. 2013). This process results in updates to the Focal Areas and Connectivity Zones and are updated on the CHAT website for reference by conservation partners and industry for targeting conservation efforts and informing development siting decisions.

**Closing Remarks**

KDWP reiterates our long-term commitment to LPC populations and habitats within Kansas and throughout the range. KDWP will continue our leadership and technical assistance roles in LPC habitat management through our Habitat First program and interactions with the USDA, as well as continuing our roles in the WAFWA RWP and Mitigation Program. We appreciate the Service's coordination efforts to date and look forward to continuing our collaborative efforts to conserve and restore LPC habitat in the future.

Sincerely,

Brad Loveless, Secretary


cc:     Mike Miller, Assistant Secretary
        Chris Tymeson, Chief Legal Counsel
        Jake George, Wildlife Division Director
        Rich Schultheis, Assistant Wildlife Division Director
        Chris Berens, Ecological Services Section Chief
        Kent Fricke, Small Game Coordinator

References

Berigan, L.A. 2019. Dispersal, reproductive success, and habitat use by translocated lesser prairie-chickens. Thesis. Kansas State University, Manhattan, Kansas.

Haukos, D.A. and C.W. Boal. 2016. Ecology and conservation of Lesser Prairie-Chickens. Studies in Avian Biology (no. 48), CRC Press, Boca Raton, FL.

Haukos, D.A., J.C. Pitman, G.M. Beauprez, and D.D. Schoeling. 2016. Pages 133-144 in D.A. Haukos and C.W. Boal (editors), Ecology and conservation of Lesser Prairie-Chickens. Studies in Avian Biology (no. 48), CRC Press, Boca Raton, FL.

Parker, N.J. 2021. Lesser prairie-chicken demography, resource selection, and habitat response following megafire in the mixed-grass prairie. Kansas State University. Thesis. 157 pages.

Rohweder, M.R. December 2015. *Kansas Wildlife Action Plan*. Ecological Services Section, Kansas Department of Wildlife, Parks and Tourism in cooperation with the Kansas Biological Survey. 176 pp.

Teige, E.C. 2021. Assessment of lesser prairie-chicken translocation through survival, space use, and resource selection. Kansas State University. Thesis. 201 pages.

Van Pelt, W.E., S. Kye, J. Pitman, D. Klute, G. Beauprez, D. Schoeling, A. Janus, and J.B. Haufler. 2013. The Lesser Prairie-Chicken Range-wide Conservation Plan. Western Association of Fish and Wildlife Agencies. Cheyenne, Wyoming. 296 pages.



WILDLIFE CONSERVATION COMMISSION

Leigh Gaddis    D. Chad Dillingham
CHAIRMAN    MEMBER
James V. Barwick    Jess Kane
VICE CHAIRMAN    MEMBER
Rick Holder    Bruce Mabrey
SECRETARY    MEMBER
Bill Brewster    John P. Zelbst
MEMBER    MEMBER

J. KEVIN STITT, GOVERNOR

J.D. STRONG, DIRECTOR

**DEPARTMENT OF WILDLIFE CONSERVATION**
P.O. Box 53465    Oklahoma City, OK 73152    PH. (405) 521-3851

August 30, 2021

Public Comments Processing
Attn: FWS-R2-ES
U.S. Fish and Wildlife Service
MS:PRB/3W
5275 Leesburg Pike
Falls Church, VA 22041-3803

**RE**: Federal Docket #: FWS-R2-ES-2021-0015 Federal Register Notice for Endangered and Threatened Wildlife and Plants; Lesser Prairie-Chicken; Threatened Status with Section 4(d) Rule for the Northern Distinct Population Segment and Endangered Status for the Southern Distinct Population Segment.

The Oklahoma Department of Wildlife Conservation (ODWC) appreciates the opportunity to provide comments to the U.S. Fish and Wildlife Service (USFWS) regarding the proposed listing rule for the Lesser Prairie-Chicken (*Tympanuchus pallidicinctus*) under the federal Endangered Species Act. ODWC's mission is to manage and protect fish and wildlife, along with their habitats, while also growing our community of hunters and anglers, partnering with those who love the outdoors, and fostering stewardship with those who care for the land.

This letter conveys the comments of the Oklahoma Department of Wildlife Conservation (ODWC) and serves as the formal comment letter in response to the U.S. Fish and Wildlife Service's proposed rule regarding the threatened species status and 4(d) rule for the Northern distinct population segment (DPS) of the Lesser Prairie-Chicken (*Tympanuchus pallidicinctus*).

**Listing as threatened under the ESA: ODWC opposes the proposed threatened listing of the northern DPS .**
 Standardized range-wide population monitoring has been on-going since 2012 and these assessments indicate that the combination of the Western Association of Fish and Wildlife Agencies' range-wide management plan, the Natural Resources Conservation Service's (NRCS) Lesser Prairie-Chicken Conservation Initiative, and the three existing Candidate Conservation Agreement with Assurances programs in New Mexico, Oklahoma, and Texas have stabilized and are beginning to increase prairie-chicken numbers across its range.  ODWC believes that federally listing this species at the present time is premature because the population has been on an increasing trajectory since 2013.  Although the modeling and analyses described in the Federal Register Notice project population declines due to habitat loss and degradation in the future, the current population trend does not align with that prediction.  Furthermore, we believe that a threatened species designation under the Endangered Species Act will undermine the successes of the past eight years and create a hindrance to the expansion (increased enrollments and participation) in the existing conservation programs for this species and reduce the probability that the species' population and distribution will increase. As the state wildlife agency responsible for managing the state's public trust resources, we believe that we have the expertise and the relationships on the ground with private landowners to manage this species whose geographic range is more than 95% in private ownership in Oklahoma.

**Existing Conservation Measures**
As enumerated in the Federal Register Notice (pp 29454 – 29456), there are multiple conservation programs for the Lesser Prairie-Chicken in each of the five states within its range and these encompass more than 3.5 million acres.  Abundant opportunities occur within these programs to work with landowners and industry to improve habitat quality and connectivity for Lesser Prairie-Chickens and we don't believe that their positive impact was fully considered during the USFWS's listing evaluation.  The largest of these, the Lesser Prairie-Chicken Range-Wide Conservation Plan (RWP), was approved by the U.S. Fish and Wildlife Service in 2014 and it serves as the most comprehensive plan for the conservation of this species across its range. The RWP has been implemented by five states under the umbrella of the Western Association of Fish and Wildlife Agencies (WAFWA) over the course of the past seven years and huge achievements have been made towards the conservation of the Lesser Prairie-Chicken. The RWP provides financial incentives to landowners who voluntarily manage their lands to benefit this species. Building on this, the NRCS's Lesser Prairie Chicken Initiative and the Conservation

Reserve Program have created or enhanced habitat on millions of acres within the prairie-chicken's range, while state wildlife agencies and the USFWS are partners in the most comprehensive network of Candidate Conservation Agreement with Assurances programs in the region. These collaborative efforts have generated over $60 million to improve native prairie and prairie-chicken habitat. Over the course of these seven years, we have documented steady population growth since the inception of these programs and we believe that if these efforts are given more time that the impacts will be substantial for this species. A listing of this species under the Endangered Species Act will be a hindrance to these efforts and will likely prove detrimental to the expansion of these conservation efforts that are already in process.

**Data Gaps**
The USFWS has acknowledged that there are limitations of the LEPC Species Status Assessment that are being used to characterize current and future population conditions and habitat evaluation.

**Adequate Existing Regulatory Mechanisms: ODWC has existing regulatory mechanisms to provide protection for the species in Oklahoma.**
The lesser prairie-chicken in Oklahoma is classified as an upland game bird with a closed hunting season to protect the species from hunting mortality. Therefore, the ODWC has the jurisdiction to pursue any illegal purposeful take of this species under the authorization of OK Title 800:25-7-14. The ODWC believes that this legal protection is sufficient and its enforcement is much more feasible at the state level where ODWC game wardens are present in every county in the state in contrast to the extremely limited presence of USFWS federal agents within the state. Additionally, ODWC has the authority to inspect all properties that are enrolled in the CCAA (over 350,000 acres) to ensure that proper conservation actions and habitat management practices are taking place on the ground within high quality habitat areas within the species' range.

**Considerations for Proposed 4(d) rule**
If the USFWS determines that the species warrants listing under the federal Endangered Species Act, the ODWC requests that additional exemptions be considered for the final 4(d) rule to allow incidental take for other activities that are beneficial to the conservation of the lesser prairie-chicken.

- We request that managed grazing activities that result in the vegetation structure and composition needed to support habitat for the lesser prairie-chicken be included within the 4 (d) rule for the potential final rule. Grazing, if conducted properly can be a very beneficial habitat management tool for the species and in some areas this management tool is vital to re-create a historical habitat management scenario. The Agriculture CCAA Agreement, which has been approved by the USFWS, outlines a "take half leave half" strategy that leaves nesting structure for the spring nesting season.
- We also request that mechanical removal of undesirable woody vegetation such as Eastern red cedar (*Juniperus virginiana*), Russian olive (*Elaeagnus angustifolia*), black locust (*Robinia pseudoacacia*) and others including native and non-native species be considered for inclusion in the final 4(d) rule. Removing these encroaching vertical structures will assist with grassland habitat management and also decrease perching areas for predatory birds.
- We request that a provision for herbicide applications that target specific species of trees and non-native grasses be considered and included in a final 4(d) rule. The current proposed 4(d) rule only allows for chemical application that is directly related to agricultural practices. Targeted herbicide application in native prairie and grassland habitats can be crucial for removing undesirable trees (e.g., Eastern Redcedar, Black Locust, Siberian Elm, and Russian Olive) as well as invasive grasses including Yellow Bluestem (*Bothriochloa ischaemum*) and positively benefit lesser prairie-chicken habitat.
- We request that a provision be added to the proposed 4(d) rule to allow for continued exemption of Lesser Prairie-Chicken Range-Wide Conservation Plan (RWP) participants. This plan was approved by the Service in 2014 and continues to serve as the most comprehensive conservation plan for the species. This would allow for protection of RWP partners to continue vital conservation efforts on the ground for this species without having to enter into lengthy and timely consultations with the Service to be able to provide habitat improvement projects for the species.
- Lastly, we also request that the implementation of prescribed fire for the purposes of grassland management remain as a proposed 4(d) rule component. We agree that prescribed fire, as well as proper grazing are vital habitat management techniques that support populations of Lesser Prairie-Chicken throughout the species range. ODWC agrees that fire plays an essential role in maintaining healthy grassland habitats and also assists with preventing woody vegetation encroachment and helps to maintain diverse plant communities.

In conclusion, we appreciate the opportunity to provide comments regarding the proposed listing for the Northern DPS of the Lesser Prairie-Chicken and proposed 4(d) rule. We appreciate your consideration of our comments and recommendations. If you have any questions regarding this letter, please contact Curtis Tackett, Threatened and Endangered Species Biologist, at curtis.tackett@odwc.ok.gov.

Sincerely,

J.D. Strong
Director

The Oklahoma Department of Wildlife Conservation is the state agency responsible for managing fish and wildlife. The Wildlife Department receives no general tax appropriations and is supported by hunting and fishing license fees and federal excise taxes on hunting and fishing equipment.