**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS, ET AL.,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | **7:23-CV-00047-DC** |
| | § | |
| **U.S. DEPARTMENT OF THE** | § | |
| **INTERIOR, ET AL.,** | § | |
| | § | |
| *Defendants.* | § | |

---

### INDUSTRY PLAINTIFFS' SECOND AMENDED COMPLAINT

---

## I.    INTRODUCTION

1.     On November 25, 2022, the Department of the Interior and its Secretary Deb Haaland, and the U.S. Fish and Wildlife Service and its Director Martha Williams (collectively, the "*Service*"), issued a decision to list two population segments of the Lesser Prairie-Chicken ("*LEPC*") as threatened and endangered under the Endangered Species Act ("*ESA*") (hereafter, the "*Listing Decision*").

2.     Industry Plaintiffs[1] represent a multitude of citizens throughout the nation with interests in Texas, Kansas, New Mexico, Colorado and Oklahoma—the five states burdened by the Listing Decision.  Industry Plaintiffs bring this action against the Service, arguing that its Listing Decision violated both the ESA and the Administrative Procedure Act ("*APA*").  Chief among those violations are:

---

[1] "Industry Plaintiffs" refer to Plaintiffs in Cause No. 7:23-CV-49:  Permian Basin Petroleum Association; National Cattlemen's Beef Association; Texas Cattle Feeder's Association; Kansas Livestock Association; New Mexico Cattle Grower's Association; Oklahoma Cattlemen's Association; Kansas Independent Oil & Gas Association; The Petroleum Alliance of Oklahoma; Chaves County, New Mexico; Roosevelt County, New Mexico, and; Lea County New Mexico.

---

- **Failed PECE analysis.**  The Service failed to conduct a meaningful analysis of all ongoing and new conservation efforts, including a failure to follow its own *Policy for Evaluation of Conservation Efforts When Making Listing Decisions* ("**PECE Policy**") for a second time.[2]

- **Unsubstantiated Impact Estimates.**  The Service arbitrarily concluded that oil and gas operations have a 300-meter impact radius that negatively affect the LEPC. The Service provided no reasoned explanation for that conclusion.  And it stands in direct conflict with the Service's own 2014 finding that oil and gas activities only have a 200-meter impact radius.  This arbitrary increase materially affected the Service's analysis and Listing Decision.  The Service also double counted the impacts of oil and gas activities by failing to account for overlap with the impacts already caused by existing features (e.g., roads, buildings, other wells).

- **Arbitrary Population Segments.**  The Service arbitrarily divided the LEPC into two population segments and evaluated their status independently, all in violation of its own Distinct Population Segment Policy.

Relying on these violations (and others), the Service improperly concluded that the northern LEPC population segment was "threatened," and that the southern LEPC population was "endangered."

3.     Industry Plaintiffs and their members suffered injuries, and will continue to suffer injury, as a result of the Service's ESA and APA violations.  The same is true for other oil and gas companies, farmers, ranchers and cattle grazers in Colorado, Kansas, New Mexico, Oklahoma and Texas.  Because of the Service's Listing Decision, Industry Plaintiffs and their members have incurred and will continue to incur expenses necessary to avoid actions now prohibited by the ESA.   Industry Plaintiffs have also suffered impairment of their operations and business opportunities, experienced diminishment of their interests in lands and minerals, will almost certainly need to expend resources to secure permits required by the ESA, suffer business delays seeking those permits, lose revenue from operations, and be denied benefits of their voluntary conservation efforts to implement measures which, in conjunction with other efforts, should have rendered the listing unnecessary in the first instance.

---

[2]     *See Permian Basin Petroleum Ass'n v. Dep't of the Interior*, 127 F. Supp. 3d 700, 725 (W.D. Tex. 2015).

4.    As a result, Industry Plaintiffs respectfully request that the Court vacate the Service's Listing Decision.

## II.    PARTIES

5.    Plaintiff Permian Basin Petroleum Association ("***PBPA***") has offices in Midland and Austin, Texas, and represents numerous member companies engaged in all aspects of environmentally responsible exploration and production of oil and natural gas in the Permian Basin region of West Texas and southeastern New Mexico.  The Permian Basin is the most prolific oil-producing region in the United States and accounts for approximately 40 percent of American oil production and 15 percent of American natural gas production.  PBPA's mission is to provide safety education, legislative and regulatory engagement, and support services for the petroleum industry to promote members' effectiveness.  PBPA member companies have existing leases, current oil and natural gas production, and plans for future leasing, exploration, and production activities in areas within the LEPC habitat.  Many of those members have actively participated in—and allocated significant resources to—voluntary conservation efforts and measures for the LEPC for almost a decade.  On behalf of its members, PBPA filed comments with the Service throughout the regulatory process regarding the listing of the LEPC under the ESA.  Some of the PBPA members also filed their own comments with the Service.  Despite the PBPA members' conservation efforts and comments, the Service nevertheless made its Listing Decision.  That decision has impacted, and will continue to impact, the PBPA members because their current and planned operations are being, and will continue to be, impacted by the Final Rule.  Because of the Service's Listing Decision, PBPA member companies are or may be, among other harms: (1) subject to additional permitting requirements under the ESA for their existing, proposed and future  projects that result in delay and increased expenses; (2) precluded from conducting certain ongoing and planned activities; or (3) penalized for inadvertently violating the ESA.  On federal

leases, PBPA's members will likely be subject to heightened requirements and additional mitigation measures for their operations. Delays in permitting and additional mitigation requirements due to the listing could also affect the PBPA members' ability to meet their lease commitments to federal, state, and fee lessors.  The Listing Decision could also preclude PBPA members' operations in certain areas to protect the LEPC and its habitat, and could subject them to potential liability for any actions they take that might affect the LEPC.

6.      Plaintiff National Cattlemen's Beef Association ("*NCBA*") is the largest and oldest national trade association representing American cattle producers.  Through direct membership and state affiliate membership, NCBA represents more than 175,000 of America's farmers and ranchers, all of whom are crucial in providing a significant portion of the nation's food supply. NCBA has members who are already engaged in voluntary conservation practices that benefit the LEPC.  Because of Service's Listing Decision, NCBA member companies are or may be, among other harms: (1) subject to additional permitting requirements under the ESA for their existing, proposed  and  future  projects that result in delay and increased expenses; (2) precluded from conducting certain ongoing and planned activities; or (3) penalized for inadvertently violating the ESA. The Listing Decision could preclude operations by NCBA's members in certain areas to protect the LEPC and its habitat, and could subject NCBA members to potential liability for any actions they take that might affect the LEPC.

7.      Plaintiff Texas Cattle Feeder's Association ("*TCFA*") is a nonprofit, agricultural trade association serving the interests of individuals and companies that feed cattle in Texas, Oklahoma, and New Mexico.  The TCFA has over 4,000 individual members and 200 feed yard members, which annually market more than 6.5 million head of cattle—comprising approximately 30% of the nation's beef supply.  Most TCFA stocker, feeder, and feed yard members reside in Texas and own and lease millions of acres of range and pasture land in the state.  TCFA has

members who are already engaged in voluntary conservation practices that benefit the LEPC. Because of Service's Listing Decision, TCFA member companies are or may be, among other harms: (1) subject to additional permitting requirements under the ESA for their existing, proposed and future projects that result in delay and increased expenses; (2) precluded from conducting certain ongoing and planned activities; or (3) penalized for inadvertently violating the ESA. The Listing Decision could preclude operations by TCFA's members in certain areas to protect the LEPC and its habitat, and could subject them to potential liability for any actions they take that might affect the LEPC.

8.      Plaintiff Kansas Livestock Association ("*KLA*") is a trade organization representing the business interests of more than 5,700 members, and the state's multi-billion-dollar livestock industry at both the state and federal levels. KLA members are involved in many aspects of the livestock industry, including seed stock, cow-calf, and stocker cattle production; cattle feeding; dairy production; swine production; grazing land management; and diversified farming operations. KLA works to advance its members' common interests, and to enhance their ability to meet consumer demand.  KLA has members who are already engaged in voluntary conservation practices that benefit the LEPC.   Because of the Service's Listing Decision, KLA member companies are or may be, among other harms: (1) subject to additional permitting requirements under the ESA for their existing, proposed and future projects that result in delay and increased expenses; (2) precluded from conducting certain ongoing and planned activities; or (3) penalized for inadvertently violating the ESA. The Listing Decision could preclude operations by KLA's members in certain areas to protect the LEPC and its habitat, and could subject them to potential liability for any actions they take that might affect the LEPC.

9.      Plaintiff New Mexico Cattle Grower's Association ("*NMCGA*") is a domestic nonprofit corporation incorporated under the laws of New Mexico. Its purpose is to advance and

protect the cattle industry in New Mexico. The NMCGA currently has over 1,400 members, representing all of New Mexico's counties, as well as some fourteen other states. NMCGA has members who are already engaged in voluntary conservation practices that benefit the LEPC. Because of Service's Listing Decision, NMCGA members are or may be, among other harms: (1) subject to additional permitting requirements under the ESA for their existing, proposed and future projects that result in delay and increased expenses; (2) precluded from conducting certain ongoing and planned activities; or (3) penalized for inadvertently violating the ESA. The Listing Decision could preclude operations by NMCGA's members in certain areas to protect the LEPC and its habitat, and could subject them to potential liability for any actions they take that might affect the LEPC.

10.     Plaintiff Oklahoma Cattlemen's Association ("*OCA*") is a member-led and member-driven trade organization with a vision to be the leadership that serves, strengthens and advocates for the Oklahoma cattle industry. The OCA represents about 5,000 Oklahoma ranching families. The OCA exists to defend the beef cattle industry at the federal and state levels, and in the media.   Because of Service's Listing Decision, OCA members are or may be, among other harms: (1) subject to additional permitting requirements under the ESA for their existing, proposed and future projects that result in delay and increased expenses; (2) precluded from conducting certain ongoing and planned activities; or (3) penalized for inadvertently violating the ESA. The listing could preclude OCA members' operations in certain areas to protect the LEPC and its habitat, and could subject them to potential liability for any actions they take that might affect the LEPC.

11.     Plaintiff Kansas Independent Oil & Gas Association ("*KIOGA*") exists to promote the development of oil and natural gas resources in Kansas through bipartisan, common-sense solutions to challenges facing the oil and natural gas industry.  Founded in 1937, KIOGA is a

nonprofit member organization representing oil and natural gas producers in Kansas, as well as allied service and supply companies. KIOGA's cooperative partnerships with other state and national trade groups means the concerns of the Kansas oil and gas industry are heard in Topeka and Washington. KIOGA is driven and led by a robust membership of nearly 3,000 members. They are the primary voice for the Kansas oil and gas industry. Through rigorous engagement at the state and federal levels, KIOGA works to create a more stable and predictable political and regulatory environment for our members. KIOGA works with other trade groups to educate all stakeholders on the material attributes that point to greater sustainability and long-term viability of companies in the energy industry.  Because of the Service's Listing Decision, KIOGA member companies are or may be, among other harms: (1) subject to additional permitting  requirements under the ESA for their existing, proposed and future projects that result in delay and increased expenses; (2) precluded from conducting certain ongoing and planned activities; or (3) penalized for inadvertently violating the ESA.  On federal leases, KIOGA's members will likely be subject to heightened requirements and additional mitigation measures for their operations. Delays in permitting and additional mitigation requirements due to the listing could also affect the KIOGA members' ability to meet their lease commitments to federal, state, and fee lessors.  The Listing Decision could also preclude KIOGA members' operations in certain areas to protect the LEPC and its habitat, and could subject them to potential liability for any actions they take that might affect the LEPC.

12.     Plaintiff The Petroleum Alliance of Oklahoma ("*Alliance*") represents more than 1,400 individuals and member companies and their tens of thousands of employees in the upstream, midstream, and downstream sectors and ventures ranging from small, family-owned businesses to large, publicly traded corporations. Their members produce, transport, process and refine the bulk of Oklahoma's crude oil and natural gas. Many of The Alliance's members are

enrolled in LPC conservation programs, and all are committed to the conservation of the species and its habitat. Because of the Service's Listing Decision, the Alliance's member companies are or may be, among other harms: (1) subject to additional permitting requirements under the ESA for their existing, proposed and future projects that result in delay and increased expenses; (2) precluded from conducting certain ongoing and planned activities; or (3) penalized for inadvertently violating the ESA. On federal leases, the Alliance's members will likely be subject to heightened requirements and additional mitigation measures for their operations. Delays in permitting and additional mitigation requirements due to the listing could also affect the Alliance members' ability to meet their lease commitments to federal, state, and fee lessors. The Listing Decision could also preclude the Alliance members' operations in certain areas to protect the LEPC and its habitat, and could subject them to potential liability for any actions they take that might affect the LEPC.

13.     Plaintiff Chaves County, New Mexico is a county in New Mexico. It has allocated significant resources to the conservation of the LEPC. The listing of the LEPC under the ESA adversely affects the Chaves County community, industries, and people who are located within, reside, ranch, farm, and use the public and private lands in Chaves County. Chaves County has significant levels of agriculture and oil and gas production. The LEPC Rule has and will continue to adversely affect these industries and Chaves County's economic health and vitality. The listing of the Lesser Prairie-Chicken creates a wide range of adverse effects upon the Chaves County community, industries, and people who are located within, reside, ranch, farm, and use the public and private lands in Chaves County. Activities that could "take" the Lesser Prairie-Chicken may need to be curtailed, including those related to oil and gas development and agriculture/farming. Chaves County has significant levels of oil and gas development. Chaves County relies upon both the revenues and jobs produced by oil and gas development. Chaves County also ranks high among

counties in New Mexico in agricultural production. Chaves County relies heavily upon the jobs provided by the agricultural community in Chaves County. Losses in the energy and agriculture sectors will adversely affect Chaves County's economic health and vitality.

14.     Plaintiff Roosevelt County, New Mexico is a county in New Mexico. The listing of the LEPC under the ESA adversely affects the Roosevelt County community, industries, and people who are located within, reside, ranch, farm, and use the public and private lands in Roosevelt County. Roosevelt County has significant levels of agriculture and oil and gas production. The LEPC Rule has and will continue to adversely affect these industries and Roosevelt County's economic health and vitality.  The listing of the Lesser Prairie-Chicken creates a wide range of adverse effects upon the Roosevelt County community, industries, and people who are located within, reside, ranch, farm, and use the public and private lands in Roosevelt County. Activities that could "take" the Lesser Prairie-Chicken may need to be curtailed, including those related to oil and gas development and agriculture/farming. These are the primary economic activities within Roosevelt County. Roosevelt County has significant oil and gas production and is one of the most important counties in New Mexico in terms of agricultural production. Losses in the energy and agriculture sectors will adversely affect the economy of Roosevelt County, and lead to a decline in jobs.

15.     Plaintiff Lea County, New Mexico is a county in New Mexico. The listing of the LEPC under the ESA adversely affects the Lea County community, industries, and people who are located within, reside, ranch, farm, and use the public and private lands in Lea County. Lea County has significant levels of agriculture and oil and gas production. The LEPC Rule has and will continue to adversely affect these industries and Lea County's economic health and vitality.  The listing of the Lesser Prairie-Chicken creates a wide range of adverse effects upon the Lea County community, industries, and people who are located within, reside, ranch, farm, and use the public

and private lands in Lea County. Activities that could "take" the LEPC may need to be curtailed, including those related to oil and gas development and agriculture/farming, which are the primary economic activities within Lea County. Lea County has significant levels of oil and gas development. Lea County relies upon both the revenues and jobs produced by oil and gas development. Lea County's economy also has a significant agricultural sector. Losses in the energy and agriculture sectors will adversely affect Lea County's economic health and vitality.

16.     Defendant Department of the Interior (the "***Interior***") is the federal agency charged with administration of the ESA.

17.     Defendant Deb Haaland is the Secretary of the Interior, and is sued in her official capacity. Secretary Haaland, in her capacity as Secretary of the Interior, has ultimate responsibility for Interior and U.S. Fish and Wildlife Service's actions under the ESA.

18.     Defendant U.S. Fish and Wildlife Service ("***FWS***") is an agency or instrumentality of the United States within the federal Department of the Interior. The Secretary of the Interior has delegated responsibility for implementing the ESA and its regulations regarding the listing of terrestrial species, including the LEPC, to the FWS.  As previously stated, when used herein, the term "Service" collectively refers to all Defendants— Department of the Interior and its Secretary Deb Haaland, and the U.S. Fish and Wildlife Service and its Director Martha Williams.

19.     Defendant Martha Williams is the Director of the U.S. Fish and Wildlife Service and is sued in her official capacity.  Director Williams oversees the U.S. Fish and Wildlife Service, the agency charged with implementing much of the  ESA.

20.     Intervenor Defendant Center for Biological Diversity ("***CBD***") is non-profit entity that has voluntarily intervened in his lawsuit as a defendant.  CBD petition for the listing of the LEPC and has filed lawsuits against the Service encouraging the Service to the list the LEPC under the ESA.

---

21.     Intervenor Defendant Texas Campaign for the Environment is non-profit entity that has voluntarily intervened in his lawsuit as a defendant.

### III.     JURISDICTION & VENUE

22.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331 (federal question), the APA, 5 U.S.C. §§ 551 *et seq.*, and the ESA, 16 U.S.C. §§ 1531 *et seq*. This Court can grant declaratory relief under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-706.  This Court may also hold unlawful, vacate and set aside an agency's action, findings or conclusions.  5 U.S.C. § 706.

23.     An actual, justiciable controversy now exists between Industry Plaintiffs and Defendants, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701- 706.

24.     Venue properly lies in this judicial district under 28 U.S.C. § 1391 because:  (1) PBPA resides in and does business in this judicial district, as do members of PBPA; (2) the LEPC and its historic and occupied range at issue in and affected by the Final Rule are located in this judicial district; and (3) a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, including actions of FWS Southwest Regional Office (Region 2), which covers the Service's operations in Texas within the jurisdictional limits of the Midland-Odessa Division of the Western District of Texas.

25.     The Federal government has waived sovereign immunity in this action pursuant to the APA and ESA. *See* 5 U.S.C. § 702; 16 U.S.C. § 1540(g).

### IV.     LEGAL FRAMEWORK

**A.     Administrative Procedure Act (APA)**

26.     The APA establishes standards, rules and procedures for federal agencies when they engage in formal rulemaking processes.  *See* 5 U.S.C. §§ 553, 551(4).  Among other requirements, an agency must publish a proposed rule in the Federal Register and allow the public

to submit written data, views, and arguments before the agency may enter and publish a final rule. *Id.* § 553(b)-(c).

27.     After time for public comment has passed, and after the agency enters and publishes a final rule, the APA also provides for judicial review by persons "adversely affected" or "aggrieved" by the final rule. *Id.* § 702.   Such adversely affected or aggrieved parties can request a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This is often termed as a review under an "arbitrary-and-capricious standard." *Fed. Communications Comm'n v. Prometheus Radio Project*, 209 L. Ed. 2d 287, 141 S. Ct. 1150, 1158 (2021).  As the United States Supreme Court held:

> The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.

*Id.*  Still, the deference afforded to the agency extends only to those explanations "articulated by the agency itself, not reasons developed post hoc." *Tex. v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (internal quotations omitted).

28.     To be sure, the arbitrary-and-capricious standard is "not toothless." *Id.* (quoting *Sw. Elec. Power Co. v. United States Envtl. Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019)).  A reviewing court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Id.* (quoting *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021).  And the APA itself mandates that a reviewing court shall "hold unlawful and set aside agency action, findings and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).  It is settled law that an agency ordinarily must follow its own policies and procedures and may depart there from only

with reasoned explanation. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *I.N.S. v. Yang*, 519 U.S. 26, 32 (1996).

29.      An agency action or decision must also be set aside if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  A reviewing court "must also ensure that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,'" and the court must assess "'whether the [agency's] decision was based on a consideration of the relevant factors[.]'" *Id*.  "Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir. 2018).  Moreover, an agency must provide reasoned explanation when it changes from a prior position.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

**B.      Endangered Species Act (ESA)**

30.      The purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section."  16 U.S.C. § 1531(b).

**(1)      Species and Distinct Population Segments**

31.      Under the ESA, the Service is tasked with evaluating the status of a species as a whole throughout all or a significant portion of its range.  The ESA defines "species" to include "any distinct population segment of any species." *Id*. at § 1532(16).  However, the ESA does not define "distinct population segment."

32.     In 1996, the Service promulgated its Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("***DPS Policy***"), 61 Fed. Reg. 4722-01 (Feb. 7, 1996) to guide the Service in determining whether a distinct population segment exists under the ESA.  "Congress has instructed the Secretary to exercise this authority with regard to [distinct population segments] . . . sparingly and only when the biological evidence indicates that such action is warranted."  *Id*.  Thus, the Service itself recognized the import of biological evidence before determining if distinct population segments exist.  And the Service recognized the import of doing so "sparingly."  *Id*.  The DPS Policy must, therefore, be used only in the rare instances where a population segment is both "discrete" and "significant."  *Id*. at 4725.

33.     Under the DPS Policy, a population segment is "discrete" only if:

> *(1)*     It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors. Quantitative measures of genetic or morphological discontinuity may provide evidence of this separation.

> *(2)*     It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

*Id*.

34.     Additionally, under the DPS Policy, the population segment must also be established as "significant."  To determine whether a population segment is significant, the Service may consider:

> *(1)*     Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon,

> *(2)*     Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon,

> *(3)*     Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range, or

*(4)*     Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

*Id.*

35.     If a population segment is both distinct from, and significant to, the species as a whole, then the Service may evaluate whether that distinct and significant population segment is "threatened" or "endangered" under the ESA listing criteria.

**(2)     ESA Listing Criteria**

36.     Under Section 4(a) of the ESA, the Secretary of the Interior uses five enumerated factors to determine by regulation whether any species of fish, wildlife, or plants are "threatened" or "endangered." *Id.* § 1533(a)(1). Those factors include:

(A)     the present or threatened destruction, modification, or curtailment of its habitat or range;

(B)     overutilization for commercial, recreational, scientific, or educational purposes;

(C)     disease or predation;

(D)     the inadequacy of existing regulatory mechanisms; or

(E)     other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(l). As part of this five-factor analysis, the Service considers actions or conditions that may have positive effects or that may ameliorate any negative effects that threaten a species. The Service must also "tak[e] into account those efforts, if any, being made by any State . . . or any political subdivision of a State . . . to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction...." *Id.* § 1533(b)(1) (Section 1533(a)(1), (b)(1) collectively referred to as the "***ESA Listing Criteria***").

37.     After engaging in this analysis, a species may be listed as ***endangered*** under the ESA if it is "in danger of extinction throughout all or a significant portion of its range." *Id.*

§ 1532(6).  Likewise, a species may be listed as **threatened** under the ESA if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).  For each listing determination, the ESA directs the Service to publish in the Federal Register a summary of the data that forms the basis for the regulation. The Service must demonstrate the relationship of such data to the adopted regulation.  *See id*. § 1533(b)(8).

> **(3)    The PECE Policy is promulgated to facilitate the ESA Listing Criteria**

38.     Before the agency can make its listing decision, the ESA Listing Criteria requires that the agency consider all current and prospective conservation efforts to protect a species.  To give a framework under which the agency should consider such conservation efforts, the Service promulgated the aforementioned PECE Policy.  68 Fed. Reg. 15,100 (Mar. 28, 2003).  The PECE Policy "identifies criteria [the Service] will use in determining whether formalized conservation efforts that have yet to be implemented or to show effectiveness contribute to making listing a species as threatened or endangered unnecessary." 68 Fed. Reg. at 15,100.  The PECE Policy applies to conservation efforts identified in conservation agreements, conservation plans, and other similar documents. *Id*.

39.     The PECE Policy establishes a consistent set of criteria to evaluate conservation efforts.  *Id.* at 15,101.  And to be fair to those engaged in voluntary conservation efforts—like the Industry Plaintiffs and their members here—the PECE Policy provides notice of the criteria that the Service will use in evaluating conservation efforts prior to making its listing decision.  *Id*.  In that regard, the PECE Policy guides states and other entities as they develop conservation efforts to make listing unnecessary. *Id*.

40.     The Service applies the PECE Policy to all formalized, prospective conservation efforts, regardless of whether "formal conservation efforts [were] developed with or without a

specific intent to influence a listing decision and with or without the involvement of the Services."

FWS, Announcement of Draft Policy for Evaluation of Conservation Efforts When Making Listing

Decisions, 65 Fed. Reg. 37,102, 37,103 (proposed June 13, 2000).  Pursuant to the PECE Policy,

the Service evaluates conservation agreements to determine: (1) the certainty that the conservation

efforts will be implemented, and (2) the certainty that the efforts will be effective.  68 Fed. Reg. at

15,101.

41.     To determine the "certainty that the conservation effort will be implemented," the

Service must evaluate the following nine criteria set forth in the PECE Policy:

*(1)*     The conservation effort, the party(ies) to the agreement or plan that will
          implement the effort, and the staffing, funding level, funding source, and
          other resources necessary to implement the effort are identified.

*(2)*     The legal authority of the party(ies) to the agreement or plan to implement
          the formalized conservation effort, and the commitment to proceed with the
          conservation effort are described.

*(3)*     The legal procedural requirements (e.g. environmental review) necessary to
          implement the effort are described, and information is provided indicating
          that fulfillment of these requirements does not preclude commitment to the
          effort.

*(4)*     Authorizations (e.g., permits, landowner permission) necessary to
          implement the conservation effort are identified, and a high level of
          certainty is provided that the party(ies) to the agreement or plan that will
          implement the effort will obtain these authorizations.

*(5)*     The type and level of voluntary participation (e.g., number of landowners
          allowing entry to their land, or number of  participants agreeing to change
          timber management practices and acreage involved) necessary to
          implement the conservation effort is identified, and a high level of certainty
          is provided that the party(ies) to the agreement or plan that will implement
          the conservation effort will obtain that level of voluntary participation (e.g.,
          an explanation of how incentives to be provided will result in the necessary
          level of voluntary participation).

*(6)*     Regulatory mechanisms (e.g., laws, regulations, ordinances) necessary to
          implement the conservation effort are in place.

*(7)*     A high level of certainty is provided that the party(ies) to the agreement or plan that will implement the conservation effort will obtain the necessary funding.

*(8)*     An implementation schedule (including incremental completion dates) for the conservation effort is provided.

*(9)*     The conservation agreement or plan that includes the conservation effort is approved by all parties to the agreement or plan.

68 Fed. Reg. at 15,114-15.  As to the seventh criteria, the Service has indicated that a "high level of certainty of funding does not mean that funding must be in place now for implementation of the entire plan, but rather, it means that we must have convincing information that funding will be provided each year to implement relevant conservation efforts."  *Id.* at 15,108.  The Service also affirmed that: "[w]e believe that at least 1 year of funding should be assured, and we should have documentation that demonstrates a commitment to obtain future funding."  *Id.*

42.     To determine the "certainty that the conservation effort will be effective," the Service must evaluate the following six criteria set forth in the PECE Policy:

*(1)*     The nature and extent of threats being addressed by the conservation effort are described, and how the conservation effort reduces the threats is described.

*(2)*     Explicit incremental objectives for the conservation effort and dates for achieving them are stated.

*(3)*     The steps necessary to implement the conservation effort are identified in detail.

*(4)*     Quantifiable, scientifically valid parameters that will demonstrate achievement of objectives, and standards for these parameters by which progress will be measured, are identified.

*(5)*     Provisions for monitoring and reporting progress on implementation (based on compliance with the implementation schedule) and effectiveness (based on evaluation of quantifiable parameters) of the conservation effort are provided.

*(6)*     Principles of adaptive management are incorporated.

*Id.* at 15,115.

**(4)     Consequences of Listing a Species**

43.     Once a species (or distinct population segment) is listed as either threatened or endangered under the ESA, no persons may "take" any threatened or endangered members of that species without additional federal authorization. *See* 16 U.S.C. § 1538(a). The Endangered Species Act defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19). "Harm" is defined to include significant habitat modification or degradation if it results in the death or injury to a listed species by significantly impairing essential behavior patterns, including breeding, feeding, or sheltering. 50 C.F.R. § 17.3.  "Harass" means an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  *Id.* Thus, the "take" prohibition can limit farming, ranching, cattle grazing, oil and gas drilling, renewable energy development, or other activities on private or federal lands that may "harm" the species through habitat modification or "harass" the species in some way.

44.     An entity who "takes" any threatened or endangered animal is subject to both criminal and civil penalties.  For a knowing violation of the "take" provision, the ESA provides criminal penalties of up to one year imprisonment and fines of up to $50,000, or both.  *See* 16 U.S.C. § 1540(b).  And the ESA provides civil penalties of up to $61,982 for each ESA violation. *See* 16 U.S.C. § 1540(a); 88 Fed. Reg. 5796, 5797 (Jan. 30, 2023).

45.     For projects with a federal nexus (e.g., those requiring federal approval, including oil and gas leasing and development on federal lands), Section 7 of the ESA requires the federal agency authorizing the project to consult with the Service prior to granting such authorization to ensure that the project will not jeopardize the continued existence of the listed species. 16 U.S.C. § 1536(a)(2).  In addition to potential prohibitions or imposition of project revisions or constraints

developed by the Service during the mandatory consultation, the time necessary for completion of the Section 7 consultation process can substantially delay projects.

46.     Section 4(d) of the ESA authorizes the Service to establish special regulations for the "take" of threatened species that the Service deems necessary and advisable to provide for the conservation of the species.  16 U.S.C. § 1533(d).  Pursuant to this authority, the Service developed general prohibitions and exceptions that apply to most threatened species. 50 C.F.R. §§ 17.31, 17.32. The Service may provide further species-specific regulations for threatened species under Section 4(d).

**(5)     Critical Habitat Designation**

47.     The ESA requires the Service to designate critical habitat—to the maximum extent prudent and determinable for such listed species—at the time of its listing decision.  16 U.S.C. § 1533(a)(3).  If the Service fails to make the determination at the time of listing, it typically must make a determination within a year.  *Id.* § 1533(b)(6)(C).

48.     Once the Service designates critical habitat, no one may take any action authorized, funded, or carried out by a federal agency that will result in the destruction or adverse modification of that critical habitat prior to consulting with the Service pursuant to Section 7 of the ESA.  16 U.S.C. § 1536(a)(2).

## V.     BACKGROUND

**A.     The Lesser Prairie Chicken.**

49.     The LEPC (*Tympanuchus pallidinctus*) is a species of prairie grouse native to the southern high plains of the United States.  Its population size can fluctuate based on a variety of factors, but the two most critical factors are temperature and rainfall, which greatly affect its population size from year to year.

50.    The LEPC's preferred habitat is native prairies consisting of short- and mixed-grasses with some shrubs.  The dominant shrub species are typically sand sagebrush (Artemesia filifolia) or shinnery oak (*Quercus havardii*).  LEPC are found in the grasslands of Kansas; the sand sagebrush native rangelands of Colorado, Kansas, Oklahoma and Texas; and in the shinnery oak-bluestem grasslands of New Mexico, Oklahoma and Texas.

51.    The LEPC's current occupied range includes parts of Andrews County, Texas, which is within the Midland-Odessa Division of the Western District of Texas.

52.    According to the Service, the LEPC's historic range prior to European settlement was estimated to have encompassed between 100,000 and 150,000 square miles.  As shown below, all of the Midland-Odessa Division is within the LEPC's estimated historic range:



Figure ES.1 The estimated historical range and the
analysis areas of the four ecoregions of the LEPC.

*See* Species Status Assessment Report for the Lesser Prairie-Chicken (*Tympanuchus pallidinctus*) at iv (Ver. 2.3, Mar. 2022).

53.     Very little information is available regarding the LEPC population size prior to 1900.  And the Service acknowledges that the historical population data on which it relied in forecasting future population sizes and making its Listing Decision was inconsistently and unreliably gathered prior to 1970, "making it difficult to precisely estimate [LEPC] population trends."  87 Fed. Reg. at 72,676.

54.     Aerial surveys are a more accurate method of estimating LEPC populations.  Yet, such surveys were not performed prior to 2012, and were not used in prior population estimates.  However, an aerial survey was conducted in 2012.  It estimated the LEPC population from 32,000 to 52,900.

**B.     States, agencies, companies and landowners work together to protect the LEPC.**

55.     Between 2012 and 2014, Industry Plaintiffs, in conjunction with numerous states, agencies, associations, ranchers, farmers, oil companies and landowners in Colorado, Kansas, New Mexico, Oklahoma and Texas began voluntarily working together to protect the LEPC and its habitat through the creation and participation in a formal conservation effort known as the Range Wide Plan ("**RWP**").  The RWP is administered by the Western Association of Fish and Wildlife Agencies ("**WAFWA**"), and permitted by the Service.  Those enrolled in the RWP have each agreed to implement conservation measures to reduce and/or eliminate known threats to the LEPC and its habitat within the LEPC's "estimated occupied range plus a buffer of 10 miles."  One of the unique aspects of the RWP is its use of adaptive management strategies to address threats to the LEPC and its range.  The RWP takes neither a static nor a one-size fits all approach.  It changes in accordance with the needs and threats to the LEPC.  The RWP is a 30-year plan, with 10-year benchmarks.  The RWP also provides for regularly monitoring to ensure the required results are

produced.  The RWP was developed at the urging of the Service.  And the Service itself has hailed the RWP as a "landmark, collaborative effort."

56.     In conjunction with the RWP and other LEPC conservation efforts, the Service also approved a Candidate Conservation Agreement with Assurances ("*CCAA*") with oil and gas industry members (the "*RWP CCAA*")—though other CCAAs exist that are unrelated to the oil and gas industry.  The RWP CCAA is designed to support and implement the RWP's conservation measures by reducing and/or eliminating known threats to the LEPC within the estimated historical range of the LEPC, plus an additional 10 miles.  The stated purpose of the RWP CCAA is to render a listing unnecessary by voluntarily avoiding, minimizing and offsetting impacts to the LEPC caused by oil and gas activities, thereby improving the quality of LEPC habitat and reducing further fragmentation.

57.     Many of the Industry Plaintiffs' members support and participate in the RWP and the RWP CCAA, which WAFWA administers, among other CCAAs.  The Service is a signatory to the RWP CCAA and is also responsible for overseeing WAFWA's administration of it.  The RWP CCAA cannot be changed without both WAFWA and the Service's approval.

**C.     After the Service first listed the LEPC as "threatened" in 2014, this Court vacated that listing decision for failing to comply with the Service's own PECE Policy.**

58.     In 2014, while the enrollment period was still ongoing for the RWP, the Service listed the LEPC as "threatened" throughout its entire range in Docket No. FWS-R2-ES-2012-0071, 79 Fed. Reg. 19,974 (April 10, 2014) (the "*2014 Listing*").  Unlike its decision in the Listing Decision now before the Court, the Service's 2014 Listing did not conclude there were distinct LEPC population segments, even after receiving public comments encouraging it to do so.  Instead, the Service evaluated the LEPC as an entire species across its range, and concluded it was "threatened" under the ESA.  However, in doing so, the Service failed to properly evaluate and

account for the effectiveness of the RWP, as it was legally required to do under the Service's own PECE Policy.

59.     The 2014 Listing was immediately challenged in this Court in *Permian Basin Petroleum Association et al v. Department of Interior et al.*, Cause No. 7-14-CV-50.  That lawsuit alleged the 2014 Listing should be vacated for, *inter alia*, the Service's failure to comply with its own PECE Policy.  On September 1, 2015, the Court ultimately vacated the 2014 Listing because the Service failed to evaluate new conservation efforts under the PECE Policy, as it was required to do.  *See Permian Basin Petroleum Ass'n v. Dep't of the Interior*, 127 F. Supp. 3d 700, 725 (W.D. Tex. 2015).

60.     Thereafter, the Service removed the LEPC from ESA's List of Endangered and Threatened Species.  81 Fed. Reg. 47,047 (July 20, 2016).

**D.      The LEPC population strengthened after the Service removed the 2014 Listing.**

61.     Although the 2014 Listing was vacated and the LEPC was removed from the List of Endangered and Threatened Species, the LEPC population nevertheless increased under the management of WAFWA and Colorado, Kansas, New Mexico, Oklahoma and Texas.  In fact, the LEPC population remains at a higher population than when the Service made its 2014 Listing because of these voluntary efforts:



Figure 2. Annual estimates of total range-wide population size of lesser prairie-chicken from 2012–2022. Bars represent the bootstrapped 90% confidence intervals. Graph generated from Nasman et al. (2022, p. 16). There were no surveys in 2019.)

Docket No. FWS-R2-ES-2021-0015, 87 Fed. Reg. 72,674, 72,677 (Nov. 25, 2022).

**E.      After environmental groups sued the Service to re-list the LEPC under the ESA, the Service settled and agreed to make a new listing decision.**

62.      On September 8, 2016, only a few months after the LEPC was removed from the List of Endangered and Threatened Species, various environmental groups petitioned the Service to segregate the LEPC into several distinct population segments, and then designate each segment as "endangered."  81 Fed. Reg. 86,315, 86,317 (Nov. 30, 2016).  Although the Service indicated at the time that a listing may be warranted, it ultimately took no further action for several years.

63.      In 2019, various environmental groups sued the Service in *Defenders of Wildlife, et al v. David Berhardt Secretary of the U.S. Dep't of Interior et al*, Cause No. 19-CV-1709, in the U.S. District Court for the District of Columbia.  That lawsuit alleged that the Service failed to make a listing decision regarding the LEPC.  The Service subsequently entered into a settlement

agreement with these environmental groups, agreeing to make a new determination of the LEPC's status by May 26, 2021.

**F.      WAFWA and the Service revised the RWP CCAA.**

64.     Before the Service's deadline to issue a new listing determination, WAFWA began revising the RWP CCAA to address a number of items requested by the Service.   During this process, the Service requested specific changes to portions of the RWP CCAA and ultimately agreed to the revised plan.   In fact, the RWP CCAA could not be revised without the Service's express approval.   WAFWA issued a revised RWP CCAA in July of 2021.

**G.      The Service published a proposed listing, finding two distinct population segments and listing one as "threatened" and the other as "endangered."**

65.     On May 31, 2021, the Service complied with its settlement obligation from the D.C. lawsuit and proposed a final rule regarding the LEPC's status in Docket No. FWS-R2-ES-2021-0015 (86 Fed. Reg. 29,432) (the "***Proposed Rule***").   The Service proposed that there be two distinct population segments of the LEPC: a Northern Population Segment and a Southern Population Segment.   The Service then proposed that the Northern Population Segment be listed as "threatened" under the ESA, and that the Southern Population Segment be listed as "endangered."

**H.      The Industry Plaintiffs submitted comments to the proposed listing raising issues that the Service ultimately disregarded.**

66.     During the public comment period, Industry Plaintiffs each submitted comments to the Service—either individually or in conjunction with other associations—raising concerns about many aspects of the proposed listing.   Among these many concerns, the Industry Plaintiffs and others informed the Service of the following:

- No LEPC populations qualify as distinct population segments under the DPS Policy based on the data, and the Service's application of the DPS Policy was arbitrary, cursory and defective.

- The best scientific and commercially available data did not support the Service's proposal to split the LEPC into distinct population segments and list any population as "threatened" or "endangered."

- The Service violated its PECE Policy by not analyzing conservation efforts that were new or had not yet demonstrated their effectiveness, including the RWP and Southern Grassland Program managed by the National Fish and Wildlife Foundation.

- The Service only paid lip service to the many ongoing, voluntary conservation efforts.  It did not actually conduct a meaningful analysis of the effects of each on the status of the LEPC and its habitat as it was required to do.

- The Service grossly overstated the impacts of oil and gas activity.

- The Service failed to extend the same exemptions for routine agricultural practices on existing cultivated lands to existing cattle grazing operations, despite acknowledging the benefits grazing provides to LEPC habitat.

Ultimately, the Service disregarded all such comments.

**I.**      **The Service published its Final Rule, splitting the LEPC into distinct population segments and listing both under the ESA.**

67.      On August 11, 2022, environmental groups notified the Service of their intent to sue the Service within 60 days for failing to finalize the Proposed Rule and publish a final rule regarding the LEPC's status under the ESA.  Thereafter, suit was filed against the Service on October 25, 2022, in *Center for Biological Diversity v. U.S. Fish & Wildlife Service, et al*, Cause No. 22-CV-796, in the U.S. District Court for the District of New Mexico.

68.      On November 25, 2022, shortly after the 2022 midterm elections, the Service entered a final rule regarding the LEPC's status in Docket No. FWS-R2-ES-2021-0015, 87 Fed. Reg. 72,674 (Nov. 25, 2022) (the "***Final Rule***").  The Final Rule did not evaluate the LEPC species' status as a whole across its entire range.  Instead, the Final Rule took a divide-and-conquer approach—splitting the LEPC into two population segments, and then concluding that each individual segment was either threatened or endangered.

**(1)**      **The Service designated the SSA as the best scientific and commercial data available for its assessment of the LEPC status.**

69.     In the Final Rule, the Service stated that the best scientific and commercial data available, regarding the LEPC, is contained in the Service's Species Status Assessment Report (the "*SSA*").  However, the Service cautioned:

> The SSA does not make any analysis or conclusions with regard to policy decisions, such as DPS Findings.  Instead, the SSA report provides the biological information that [the Service's] decisionmakers can then use to inform those policy decisions. Thus, all of the policy decisions and the rationale for those decisions are contained within the Federal Register documents and not included within the SSA report.

87 Fed. Reg. at 72,739.

70.     The SSA is merely a compilation and summarization of many studies, reports and data collected from many different sources over several decades.  Upon information and belief, the Service itself did not collect any raw data or perform any independent studies of the LEPC beyond reviewing, cherry-picking data and drawing its own conclusions from the work of others. In so doing, the Service also arbitrarily disregarded the best available data to it at the time of the listing, including LEPC genetic, genomic and DNA data—which contradicts the Service's findings and conclusions.  The Service did so without providing any reasonable explanation.

71.     The Service is obligated by its own policy to maintain originals of all scientific and commercial data—including all data cited in the SSA—that it relied upon in promulgating the Proposed Rule and Final Rule. Although the Service possessed important data necessary to verify the Service's conclusions within the SSA and Final Rule, it failed to make that information reasonably available sufficiently in advance of publishing the Final Rule.

**(2)     The Service arbitrarily concludes there are two distinct population segments.**

72.     Although the Service previously refused to recognize distinct population segments in its 2014 Listing, it reversed course in the Final Rule at the prompting of various environmental groups.  Now—for the first time—the Service has determined there are two distinct and significant LEPC population segments: a Northern Population Segment and a Southern Population Segment.

This determination was not based on any new scientific data or study.  Rather, it was based on scientific and commercial data available at the time of the 2014 Listing—in which the Service did not conclude any DPS existed.

73.     The Service identifies the boundary between these two so-called population segments as follows:



87 Fed. Reg. at 72,682.

74.     In making this newfound determination, the Service performed a cursory and arbitrary application under its DPS Policy, which required two findings: discreteness and significance.

75.     The Service based its "discreteness" finding solely only on factor (1) of the DPS Policy: evidence that the population segment is markedly separated from other populations of the

same taxon as a consequence of physical, physiological, ecological, or behavioral factors.  The Service's basis for this finding was limited to the following:

- The Southern Population Segment is separated from the Northern Population Segment by 95 miles;

- There has been no *recorded* movement of the LEPC between the two population segments in several decades; and

- Because there is no connection between the two population segments, there is presently no gene flow between the two segments.

*Id.* at 72,680.  Although the DPS Policy states that the term "markedly" is intended to have its commonly understood meaning, the Service arbitrarily rendered it as meaningless by essentially treating any separation (i.e., physical distance), no matter how small, as a marked one.  Moreover, the Service arbitrarily drew different and contradictory conclusions from the only study cited in support of this finding.  That study did not conclude there were two distinct population segments, nor did it conclude there is presently no gene flow between Northern and Southern Population Segments.  Moreover, had the Service reviewed the genetic and genomic LEPC data available to it, it would have concluded that there are no marked differences between either population segment and that there is gene flow and connectivity between the population segments.

76.     The Service based its "significance" finding solely on factors (2) and (4) of the DPS Policy. First, the Service considered evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics, which the Service described as follows:

- The most recent range wide genetic study examined neutral markers in LEPC across all of its known ecoregions allegedly "concluded that there is significant genetic variation across the [LEPC's] range";

- The same study allegedly concludes that the Southern Population Segment is "genetically distinct from the remainder of the range"; and

- The Southern Population Segment was likely historically connected to the remainder of the range, but has been separated since approximately the time of European settlement.

*Id.* at 72,680-81.  Although the DPS Policy states that the term "markedly" is intended to have its commonly understood meaning, the Service arbitrarily rendered it as meaningless by essentially treating any genetic difference, no matter how small, as a marked one. Moreover, the Service arbitrarily drew different and contradictory conclusions from the only study cited in support of this finding.   Finally, the Service ignored readily available data demonstrating there is no genetically marked difference between the Northern and Southern Population Segments.

77.    Second, the Service additionally considered evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon, which it described as follows:

- The Southern Population Segment is separated from the Northern Population Segment by 95 miles;

- The loss of the Southern Population segments would result in a loss of that portion of the LEPC's range and decrease the species' redundancy and ecological and genetic representation, thus decreasing its ability to withstand demographic and environmental stochasticity; and

- The loss of the Northern Population segments would result in a loss of 75% of the LEPC's range and decrease the species' redundancy and ecological and genetic representation, thus decreasing its ability to withstand demographic and environmental stochasticity.

*Id.*  Although the DPS Policy requires a resulting "significant gap" in the LEPC range, the Service arbitrarily defined "gap" to mean a reduction (or contraction) at the very edge of a species' range, rather than its commonly understood meaning.   Moreover, the Service arbitrarily defined "significant" to essentially mean any gap or reduction in the LEPC range, no matter how small, rather than its commonly understood meaning.  The Service further arbitrarily relied on the same evidence supporting its discreteness finding, rendering the significance prong of the DPS Policy redundant and meaningless—a violation of Congressional intent and the DPS Policy itself.

**(3)** **The Service arbitrarily overstated the impact that oil and gas and grazing operations have on the LEPC.**

78.     The Service concluded that "about 1,433,000 ac[res]" have been "lost due to oil and gas development."  SSA at 28-29.  This conclusion is premised on two major flaws:  (1) an arbitrary assumption that oil and gas activities have an impact radius extending 300 meters on the surrounding LEPC habitat, and (2) a failure to account for overlap with other existing features, where the impact has already occurred—meaning the oil and gas activity does not change or increase the already impacted area.

79.     In the Final Rule, the Service concluded that oil and gas operations have an impact radius of 300 meters on the LEPC without providing credible scientific justification or reasonable explanation.  The Service's decision to list the LEPC as endangered and threatened in both regions is based in part on this finding.  However, in 2014, the Service promulgated a final rule where it concluded that oil and gas operations only have an impact radius on 200 meters.  The Service explained at that time:

> If we apply a 200 m buffer to those wells, as used in the range wide plan (Van Pelt et al. 2013, p. 95), and remove any overlap from our analysis, an estimated 516,000 ha (1.27 million ac) of habitat within the estimated occupied range was impacted by oil and gas development by 2008. ***The buffers established in the range wide plan were based on the best available science and the professional judgment of the members of the Interstate Working Group Science team, which included representation from the Service,*** U.S. Geological Survey, Natural Resources Conservation Service, State Fish and Wildlife Agencies, public universities, private conservation organizations and private consultants.

79 Fed. Reg. at 20,054 (emphasis added).

80.     The Service did not provide a reason for this sudden change, nor does it cite to any new data that was not available or considered in 2014. As a result of the Service's sudden change, the Service has increased the impacted area by more than double, which materially affected its evaluation of the ESA Listing Criteria.

---

81.     The Service also overstated the impact of existing oil and gas operations by failing to account for overlap with existing features nearby, such as roads, fixtures, buildings and other wells.  The Service acknowledges that its analysis does not account for any such overlap—even though it does attempt to account for overlap when projecting future oil and gas activity.  In fact, the Service estimates that approximately 50% of future oil and gas activity will overlap with existing impacts.  Consequently, the Service reduced its estimates of future oil and gas impacts by that amount.  In contrast, the Service makes no attempt to do so for existing oil and gas activities, nor does it offer any reasonable explanation for treating its analysis of present and future impacts differently.  This materially affected its evaluation of the ESA Listing Criteria.

82.     The Service also arbitrarily concluded that cattle grazing operations negatively impact the LEPC, while simultaneously acknowledging cattle grazing is essential for maintaining suitable LEPC habitat.  This, too, affected the Service's evaluation of the LEPC's status under the ESA.

**(4)     The Service (again) refused to conduct the PECE analysis or properly consider all new and existing conservation efforts, despite an obligation to do so.**

83.     After concluding there are two distinct population segments of LEPC, the Service evaluated the status of each population segment under the ESA Listing Criteria in the development of its Final Rule.

84.     Conspicuously absent from the Final Rule is any PECE analysis whatsoever.  Despite this Court's prior ruling and the urging of Industry Plaintiffs in their public comments to the Proposed Rule, the Service failed and refused to conduct a PECE analysis of *any* conservation effort in the Final Rule.

85.     For example, the Service did not perform a PECE analysis on the Southern Plains Grassland Program conservation effort.  The Service acknowledged the new Southern Plains Grassland Program conservation effort "will likely result in some future benefits to the [LEPC]"

and claimed to have considered "this idea while making our listing determination," but ultimately did not alter its future projections because it "[was] not able to quantify the future benefits to the [LEPC]" at that time.  87 Fed. Reg. at 72,730.  The PECE Policy was created for this very situation: to allow the Service to evaluate a fledgling conservation effort—formalized but not fully implemented or shown to be effective.  Yet the Service failed to apply its PECE Policy again here, even after this Court vacated the 2014 Listing for the same reason.

86.      The Service also refused to conduct a PECE analysis of the RWP or RWP CCAA, alleging it was unnecessary.  87 Fed. Reg. at 72,725.  The Service did so, even though it was aware the RWP CCAA was materially revised in 2021—at the Service's behest and with the Service's approval—to increase the plan's effectiveness and longevity.  And it did so even though it was aware that the RWP was still in its early stages and changing to adapt to the LEPC's specific needs.

87.      Moreover, while the Service summarized and claimed to have considered all existing conservation efforts in promulgating the Final Rule, no meaningful analysis or consideration appears in the Service's Final Rule.  Perhaps most concerning was the Service's outright refusal to consider the effects of increased habitat quality—the RWP's focal point—simply because it was not easily quantified.

(5)      **The Service arbitrarily listed both population segments under the ESA.**

88.      After splitting the LEPC into distinct population segments and refusing to properly consider all conservation efforts—including a refusal to conduct any PECE analysis—the Service concluded that the Northern Population Segment was "threatened" under the ESA, while the Southern Population Segment was "endangered."

89.      In reaching this conclusion, the Service forecasted LEPC population estimates based on (1) overstated impacts, (2) historical population data the Service acknowledged was

inconsistently and unreliably gathered, and (3) unaccounted positive impacts of ongoing and new conservation efforts, including the encouraging trends over the past decade.

> **(6)     The Service imposed prohibitions under Section 9 of the ESA, but offered vague and overbroad descriptions of activities that constitute violations.**

90.     The ESA imposes Section 9 prohibitions (codified in 16 U.S.C. § 1538 and 50 C.F.R. § 17.21) where the LEPC is listed as endangered making it illegal to "take"—including harassment and harming—the LEPC. *See also* 50 C.F.R. § 17.3.  The Service imposed many of these same Section 9 prohibitions where the LEPC is listed as threatened through a rule issued under Section 4(d) of the ESA.

91.     The Service was then obligated to specify the types of activities likely to result or not result in a violation of Section 9, pursuant to its Endangered and Threatened Wildlife and Plants: Notice of Interagency Cooperative Policy for Endangered Species Act Section 9 Prohibitions ("***Section 9 Policy***"), 59 Fed. Reg. 34272 (July 1, 1994).  However, the Service provided only vague explanations of violations that ultimately imposed greater restrictions than those that Section 9 prohibits in its Final Rule.  For example, the Service vaguely indicated that activities that may "result in the unauthorized destruction or alteration of the [LEPC's] habitat" are prohibited—even though the activities would not actually result in a "take."  87 Fed. Reg. at 72749.

> **(7)     The Service imposed a special 4(d) Grazing Rule that was not included in the Proposed Rule.**

92.     The Final Rule acknowledges that cattle grazing is essential to managing and maintaining healthy grasslands and shrublands, which provide habitat for the LEPC.  However, the Service still precluded incidental take of the LEPC as a result of cattle grazing unless an unidentified third party approved by the Service approves of the grazing. ("***4(d) Grazing Rule***").  In other words, the Final Rule outsourced enforcement of the ESA to unidentified third parties to

determine appropriate cattle grazing activities on a site-specific basis.  The ESA does not grant the Service the power to delegate enforcement of the ESA to unspecified third parties.

93.     This 4(d) Grazing Rule—outsourcing the ESA's enforcement obligations to unidentified third parties—was not included in the Proposed Rule or made available for public comment before being implemented.  The Service included this 4(d) Grazing Rule for the first time in the Final Rule.

94.     The Final Rule authorizes unqualified incidental take for a host of "routine agricultural practices on existing cultivated lands . . . ." 87 Fed. Reg. at 72754.  This is despite the fact the Service acknowledged in the Proposed Rule: "prairie-chickens also maintain lek sites within these cultivated areas, and they may be present during farming operations.  Thus, existing cultivated lands, although not a native habitat type, may provide food resources for lesser prairie-chickens."  86 Fed. Reg. at 29476.  Conversely, the Service arbitrarily and capriciously denied such unqualified authorizations to agricultural grazing lands and instead subjects such grazing lands to third-party approved grazing plans.

**J.      Industry Plaintiffs timely notify the Service of their intent to file suit.**

95.     Industry Plaintiffs notified the Service in writing by e-mail and FedEx Overnight of their intent to file this suit if the Service on January 19, 2023,  February 1, 2023, and April 14, 2023.  The Service responded to each of these notices by stating it would not remedy the issues identified in Industry Plaintiffs' letters.

## VI.     CLAIMS FOR RELIEF

96.     Industry Plaintiffs allege and incorporate by reference the allegations of all preceding paragraphs.

97. The Service's decision to list the LEPC as threatened in the Northern Region and endangered in the Southern Region is a final agency action, which is subject to judicial review by this Court under the APA.

98. By promulgating the Final Rule listing the LEPC as threatened in the Northern Region and endangered in the Southern region under the ESA, the Service violated the APA. The Service's Final Rule is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law and without observance of procedure required by law pursuant to the APA. Therefore, the Final Rule and the 4(d) Grazing Rule should be set aside and vacated.

99. Moreover, the Final Rule should be vacated because the Service failed to perform nondiscretionary acts when entering the Final Rule. In listing the LEPC as threatened in the Northern Region and endangered in the Southern Region under the ESA, the Service failed to perform a number of nondiscretionary acts required under the ESA.

100. As a result, the Final Rule and the 4(d) Grazing Rule are invalid and should be vacated.

**Claim 1: The Service violated the APA, ESA, and its own PECE Policy when it failed to perform the PECE analysis (again).**

101. Industry Plaintiffs allege and incorporate by reference the allegations of all preceding paragraphs.

102. Pursuant to its PECE Policy, the Service committed itself to evaluating conservation efforts in deciding whether to list species as endangered or threatened. 68 Fed. Reg. 15,1000. The PECE Policy requires the Service to evaluate 15 specified criteria in order to determine whether conservation efforts are likely to be implemented and effective in the future. *Id*. at 15,114-15. In 2015, this Court vacated the Service's prior listing of the LEPC for not conducting the required PECE analysis.

103.    Although the Service was obligated to perform a PECE analysis of various conservation efforts in the Final Rule, the Service failed to conduct and publish a PECE Policy evaluation of the many planned and existing LEPC conservation efforts, both individually and cumulatively, including the Southern Plains Grasslands Programs, the RWP and the RWP CCAA that was revised with the Service's approval in 2021.  The Service's failure to perform and publish these evaluations is in violation of its PECE Policy.  By failing to undertake and consider the required PECE analysis as part of its Final Rule, the Service broke its own policy, failed to consider an important aspect of the listing, and its decision is not based on consideration of all relevant factors.

104.    In its Final Rule, the Service negated the purpose and intended effect of its PECE Policy by requiring that, in order to have an impact on the Service's Final Rule, planned conservation efforts, as well as existing conservation efforts whose effectiveness had not yet been demonstrated, must have already resulted in reduction or elimination of threats to the LEPC at the time of the Final Rule.  In so doing, the Service violated its PECE Policy, erected an irrational barrier to the required consideration of such conservation efforts, failed to consider all relevant factors, and failed to consider an important aspect of the listing.

105.    Consequently, the Final Rule listing the LEPC as "threatened" in the Northern Region and "endangered" in the Southern Region must be vacated because the Service acted in an arbitrary, capricious manner, abusing its discretion, or otherwise not in accordance with law or in observance of procedure required by law.

**Claim 2:**    **The Service's evaluation of the ESA Listing Criteria violated the APA and ESA because it was conclusory, inconsistent, irrational, and contrary to the evidence.**

106.    Industry Plaintiffs allege and incorporate by reference the allegations of all preceding paragraphs.

107.   The Service was required to consider the ESA Listing Criteria in evaluating the status of the LEPC species under the ESA, including the present or threatened destruction, modification or curtailment of the species' habitat or range and other threats and factors affecting its continued existence.   In the Final Rule, the Service identified present and future oil and gas operations as a factor negatively impacting the LEPC and its habitat, which served as a basis for its Listing Decision.   However, the Service failed to perform its obligations and arbitrarily made determinations regarding the impacts of oil and gas activity.   As a result, the Service inaccurately and grossly overstated such impacts in making the Listing Decision.   For example:

- The Service arbitrarily determined that oil and gas wells and operations have an impact radius of 300 meters without providing credible scientific justification or reasonable explanation for such determination.

- The Service failed to provide a reasonable explanation for changing its position from the 2014 Listing wherein it stated the impact radius was only 200 meters based on the best available scientific data and professional judgment of the Service and several other organizations.

- The Service failed to account for overlap that may exist with other features, which may have already impacted the landscape, habitat and range.

108.   The Service was also required to consider all conservation efforts in evaluating the status of the LEPC species under ESA.   However, the Service failed to do so, paying only lip service to its statutory and regulatory obligations.   For example:

- The Service arbitrarily understated the benefits of these plans based on its newfound conclusion that the "impact radius" for the forecasted oil and gas activities on the LEPC habitat is 300 meters. 87 Fed. Reg. at 72687.

- The Service arbitrarily discounts and disregards the effect of increased habitat quality when evaluating conservation efforts and the status of the LEPC simply because it was not able to quantify the value of high-quality habitat for purposes of analysis.   It arbitrarily did so even after inciting numerous states, agencies, companies and landowners to create and participate in the Service-approved RWP and RWP CCAA, which focuses primarily on increasing habitat *quality*.

- The Service arbitrarily ignored the ability of these conservation efforts to prevent further habitat fragmentation, particularly in areas of high quality LEPC habitat. The Service further arbitrarily discounted and disregarded the effects of the RWP

based on inaccurate and inconsistent factors, such as speculation as to its future financial viability.

- The Service failed to perform a meaningful analysis of the effects of conservation programs on the LEPC.  For example, the Service's conclusion that "existing regulatory mechanisms have minimal influence on the range wide trends of [LEPC] habitat loss and fragmentation because 97 percent of the lesser prairie-chicken analysis area occurs on private lands" fails to account for the role of voluntary conservation measures.  *Id.* at 72695.  Similarly, the Service did not analyze the benefits of the RWP CCAA and other conservation agreements.  The Service merely listed the number of acres enrolled but did not examine the conservation benefits conferred by these programs or analyze where these benefits were conferred in relation to threats to the species.  *See id.* at 72697–98.

- The Service arbitrarily failed and refused to consider the positive effects each conservation effort has generated and will likely generate in the future, both on an individual and cumulative basis.

- The Service improperly discounted the benefits of conservation plans, including but not limited to the RWP and the Candidate Conservation Agreement/Candidate Conservation Agreement with Assurances in New Mexico.  The Service incorrectly assumed that, under a listing and 4(d) rule, the destruction or alteration of the species' habitat and activities that result in LEPC avoidance of an action would constitute a violation of Section 9 of the ESA.  *See* 87 Fed. Reg. at 72748.  Because the circumstances in which such activities would violate section 9 of the ESA are narrow, the conservation plans yield a greater conservation benefit than listing the LEPC by creating incentives to reduce disturbances and infrastructure in LEPC habitat.  The Service further discounted the expected benefits of the RWP due to vague concerns about the RWP's financing.

- The Service did not consider the positive effects of the Southern Plains Grassland Program managed by the National Fish and Wildlife Foundation.   87 Fed. Reg. at 72730; PECE, 68 Fed. Reg. 15100-02; *see also* 16 U.S.C. § 1533(a), (b).

- The Service did not consider the positive overlapping effects of the Monarch Butterfly and Dune Sage Brush Lizard conservation efforts in the LEPC range and habitat.

109.    Consequently, the Final Rule must be set aside and vacated because the Service acted in an arbitrary, capricious manner, abusing its discretion, or otherwise not in accordance with law or in observance of procedure required by law.

110.    Further, the Service failed to perform a nondiscretionary act in promulgating the Final Rule, which must be vacated.

**Claim 3:      The Service violated the APA, ESA, and its own DPS Policy when it determined there are two distinct population segments.**

111.     Industry Plaintiffs allege and incorporate by reference the allegations of all preceding paragraphs.

112.     The Service did not evaluate the status of the LEPC species as a whole as it was required to do under the ESA.  Instead, the Service determined there were two distinct population segments and evaluated each population segment separately.  The Service may do so only when the DPS Policy criteria are satisfied, which the Service must follow.

113.     The DPS Policy requires a population segment to be both discrete and significant before its status may be evaluated separate from the rest of the population.  Congress has instructed to use the DPS Policy sparingly.

114.     The Service did not comply with the DPS Policy.  Instead, the Service violated the policy and Congressional mandate to reach its desired conclusion.

115.     The Service's conclusion that the so-called Northern Population Segment and Southern Population Segment are "discrete" LEPC population segments is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law because the populations are not "markedly separated" from one another.  For example:

- The Service ignored its own DPS Policy requirement that any separation be "marked[]"—or alternatively employed an arbitrary or capricious definition of "markedly"—concluding mere distance of 95 miles alone is not sufficient evidence of discreteness;

- The Service disregarded scientific and commercial data that the LEPC can travel distances greater than 95 miles in a single day—the approximate distance between the so-called population segments—by merely stating there has been no *record* of a LEPC traveling between the Northern and Southern Regions.

- The Service's conclusion is counter to the scientific and commercial data on which the Service purports to rely, including studies that acknowledge there was gene flow and connectivity between the two populations;

- The Services' conclusion is the result of illogical and internally inconsistent analysis of the scientific and commercial data, including the Service's decision to disregard contradictory portions of studies it deemed to be the best scientific and commercial data available;

- The Service's analysis of the "discreteness" prong was cursory, conclusory and not based on the best available scientific or commercial data.

116.    Additionally, the Service's conclusion that the so-called Northern Population Segment and Southern Population Segment are "significant" is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law.  For example:

- The Service's conclusion is counter to the scientific and commercial data on which the Service purports to rely, including studies that acknowledge there was gene flow and connectivity between the two populations;

- The Service's conclusion is not supported by the best scientific and commercially available data, including genomic and genetic data of the LEPC in its possession or otherwise available to it (via other federal agencies) that confirms there is no genetically marked difference between the LEPC across its range;

- The Service's conclusion is counter to the scientific and commercial data on which the Service purports to rely;

- The Service's conclusion is the result of illogical and internally inconsistent analysis of the scientific and commercial data, including drawing unintended conclusions from scientific studies and overstating the significance of slight differences in three neutral genetic markers in LEPC population segments;

- The Service ignored its own DPS Policy requirement that any difference in populations be "marked[]," such that they manifest observable and meaningful differences in the characteristics of each population segment—or, alternatively, employed an arbitrary or capricious definition of "markedly" to fit its predetermined conclusion;

- The Service failed to identify a "significant gap" in the LEPC's range as its DPS Policy required—or, alternatively, employed an arbitrary or capricious definitions of "significant" and "gap" to reach its desired conclusion;

- The Service's conclusion is premised on circular reasoning;

- The Service's conclusion is based on the same evidence as the "discreteness" prong (i.e., mere distance), rendering the DPS Policy's "significance" requirement meaningless; and

- The Service's conclusion is not based on the best available scientific or commercial data.

117.   Additionally, the Service relied on data available to it during the 2014 Listing—which declined to recognize the existence of distinct population segments—but offered no reasonable explanation for the newfound determination that distinct population segments now exist.

118.   Consequently, the Final Rule must be vacated because the Service acted in an arbitrary, capricious manner, abusing its discretion, or otherwise not in accordance with law or in observance of procedure required by law.

**Claim 4:**     **The Final Rule's prohibitions violate the ESA and APA and are inconsistent with the Service's Section 9 Policy.**

119.   Industry Plaintiffs allege and incorporate by reference the allegations of all preceding paragraphs.

120.   The APA requires the Service to publish a proposed rule in the Federal Register and provide the public an opportunity to submit written data, views, or arguments before a final rule is published.  The Service failed to comply with the APA by not publishing the 4(d) Grazing Rule with its Proposed Rule or allowing the public an opportunity to submit written data, views, or arguments before including it in the Final Rule.  Moreover, the Service exceeded the statutory authority of the ESA by outsourcing enforcement of the ESA to unidentified Service-approved third parties, which the ESA does not allow.

121.   Further, the Service's Section 9 Policy then obligated the agency to specify the types of activities likely to result or not result in a violation of Section 9, but the Service failed to do so.  The Service provided only vague explanations of activities that would result in violations. Furthermore, these activities would not result in take as defined at 16 U.S.C. § 1532(19) and 50 C.F.R. § 17.3.   For example, the Service vaguely indicates activities that may "result in the

unauthorized destruction or alteration of the [LEPC's] habitation" will be prohibited—even though it would not actually result in a "take."  87 Fed. Reg. at 72749.  It is settled law that an agency ordinarily must follow its own policies and procedures and may depart there from only with reasoned explanation.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *I.N.S. v. Yang*, 519 U.S. 26, 32 (1996).  The Service departed from its Section 9 Policy but failed to provide any reasoned explanation for doing so.  Because the Service did not follow its own policy, its actions are arbitrary and capricious.

122.    Where the Service did attempt to describe prohibited actions, however, it improperly described the 4(d) Rules as prohibiting a broader class of actions than the law actually states.  *See* 87 Fed. Reg. at 72748; see also 16 U.S.C. § 1532(19); 50 C.F.R. 17.3; 46 Fed. Reg. 54748-01.

123.    Consequently, the Final Rule must be vacated because the Service acted in an arbitrary, capricious manner, abusing its discretion, or otherwise not in accordance with law or in observance of procedure required by law.  Alternatively, the Court should remand the Final Rule to the Service to comply with the Section 9 Policy.

**Claim 5:      The Service's 4(d) Grazing Rule violates and exceeds the authority granted under the ESA.**

124.    Industry Plaintiffs allege and incorporate by reference the allegations of all preceding paragraphs.

125.    The ESA authorizes the Service to enforce the ESA.  The ESA does not give the Service the discretion to delegate or outsource its enforcement obligations to third parties.

126.    In the Final Rule, the Service outsourced enforcement of the ESA under the 4(d) Grazing Rule to unidentified third parties.  But the Service had no discretion to do so.  As a result, the Service failed to perform a nondiscretionary act in promulgating the Final Rule and 4(d) Grazing Rule, which must be vacated.  Alternatively, the Court should vacate the portion of the

4(d) Grazing Rule that exceeds the scope and authority of the ESA, namely: the outsourcing of ESA enforcement and grazing management to third parties.

## CONCLUSION & PRAYER

WHEREFORE, premises considered, Industry Plaintiffs pray the Defendants be served with citation and ordered to appear, that the Final Rule be vacated, and Defendants be ordered to pay Industry Plaintiffs' reasonable and necessary attorneys' fees and costs of court, and that Industry Plaintiffs be awarded all other relief to which they may be entitled at law or in equity.

Submitted this 8th day of February, 2024.

Respectfully submitted,

*/s/ Jeff Kuhnhenn*

Jeff Kuhnhenn
Texas Bar No. 24078809
jeff.kuhnhenn@kellyhart.com
Derek Montgomery
Texas Bar No. 24042264
derek.montgomery@kellyhart.com
**KELLY HART & HALLMAN LLP**
P.O. Box 3580
Midland, Texas 79701
Telephone:  (432) 683-4691
Facsimile:  (432) 683-6518

Marianne Auld
Texas Bar No. 01429910
marianne.auld@kellyhart.com
**KELLY HART & HALLMAN LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:  (817) 878-3543
Fax:  (817) 878-9280

**ATTORNEYS' FOR INDUSTRY PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Texas by using the CM/ECF system, which will send notification of this filing to the attorneys of record.


_____*/s/ Jeff Kuhnhenn*_____
Jeff Kuhnhenn