**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS, ET AL.,** | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | **CIVIL ACTION NO.** |
| v. | § | **7:23-CV-00047-DC** |
| | § | |
| **U.S. DEPARTMENT OF THE** | § | |
| **INTERIOR, ET AL.,** | § | |
| | § | |
| *Defendants.* | § | |

**INDUSTRY PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO COMPEL**
**THE SERVICE TO COMPLETE AND SUPPLEMENT**
**THE ADMINISTRATIVE RECORD**

The Industry Plaintiffs file this Reply in Support of Their Motion to Compel the Service to

Complete and Supplement Administrative Record[1] (Doc. 50) lodged by the Defendants

(collectively, the "***Service***"):

## INTRODUCTION

The Service is attempting to limit judicial review.  It excluded all of its internal documents,

claiming they are irrelevant as deliberative materials.  The Service devotes most of its Response

to the uncontested point that deliberative materials should not be produced absent unusual

circumstances and bad faith.[2]  But it glosses over two critical issues:

1.      Who determines whether a document is "deliberative": the Court or the Service?

2.      Are the internal documents withheld by the Service actually deliberative?

---

[1] The "***Administrative Record***" refers to the documents identified in the Index to the Administrative Record (Doc. 47-2), which were submitted to the Court and district clerk via USB on February 16, 2024 (Doc. 48).

[2] As the Motion to Compel demonstrates, there is evidence of impropriety and bad faith here, warranting production of documents related the policy making portion (Phase 2), too.  *See* (Doc. 50 at 14-18).

The Service also excluded certain documents cited in the Species Status Assessment for the Lesser Prairie Chicken ("*SSA*"), claiming they were too attenuated to be part of the Record. But the Service skips that they were created and considered by the Service staff.

Lastly, the Service excluded WAFWA emails sent before the listing decision, claiming they contained nothing to consider.  But the Service ignores that these provided new genetic *data*, relevant to the analysis required by its policies and the ESA and the emails are necessary to document the Service's decision-making process.

Because the Service offers no guidance on these points, Industry Plaintiffs file this limited reply in support of their Motion.

## DISCUSSION

### A.    The Court determines matters of relevance, including whether a document is "deliberative."

Nothing in the Administrative Procedure Act ("APA")'s text or history suggests that Congress intended to weaken judicial review by limiting its ability to review the "whole record" of agency action.[3]  And "[t]here is mounting evidence that the Executive Branch is using the deliberative process privilege . . . arguably as a subterfuge to cover up decisions that are being

---

[3] 5 U.S.C. § 706 (requiring courts to review the "whole record"  and not speaking to the exclusion of deliberative materials); *see also Kaiser Aluminum & Chem. Corp. v. United States*, 141 Ct. Cl. 38, 49, 157 F. Supp. 939 (1958) (courts did not begin recognizing the deliberative-process privilege until more than a decade after Congress adopted the APA's "whole record" judicial-review standard). While the compilation of administrative records is not governed by the FOIA Act, many courts look to FOIA precedent as guidance due to the limited judicial precedent. Regardless, in both a FOIA and APA context, the government must demonstrate a document is "deliberative" before excluding. *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1180 (D.C. Cir. 1996) (In FOIA cases, a specific type of affidavit, known as a Vaughn Index, is required and must "itemize each document and explain the connection between the information withheld and the exemption claimed . . . ."); *Branch v. Phillips Petrol. Co.*, 638 F.2d 873, 882-83 (5th Cir. 1981) (discussing and quoting *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953)) (acknowledging the agency is procedurally required to assert the "official" or "deliberative process" privilege to the court when withholding such documents);  *Exxon Mobil Corp. v. Mnuchin*, 2018 WL 10396585, at *4 (N.D. Tex. June 26, 2018), *objections overruled*, No. 3:17-CV-1930-B, 2018 WL 4103724 (N.D. Tex. Aug. 29, 2018) ("An agency has the burden of establishing that the deliberative-process privilege applies, i.e., that the materials sought are pre-decisional and deliberative") (citations omitted).

made largely on political grounds. . . ."[4]  This case presents an opportunity to establish clear boundaries for agencies to protect the integrity of the courts and Constitution.

The Service claims that all internal documents it circulated during both the SSA portion (Phase 1) and policy making portion (Phase 2) of the listing decision are irrelevant because they are "deliberative" and "pre-decisional."  (Doc. 57 at 11-12; Doc. 58 at 6-7).  But the Service is quick to note that it has not asserted any claim of privilege.[5]  Yet nearly all of the Service's authorities concerns an assertion of the narrow[6] "deliberative process" privilege under the Freedom of Information Act ("*FOIA*").[7]  This undermines the Service's argument.  In each of the Service's authorities, the federal agency making this claim bore the initial burden of proving the *specific* documents withheld were "deliberative" and "pre-decisional."  But the Service offers no such evidence here.

Instead, it tries to avoid its burden of proving the withheld documents are deliberative, relying on the D.C. Circuit's opinion in *Oceana, Inc. v. Ross*,[8] which the Ninth Circuit only

---

[4] Michael Ray Harris, *Standing in the Way of Judicial Review: Assertion of the Deliberative Process Privilege in APA Cases*, 53 ST. LOUIS U. L.J. 349, 386 (2009); *see also* Kirk D. Jensen, *The Reasonable Government Official Test: A Proposal for the Treatment of Factual Information Under the Federal Deliberative Process Privilege*, 49 DUKE L.J. 561, 567 (1999) (noting that the deliberative process privilege has "spread through the federal courts like wildfire" and "is being applied in an ever-increasing number of cases").

[5] (Doc. 57 at 12 n. 6, 13); (Doc. 50-7 at 2).  In doing so, the Service has expressly waived any claim to privilege regarding these withheld internal documents. *See Mia. Nation of Indians of Ind. v. Babbitt*, 979 F. Supp. 771, 778 (N.D. Ind. 1996) ("The government's lack of specific objection could be construed as a waiver of its claim of privilege."); *see also* FED. R. CIV. PROC. 26(5)(a)(ii) (requiring parties to "expressly" invoke a privilege to withhold information otherwise discoverable); *EEOC v. BDO USA, LLP*, 876 F.3d 690, 697 (5th Cir. 2017) (requiring an agency to withhold such material as privileged expressly "to permit courts and other parties to test the merits of the privilege claim").

[6] *Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 133, *modified on reconsideration*, 71 Fed. Cl. 205 (2006) ("Like all evidentiary privileges that derogate a court's inherent power to compel the production of relevant evidence, the deliberative process privilege is narrowly construed.").

[7] *See* (Doc. 57 at 13).

[8] 920 F.3d 855, 865 (D.C. Cir. 2019).  The other cases cited by the Service do not involve the same issue.

For example, in *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, , the petitioners asked for the transcript of literal policy deliberations during a closed meeting by a Nuclear Regulatory Commission hearing. 789 F.2d 26, 44–45 (D.C. Cir. 1986).  But unlike that case, the Service here concedes there were no policy determinations being discussed during the SSA phase (Phase 1).  (Doc. 57 at 15).

The Service also cites to an unreported Sixth Circuit case, *In re U.S. Dep't of Def. & EPA*, in which the court evaluated and confirmed that the withheld documents were truly deliberative before excluding them.  No. 15-3751,

recently followed.[9]   *Oceana* continues the dangerous trend of incremental agency overreach through presumptions and deference (some of which are under review in the Supreme Court).[10] For example, *Oceana* holds that merely certifying the record as complete is enough to prove all excluded documents are presumed irrelevant.  But the D.C. Circuit once held a more practical view consistent with Constitutional and legislative principals of judicial review—not to mention the practicalities of litigation.  In *National Courier Association v. Board of Governors of Federal Reserve System*, the D.C. Court said:

> ***The Government takes the position that internal staff memoranda are never part of the record. . . .  We think a fuller analysis is called for.*** Private parties and reviewing courts alike have a strong interest in fully knowing the basis and circumstances of an agency's decision. The process by which the decision has been reached is often mysterious enough without the agency's maintaining unnecessary secrecy. To be sure, the agency may have a strong interest of its own in keeping internal documents from public view, but it will normally be far easier for the agency to establish its interest in suppressing such documents than for the private litigants to establish their interest in exposing them to judicial scrutiny. ***The proper approach, therefore, would appear to be to consider any document that might have influenced the agency's decision to be "evidence" within the statutory definition, but subject to any privilege that the agency properly claims as protecting its interest in non-disclosure.***[11]

As already briefed in the Motion to Compel, this Court need not—and should not—follow *Oceana* for several reasons.  (Doc. 50 at 12-13).  Agencies should not be trusted to unilaterally determine matters of relevance—including deliberative material designations—as this case shows.

---

2016 WL 5845712, at *1-2 (6th Cir. Oct. 4, 2016) (per curiam) (mem. op.).  The Sixth Circuit did not just take the agency at its word like the Service asks here.

[9] Although the Ninth Circuit recently agreed with the D.C. Circuit's approach in *Oceana*, it still noted that "whether materials are in fact deliberative is subject to judicial review[.]"  *Blue Mountains Biodiversity Project v. Jeffries*, 72 F.4th 991, 997 (9th Cir. 2023), *amended and superseded on denial of rehearing en banc*, No. 22-35857, 2024 WL 1641526 (9th Cir. Apr. 16, 2024).

[10] *Loper Bright Enters., Inc. v. Raimundo*, 45 F.4th 359 (D.C. Cir. 2022), *cert. granted*, 143 S. Ct. 2429, 216 L. Ed. 2d 414 (2023) (granting certiorari on whether *Chevron* deference should be overruled or at least clarify that statutory silence concerning controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency).

[11] 516 F.2d 1229, 1241–42 (D.C. Cir. 1975) (emphasis added).

**B.      The Service is withholding documents that are not "deliberative."**

Although *Oceana*—if applied—would already severely limit judicial review of the Service's decision to exclude many documents from the Record, the Service asks the Court to extend it further. The Service reads *Oceana* as allowing it to withhold *all* internally circulated Service documents based on hypothetical deliberations of non-policy matters.  This should not be allowed.

The Service concedes the withheld "internal communications concerning the SSA are not deliberations concerning a policy decision[.]"  (Doc. 57 at 16).  It merely claims these documents may contain other forms of deliberations.  *Id.*  But there are two problems with this argument.

First, the Service only suggests *hypothetical* deliberations that *may* be included in these withheld documents.[12]  For example, the Service claims:

> [T]he agency **may** also deliberate, inter alia, in determining the best available science, deciding staffing for specific projects and the most efficient use of agency resources, determining the appropriate level of management involvement in a specific project, deciding the best strategy for facilitating stakeholder participation in a project, developing a communications strategy to announce a decision, and assessing litigation risk associated with various decisions.

(Doc. 57 at 16) (emphasis added).

The Service does not state every withheld document contains one or more of these possible deliberations. Nor does it offer even a scintilla of evidence as support that any do.  How can the Industry Plaintiffs prove (and the Court meaningfully evaluate) whether a document is relevant when all information is in the Service's possession and concealed?[13]  From a practical standpoint,

---

[12] *In re Nielsen*, No. 17-3345, 2017 U.S. App. LEXIS 26821, at *13 (2d Cir. Dec. 27, 2017) ("[T]he possibility that some documents not included in the record may be deliberative does not necessarily mean that they were properly excluded.") (citing *Suffolk v. Sec'y of the Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977)).

Nor does the APA require that "Plaintiffs must identify with particularity the documents they believe were  omitted from the Administrative Record" as the Service argues. (Doc. 57 at 7). Such a requirement would be impractical if not impossible when the Service contends that certain documents are categorically excluded. Similar to the impossibility of determining the contents of the documents making them "deliberative," it would be impossible for the court or the Industry Plaintiffs' to identify every document excluded.

the Service should bear the burden of establishing each withheld document is deliberative—which it did not carry.  Allowing a party to categorically exclude documents without providing *some* evidence in support creates an unreviewable moral hazard. The Court is the gatekeeper—not the agency.

Second, the Service cites no cases holding that these theoretical deliberations are the type contemplated in the Service's own authorities under FOIA, or even under the APA—because they are not. In fact, "Congressionally mandated scientific decisions," such as listing determinations, "are less likely to result in the creation of documents which might expose the agency's decision-making process in such a way as to discourage candid discussion within the agency."[14] The two cases that the Service cites involved deliberations of policy matters,[15] which the Service concedes did not occur during the SSA process (Phase 1).

If the Court applies *Oceana* in the manner the Service suggests, agencies will be permitted to withhold documents for any number of hypothetical, non-policy reasons—and practically evade all judicial review.[16]

---

[14] *See Nw. Env't. Advocates v. Envtl. Prot. Agency*, No. 05-1876-HA, 2009 WL 349732, at *21 (D. Or. Feb. 11, 2009) (internal quotations omitted); *see also Ctr. for Biological Diversity v. Env't. Prot. Agency*, 279 F. Supp. 3d 121, 148 (D.D.C. 2017) (records that "weigh and evaluate scientific data, studies, reports, and other relevant information" to make a scientific determination are generally not the type of "policy determinations" protected by the deliberative process privilege); *see also Parke, Davis & Co. v. Califano*, 623 F.2d 1, 6 (6th Cir. 1980) (stating that opinions of "scientifically trained persons" are only exempt if they reflect "the deliberative process of decision or policy making").

[15] *See Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 363, 364 (D.C. Cir. 2021) (FOIA case noting "[t]he emails were also deliberative . . .  contain[ing] the type of back-and-forth exchange of ideas, constructive feedback, and internal debate over how best to promote and to preserve the undercover *policy* that sits at the heart of the deliberative process privilege" and, at the end of which "[t]he FBI ultimately did change its policies" (emphasis added)); *Nat'l Sec. Archive v. C.I.A.*, 752 F.3d 460, 463 (D.C. Cir. 2014) (FOIA case noting the D.C. Circuit has previously "held that a draft of an agency's official history is pre-decisional and deliberative because it "constitutes the agency's 'official statement' concerning the agency's prior actions, and it helps educate future agency decision makers.").

[16] The Northern District of Texas explained it this way: "Under the circumstances presented in the case *sub judice*, excusing Defendants from the requirement of providing a privilege log would essentially vitiate their burden of establishing the applicability of the privilege. Without a log, Plaintiffs would have no way of knowing what materials were withheld, whether they are relevant, or whether they contain information available from another source. In other words, Plaintiffs would lack the information necessary to overcome the privilege and Defendant's invocation of privilege would essentially be absolute. This is precisely why 'blanket' invocations of the deliberative-process privilege are impermissible." *Mnuchin*, 2018 WL 10396585, at *4.

Because the Service has not established that each internally circulated document during the SSA phase is "deliberative" in nature—and is not asserting privilege claims—the Court should order it to complete the Record with these missing documents.

**C.      The Service is withholding documents its staff created and reviewed.**

The Service also concedes it is withholding internal documents that its staff created, reviewed, cited, and summarized in the SSA. (Doc. 57 at 7-11). The Service omitted these documents from the record, claiming its decision maker did not actually review them—only the summaries contained in the SSA. (Doc. 50-7 at 2). It does not believe the Record includes documents cited within ones the decision maker reviewed.

While that limitation sounds reasonable, it is unreasonable when applied to documents *created* by the Service.  That distinguishes this case from the one cited in the Service's Response. In *Center for Native Ecosystems v. Salazar*, the Colorado district court declined to order an agency to produce documents cited in a document the agency cited.[17]  The Colorado district court based this decision on the fact that the agency only considered a few statistics from a particular document and there was "no additional (or clear) evidence establishing that Colorado Field Office staff considered [the sources cited in that document]."[18]

Here, the Service's staff *did consider* the underlying data and modeling because they gathered and analyzed it.  That renders it part of the Record.  And the Service's communications related to these critical actions[19] should also be included to ensure the whole story is told because they document this important step of the decision making process.

**D.      Documents from the SSA process (Phase 1) are relevant because the SSA is part of the Service's Final Listing Decision.**

---

[17] *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1277–78 (D. Colo. 2010).
[18] *Id.*
[19] The modeling concerns available and impacted habitat, which affects the alleged primary threat facing the Lesser Prairie Chicken: ongoing loss of suitable habitat.

Under the Endangered Species Act, the Service is required to "apply the ESA listing criteria in light of the best available science."[20]  While the Service admits it prepared the SSA for this very purpose, it claims all internal documents during that process are "not properly part of the Administrative Record" because the lawsuit challenges only "the Final Listing Rule, not the SSA."[21]

The Service's position, as already noted, amounts to agency "smurfing."[22]  The SSA is not a final, reviewable document itself, but it is *the* primary supporting document for the Final Listing Rule.[23]  And until 2016, the Service included all of that information in the Final Rule itself.  *See, e.g.*, 79 Fed. Reg. at 19998-20015 (2014 Listing Decision).

Although the Service compiled the information in a separate document (the SSA), it later incorporated that information into the Final Listing Rule.[24]  That is why the Service included all of its communications with third parties and documents related to preparing the SSA in the Record, including drafts of the SSA itself.  To now claim the SSA is essentially unreviewable and not part

---

[20] 16 U.S.C. § 1533(b)(1)(A). In fact, the determinations must be made *based solely on* the best scientific and commercial data available after reviewing the status of the species and considering those efforts. *Id.* § 1533(b)(1).

[21] (Doc. 57 at 16). The Service states, "the development of the SSA is a condition precedent to the decision-making process, but it is not a part of the process." *Id.* at 15.

[22] *See* (Doc. 50 at 7, n. 18).

[23] *See* Ex. A (FWS19104) (Final Listing Decision Excerpt) ("The SSA report documents the results of our comprehensive biological review of the best scientific and commercial data regarding the status of the species" and "provide[s] the scientific basis that informs our regulatory decisions."); (Doc 50-4 at 2-3) (referring to the SSA as a "Decision Support Tool."); (Doc. 50-3 at 2) (same).

[24] (Doc. 57 at 15 n. 9) (the SSA "inform[s] subsequent ESA determinations"); *see, e.g.*, Ex. A (FWS19108) ("Please see the SSA report for a detailed summary of the best available scientific information regarding avoidance distances and effects of oil and gas development on lesser prairie-chicken habitat use"), Ex. A (FWS19109) ("Please see the SSA report for a detailed review of the best available scientific information regarding the potential effects of wind energy development on habitat use by the lesser prairie-chicken"), Ex. A (FWS19131) ("Our SSA is based on the best available science."), Ex. A (FWS19132) ("Throughout the SSA process, the Service worked with the States and other partners to compile and evaluate the best available data to inform our decision with regard to the status of the lesser prairie-chicken.").

8

of the Final Listing Decision is inaccurate and inconsistent with the Service's other actions—and amounts to agency smurfing.[25]

### E.   The WAFWA e-mails provided new data that the Service considered, but disregarded.

The Service acknowledges it received emails from WAFWA at least a month before it made its listing decision.  (Doc. 57 at 5-6).  These emails are necessary to tell the "complete story" of the Service's decision making process.[26]  In these emails, WAFWA informed the Service it had published new genetic and genomic data for the lesser prairie chicken on a government run database available to the public.  (Doc. 50-9 at 2).  Genetic and genomic data are critical to analyzing distinct population segments and the species' overall status.[27]

The Service claims it omitted these emails from the Record because the emails provided nothing to consider—only notice that a new research paper was being drafted.  (Doc. 57 at 5-6). But this argument fails for two reasons.  First, while WAFWA acknowledged a research paper was being developed, it directed the Service to a government run database hosting new publicly available data.  (Doc. 50-9 at 2).  The data included over ten years of genetic samples from lesser prairie chickens in New Mexico, Texas, Oklahoma, and Kansas.  *Id.*  The Service said it forwarded this information on to its experts—yet none of it appeared in the Final Rule or SSA.  *Id.* at 1.

Second, the Service solicited and considered other unpublished research papers during the SSA phase.[28]  So why not this time?

---

[25] *See* (Doc. 50 at 7, 8, n. 18) (citing *See Tex. v. United States Dep't of Health & Human Services,* No. MO:23-CV-00022-DC, 2023 WL 4629168, at *1 (W.D. Tex. July 12, 2023)).

[26] *See* U.S. FISH & WILDLIFE SERVICE, *Compiling a Decision File and an Administrative Record*, at 5.4.A(s) (Mar. 2, 2007), available at https://www.fws.gov/policy-library/282fw5.

[27] *E.g.*, Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("DPS Policy"), 61 Fed. Reg. 4722-01 (Feb. 7, 1996).

[28] *E.g.*, Ex. B (FWS00515-FWS00516) (considering an unpublished draft paper and advising to "download" and "add" the underlying data to the Service's records); Ex. C (FWS09517) (soliciting "Summaries of any ongoing research you are conducting (including schedule for potential completion and publication) which you would be willing to share.").

The WAFWA emails are relevant—if not necessary—to tell the complete story of the decision making process. And a critical part of that story is whether and why the Service improperly ignored information provided to it.

**CONCLUSION & PRAYER**

Based on the these reasons, the Court should grant the Industry Plaintiffs Motion and order the Record be completed and supplemented.  Industry Plaintiffs also request that the Court grant them all other relief to which they may be entitled.

Respectfully submitted,

_____/s/ Jeff Kuhnhenn_____
Jeff Kuhnhenn
Texas Bar No. 24078809
jeff.kuhnhenn@kellyhart.com
Derek Montgomery
Texas Bar No. 24042264
derek.montgomery@kellyhart.com
**KELLY HART & HALLMAN LLP**
P.O. Box 3580
Midland, Texas 79701
Telephone:  (432) 683-4691
Facsimile:  (432) 683-6518

Marianne Auld
Texas Bar No. 01429910
marianne.auld@kellyhart.com
**KELLY HART & HALLMAN LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:  (817) 878-3543
Fax:  (817) 878-9280

**ATTORNEYS FOR INDUSTRY PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Texas by using the CM/ECF system, which will send notification of this filing to the attorneys of record.

_____/s/ Jeff Kuhnhenn_____